# EXHIBIT A

**URBAN AIR TRAMPOLINE PARK**[TM]
**FRANCHISE AGREEMENT**

**Agreement # _____**

# URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
## FRANCHISE AGREEMENT

### SUMMARY PAGES

**EFFECTIVE DATE:**

**EXPIRATION DATE:**

**FRANCHISEE(S):**

**ADDRESS FOR NOTICES:**


**TELEPHONE NUMBER:**

**FACSIMILE NUMBER:**

**E-MAIL ADDRESS:**

**FRANCHISOR:**               UATP MANAGEMENT, LLC

**ADDRESS FOR NOTICE:**       317 South Jenkins, Suite C, Grapevine, Texas 76051

**SITE SELECTION AREA:**

**INITIAL FRANCHISE FEE:**    $30,000

**ADMINISTRATIVE FEE:**       Pro-rata portion of call centers hourly rate plus a $5.00 commission

**GRAND OPENING
ADVERTISING AMOUNT:**         $15,000.00

**MONTHLY ROYALTY FEE:**      6% of weekly Gross Sales

**MONTHLY DEVELOPMENT
FUND CONTRIBUTION:**          1% of weekly Gross Sales

**TRANSFER FEE:**             50% of our then-current initial franchise fee if transferred to a new
                              approved franchisee or 25% of our then-current initial franchise fee if
                              transferred to an approved existing franchisee; plus reimbursement of
                              legal and professional fees and cost incurred by Franchisor in connection
                              with the transfer

**RENEWAL FEE:**              $3,000 plus reimbursement of legal and professional fees and cost
                              incurred by Franchisor in connection with the renewal (option of three 5
                              year renewals)

**OPENING DATE:**             Three months after the lease is signed

_____                              _____
Franchisor Initial                                   Franchisee Initial

URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
FRANCHISE AGREEMENT

**TABLE OF CONTENTS**

1.    GRANT OF FRANCHISE .................................................................................... 1
      A.  **Grant.** ........................................................................................................ 1
      B.  **Protected Area.** ........................................................................................ 2

2.    TERM .................................................................................................................. 2
      A.  **Initial Term.** ............................................................................................ 2
      B.  **Successor Term.** ...................................................................................... 2

3.    DEVELOPMENT PROCEDURES ...................................................................... 3
      A.  **Site Selection.** ......................................................................................... 3
      B.  **Franchise Site Application.** .................................................................... 3
      C.  **Lease Terms.** ........................................................................................... 4
      D.  **Relocation.** .............................................................................................. 4

4.    DRAWINGS, CONSTRUCTION, AND RENOVATION ................................... 5
      A.  **Specifications and Drawings.** ................................................................ 5
      B.  **Commencement and Completion of Construction and Build Out.** ....... 5
      C.  **Acquisition of Necessary Furnishings, Fixtures and Equipment.** ........ 5
      D.  **Inspection, Cooperation.** ....................................................................... 6
      E.  **Final Inspection.** .................................................................................... 6

5.    OPENING ............................................................................................................ 6

6.    FEES ................................................................................................................... 7
      A.  **Initial Franchise Fee.** ............................................................................. 7
      B.  **Royalty Fee.** ............................................................................................ 7
      C.  **Development Fund Contribution.** .......................................................... 7
      D.  **Administrative Fee.** ................................................................................ 7
      E.  **Payment of Fees.** .................................................................................... 7
      F.  **Interest; Non-Sufficient Funds Charge.** ................................................ 8
      G.  **Partial Payments.** ................................................................................... 8
      H.  **Collection Costs and Expenses.** ............................................................ 8

7.    RECORDKEEPING AND REPORTS ................................................................. 8
      A.  **Recordkeeping.** ....................................................................................... 8
      B.  **Periodic Reports.** ................................................................................... 9
      C.  **Annual Reports.** ..................................................................................... 9
      D.  **Other Reports.** ........................................................................................ 9
      E.  **Audit Rights.** .......................................................................................... 9
      F.  **Accounting Practices.** ............................................................................ 9

8.    TRAINING AND ASSISTANCE ........................................................................ 9
      A.  **Training.** ................................................................................................. 9

|  | **B.** | **Pre-Opening Assistance.** | 10 |
|  | **C.** | **Ongoing Assistance.** | 10 |
|  | **D.** | **Conferences.** | 11 |
| 9. | | MANUAL | 11 |
| 10. | | MODIFICATIONS OF THE SYSTEM | 11 |
| 11. | | PERFORMANCE REQUIREMENTS | 12 |
|  | **A.** | **Best Efforts.** | 12 |
|  | **B.** | **Standards, Specifications and Procedures.** | 12 |
|  | **C.** | **Approved Suppliers and Distributors.** | 13 |
|  | **D.** | **Authorized Products and Services.** | 14 |
|  | **E.** | **Computer Systems and Intranet/Extranet Systems.** | 14 |
|  | **F.** | **Non-Cash Payment Systems.** | 15 |
|  | **G.** | **Franchisor Inspections.** | 15 |
|  | **H.** | **Upkeep of the Store.** | 16 |
|  | **I.** | **Store Operations.** | 16 |
|  | **J.** | **Management and Personnel.** | 16 |
|  | **K.** | **Designated Manager.** | 16 |
|  | **L.** | **Signs and Logos.** | 16 |
|  | **M.** | **Entertainment Equipment.** | 17 |
|  | **N.** | **Compliance with Laws and Good Business Practices.** | 17 |
|  | **O.** | **Payment of Taxes and Other Indebtedness.** | 17 |
| 12. | | ORGANIZATION OF THE FRANCHISEE | 17 |
|  | **A.** | **Representations.** | 17 |
|  | **B.** | **Governing Documents.** | 18 |
|  | **C.** | **Ownership Interests.** | 18 |
|  | **D.** | **Restrictive Legend.** | 18 |
|  | **E.** | **Guarantees.** | 18 |
| 13. | | PROPRIETARY MARKS AND COPYRIGHTED WORKS | 18 |
|  | **A.** | **Acknowledgments.** | 18 |
|  | **B.** | **Modification of the Proprietary Marks and Copyrighted Works.** | 19 |
|  | **C.** | **Use of the Proprietary Marks and Copyrighted Works.** | 19 |
|  | **D.** | **Internet and Social Media Usage.** | 19 |
|  | **E.** | **Assignment of Rights.** | 19 |
|  | **F.** | **Infringement; Notice of Claims.** | 20 |
|  | **G.** | **Remedies and Enforcement.** | 20 |
| 14. | | CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS | 20 |
|  | **A.** | **Confidential Information.** | 20 |
|  | **B.** | **Covenants of the Franchisee.** | 21 |
|  | **C.** | **Covenants of the Franchisee's Owners.** | 21 |
|  | **D.** | **Reformation and Reduction of Scope of Covenants.** | 22 |

|       | E. | Acknowledgments. | 23 |
|       | F. | No Undue Hardship. | 23 |
|       | G. | Injunctive Relief. | 23 |
| 15.   |    | BRAND DEVELOPMENT; MARKETING | 23 |
|       | A. | General Requirements. | 23 |
|       | B. | Grand Opening Advertising. | 23 |
|       | C. | Development Fund. | 23 |
|       | D. | Advertising Cooperatives. | 24 |
|       | E. | Restriction Against Internet Advertising. | 25 |
|       | F. | Loyalty Programs, Prize Promotions, and Promotional Literature | 25 |
| 16.   |    | INSURANCE | 25 |
|       | A. | Obligation to Maintain Insurance. | 25 |
|       | B. | Minimum Insurance Coverage. | 25 |
|       | C. | Insurance Policy Requirements. | 26 |
|       | D. | Delivery of Certificate. | 26 |
|       | E. | Minimum Insurance Requirements Not a Representation of Adequacy. | 26 |
|       | F. | Franchisor's Right to Procure Insurance. | 27 |
| 17.   |    | TRANSFER | 27 |
|       | A. | Transfer by Franchisor. | 27 |
|       | B. | Transfer by Franchisee. | 27 |
|       | C. | Security Interest. | 28 |
|       | D. | Public and Private Offerings. | 28 |
|       | E. | Right of First Refusal. | 28 |
|       | F. | Transfer Upon Death or Mental Incapacity. | 29 |
|       | G. | Non-Waiver of Claims. | 29 |
| 18.   |    | DEFAULT AND TERMINATION | 29 |
|       | A. | Automatic Termination. | 29 |
|       | B. | Termination without Opportunity to Cure. | 29 |
|       | C. | Termination with Opportunity to Cure. | 30 |
|       | D. | Other Remedies. | 30 |
|       | E. | Step-In Rights. | 30 |
| 19.   |    | OBLIGATIONS UPON EXPIRATION OR TERMINATION | 31 |
|       | A. | Expiration or Termination of Franchise. | 31 |
|       | B. | Franchisor's Option to Assume Lease and Purchase Assets. | 31 |
|       | C. | Compliance with Post Term Obligations. | 33 |
| 20.   |    | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 33 |
|       | A. | Independent Contractor. | 33 |
|       | B. | Indemnification. | 33 |
| 21.   |    | NOTICES | 35 |
| 22.   |    | SEVERABILITY AND CONSTRUCTION | 35 |

|  |  |  |  |
|---|---|---|---|
|  | A. | **Entire Agreement.** | 35 |
|  | B. | **Modification.** | 35 |
|  | C. | **Written Consent.** | 36 |
|  | D. | **No Waiver.** | 36 |
|  | E. | **Severability.** | 36 |
|  | F. | **Captions and Headings; References to Gender; Counterparts.** | 36 |
|  | G. | **Persons Bound.** | 36 |
|  | H. | **Franchisor's Judgment.** | 36 |
| 23. |  | GOVERNING LAW AND FORUM SELECTION | 37 |
|  | A. | **Governing Law.** | 37 |
|  | B. | **Jurisdiction and Venue.** | 37 |
|  | C. | **Remedy.** | 37 |
|  | D. | **Waiver of Jury Trial.** | 37 |
|  | E. | **Contractual Limitations Period.** | 37 |
|  | F. | **Waiver of Punitive Damages.** | 37 |
|  | G. | **Attorneys' Fees.** | 38 |
| 24. |  | ACKNOWLEDGMENTS | 38 |
|  | A. | **Receipt of Disclosure Document.** | 38 |
|  | B. | **Receipt of Agreement.** | 38 |
|  | C. | **Independent Investigation.** | 38 |
|  | D. | **No Representations; No Reliance.** | 38 |
|  | E. | **No Financial Performance Representations; No Reliance.** | 39 |
|  | F. | **No Licensure Representations; No Reliance.** | 39 |
|  | G. | **Reasonable Restrictions.** | 39 |

**ATTACHMENTS**

| | |
|---|---|
| <u>Attachment A</u> | Glossary of Additional Terms |
| <u>Attachment B</u> | Approved Location and Protected Territory |
| <u>Attachment C</u> | Franchisee's Owners and Key Personnel |
| <u>Attachment D-1</u> | Undertaking and Guaranty |
| <u>Attachment D-2</u> | Confidentiality and Non-competition Agreement |
| <u>Attachment E</u> | Electronic Debit Authorization |
| <u>Attachment F</u> | Telephone Assignment Agreement |
| <u>Attachment G</u> | Lease Rider |

# URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
## FRANCHISE AGREEMENT

This FRANCHISE AGREEMENT ("Agreement") is made and entered into on the Effective Date reflected in the Summary Pages ("Effective Date"), by and between UATP MANAGEMENT, LLC, a Texas limited liability company, with its principal office in Southlake, Texas ("we" or "Franchisor") and the Franchisee identified on the Summary Page ("you" or "Franchisee").

## BACKGROUND

A.      Franchisor and its Affiliates have, as the result of the expenditure of time, skill, effort, and money, developed a distinctive business system relating to the development, establishment, and operation of indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities (each a "Store") under the name URBAN AIR TRAMPOLINE PARK<sup>TM</sup> ("Brand"), which are based on the Proprietary Products, Proprietary Marks, Indicia, and Standards ("System").

B.      The distinguishing characteristics of the System include, without limitation, the services, products, and merchandise, which incorporate Franchisor's Proprietary Marks, trade secrets, and proprietary information ("Proprietary Products"); distinctive exterior and interior design, decor, color scheme, graphics, fixtures, and furnishings ("Indicia"); standards and specifications for products and supplies; service standards; uniform standards, specifications, and procedures for operations; procedures for inventory and management control; training and assistance; and advertising and promotional programs ("Standards"); all of which may be changed, improved, and further developed by Franchisor from time to time.

C.      The System is identified and recognized by means of certain trade names, service marks, trademarks, logos, emblems, and indicia of origin, including, but not limited, to the word mark "URBAN AIR TRAMPOLINE PARK" and the list of marks set forth in <u>Attachment A</u> to this Agreement, and such other trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may hereafter designate in writing for use in connection with the System ("Proprietary Marks"). Franchisor obtained from its Affiliate, UATP Management, LLC, the right to use and license others to use the Proprietary Products, Proprietary Marks, Indicia, Standards, and the System.

D.      Franchisor and its Affiliates continue to develop, establish, use, and control the use of the Proprietary Products, Proprietary Marks, Indicia, Standards, and System in order to identify for the public the source of services and products marketed under this Agreement and under the System, and to represent the System's high standards of quality, appearance, and service.

E.      You have applied for the right to operate a Store using the System and the Proprietary Products, Proprietary Marks, Indicia, and Standards ("Franchised Business"), and Franchisor has approved your application in reliance on the representations contained therein, including those concerning your financial resources, your business experience and interests, and the manner in which the Store will be owned and operated.

## AGREEMENT

IN CONSIDERATION OF the mutual promises contained in this Agreement, including the recitals set forth above, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

**1.      GRANT OF FRANCHISE**

**A.      Grant.**

Subject to the provisions of this Agreement, Franchisor hereby grants you the exclusive right ("Franchise") to continuously operate a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Store at the Approved Location identified (or to be identified) in <u>Attachment B</u> to this Agreement and to use the Proprietary Marks in the operation and promotion of the Franchised Business. You hereby undertake the obligation and agree to continually operate the Franchised Business during the term hereof and strictly according to the terms and conditions of this Agreement.

**B.**   **Protected Area.**

During the initial term and all successor terms, and provided that you are in full compliance with this Agreement and all other agreements between you and Franchisor, Franchisor shall neither operate nor grant others the right to operate another URBAN AIR TRAMPOLINE PARK™ Store in the Protected Area.

Franchisor retains for itself and/or its Affiliates all other rights in and to the Proprietary Products, Proprietary Marks, Indicia, and System including, without limitation: (a) the right to own and operate and to grant others the right to own and operate Stores at any location outside the Protected Area, regardless of proximity to the Protected Area; and (b) the right to distribute any and all products and services and/or their components identified by the Proprietary Marks, including those used or sold in your Franchised Business, including, without limitation, proprietary merchandise (such as shirts, hats, jackets, etc.) and pre-packaged products, through alternative channels of distribution, including, without limitation, mail order, catalog sales, the Internet, World Wide Web or any other form of electronic commerce, or any other channel of distribution whatsoever except a Store, whether or not such sales occur within your Protected Area; you are not entitled to compensation for any such sales made in your Protected Area.  Franchisor also may offer, grant and support franchises under any name other than URBAN AIR TRAMPOLINE PARK™, whether or not in the same, similar, or different line of business as your Franchised Business.

Nothing in this Agreement prohibits or restricts Franchisor or its Affiliates from owning, acquiring, establishing, operating, or granting franchise rights for (a) one or more other businesses at any location outside of the Protected Area under a different trademark or service mark (i.e., a mark other than URBAN AIR TRAMPOLINE PARK), whether or not the business is the same as, similar to, or competitive with the Stores; or (b) one or more indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities under the name URBAN AIR TRAMPOLINE PARK™ or some derivative of the Proprietary Marks at any location outside of the Protected Area.

**2.**   **TERM**

**A.**   **Initial Term.**

The initial term of this Agreement ("Initial Term") shall begin on the Effective Date and shall expire at midnight on the (ten years) Expiration Date, unless this Agreement is terminated at an earlier date pursuant to Section 18 of this Agreement.

**B.**   **Successor Term.**

At the expiration of the Initial Term, you will have an option to remain a franchisee at the Approved Location for up to three additional, five-year successor terms.  You must give Franchisor written notice of whether or not you intend to exercise your successor term option no less than eight months, nor more than 12 months, before expiration of the then-current term.  Failure to timely provide the required written notice constitutes a waiver of your option to remain a franchisee beyond the expiration of the then-current term.  If you desire to exercise this option, you must comply with all of the following conditions prior to and at the end of the then-current term:

(1)   You may not be in default under this Agreement or any other agreement between you and Franchisor or its Affiliates; you may not be in default beyond the applicable cure period of any real estate lease, equipment lease or financing instrument relating to the Franchised Business or Store; you may not be in default beyond the applicable cure period with any vendor or supplier to the Franchised Business or Store; and, for the 12 months before the date of your notice and the 12 months before the expiration of the then-current term, you may not have been in default beyond the applicable cure period under this Agreement or any other agreements between you and Franchisor or its Affiliates;

(2)   If reasonably deemed necessary by Franchisor, you must renovate and upgrade the Store premises and all fixtures, furniture, equipment, signage and graphics, at your expense, to reflect the then-current image of a URBAN AIR TRAMPOLINE PARK™ Store, which renovations may include structural changes, remodeling, redecoration, and modifications to existing improvements;

(3)     You and your employees must be in compliance with Franchisor's then-current training requirements;

(4)     You must have the right to remain in possession of the Store premises, or have secured other premises acceptable to Franchisor, for the renewal term and all monetary obligations owed to your landlord, if any, must be current;

(5)     You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective past and present officers, directors, shareholders, agents, and employees, in their corporate and individual capacity, including, without limitation, claims arising under federal, state, or local laws, rules, or ordinances, and claims arising out of, or relating to, this Agreement, any other agreements between you and Franchisor or its Affiliates and your operation of the Franchised Business and Store and the offer and grant of the URBAN AIR TRAMPOLINE PARK<sup>TM</sup> franchise opportunity; and

(6)     As determined by Franchisor in its sole discretion, you have operated the Franchised Business and the Store in accordance with this Agreement and with the System (as set forth in the Manual or otherwise and as revised from time to time by Franchisor) and that you have operated any other URBAN AIR TRAMPOLINE PARK<sup>TM</sup> franchises in which you have an interest in accordance with the applicable franchise agreement.

Within four months after Franchisor's receipt of written notice of your desire for a successor term, Franchisor shall advise you whether or not you are entitled to remain a franchisee for the successor term. If Franchisor intends to permit you to remain a franchisee for the successor term, the notice will contain preliminary information regarding the required renovations and modernizations described in Subsection 2.B(2), above. If Franchisor does not intend to permit you to remain a franchisee for the successor term, the notice shall specify the reasons for non-renewal. If Franchisor chooses not to permit you to remain a franchisee for the successor term, it shall have the right to unilaterally extend the then-current term of this Agreement as necessary to comply with applicable laws.

If you are granted successor term rights, Franchisor will deliver to you for execution a new franchise agreement at least one month prior to the expiration of the then-current term. The form of successor agreement shall be the form then in general use by Franchisor for new URBAN AIR TRAMPOLINE PARK<sup>TM</sup> franchises (or, if Franchisor is not then granting franchises, then the form of agreement as specified by Franchisor), which may differ from this Agreement and may reflect, among other things, a different royalty fee, development fund fee, and marketing obligations. Your Protected Area under the successor agreement will be the same as under this Agreement, and Franchisor will waive any initial franchise fee imposed under the successor agreement, but you must pay Franchisor the Renewal Fee set forth in the Summary Pages.

You must execute the franchise agreement for the successor term and return the signed agreement and payment of the Renewal Fee to Franchisor prior to expiration of the then-current term. Failure to sign the franchise agreement, pay the Renewal Fee, and to return them to Franchisor within this time shall be deemed a waiver of your successor term option and result in termination of this Agreement and the franchise granted by this Agreement at the expiration of the then-current term. If you have timely complied with all of the conditions set forth in this Section 2, Franchisor shall execute the successor term franchise agreement and promptly return a fully executed copy to you.

## 3.     DEVELOPMENT PROCEDURES

### A.     Site Selection.

You must acquire an acceptable site for the Store (by purchase or lease) within three months after the Effective Date of this Agreement. The site must be located within the Site Selection Area identified in the Summary Page, must meet Franchisor's site selection Standards, and must be approved by Franchisor.

### B.     Franchise Site Application.

For each proposed site that you identify, you must submit to Franchisor a Franchise Site Application including such information about the site as Franchisor may reasonably request to perform its evaluation. This

information may include, among other things, a description of the proposed site, demographic characteristics, traffic patterns, parking, character of the neighborhood, competition from other businesses in the area, the proximity to other businesses, the nature of other businesses in proximity to the site, and other commercial characteristics (including the purchase price, rental obligations and other lease terms for the proposed site) and the size, appearance, other physical characteristics and a site plan of the premises.

To assist you with identifying and evaluating proposed sites for the Store, Franchisor will make available to you its then-current site evaluation software.  There is no charge to you for the first site you propose for the Store, but Franchisor may charge you its then-current Site Evaluation Fee for each additional proposed site, as published in the Manual from time to time.

Franchisor will approve or refuse to approve a proposed site within 14 days after the receipt of these documents and any additional information as Franchisor may reasonably require.  Franchisor's failure to provide notification within this time period shall not be considered either approval or disapproval.  To the extent that Franchisor provides onsite evaluations, you must reimburse Franchisor for any out of pocket costs that it incurs in connection with performing the evaluation, such as travel, lodging, and dining expenses for each individual performing the evaluation.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF YOUR PROPOSED SITE DOES NOT AND WILL NOT CONSTITUTE, DIRECTLY OR IMPLICITLY, AN ASSURANCE THAT THE STORE WILL ACHIEVE A CERTAIN SALES VOLUME OR LEVEL OF PROFITABILITY; IT MEANS ONLY THAT THE PROPOSED SITE MEETS FRANCHISOR'S <u>MINIMUM</u> CRITERIA.  FRANCHISOR ASSUMES NO LIABILITY OR RESPONSIBILITY FOR: (1) EVALUATION OF THE STORE LOCATION'S SOIL FOR HAZARDOUS SUBSTANCES; (2) INSPECTION OF ANY STRUCTURE ON THE STORE LOCATION FOR ASBESTOS OR OTHER TOXIC OR HAZARDOUS MATERIALS; (3) COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT ("ADA"); OR (4) COMPLIANCE WITH ANY OTHER APPLICABLE LAW.  IT IS YOUR SOLE RESPONSIBILITY TO OBTAIN SATISFACTORY EVIDENCE AND/OR ASSURANCES THAT THE STORE LOCATION (AND ANY STRUCTURES THEREON) IS FREE FROM ENVIRONMENTAL CONTAMINATION AND IS IN COMPLIANCE WITH THE REQUIREMENTS OF THE ADA AND OTHER APPLICABLE LAWS.**

C.    **Lease Terms.**

Franchisor must approve the Lease for the Store premises before you sign it.  Franchisor will not withhold approval arbitrarily, but may condition its approval on the lease containing any or all of the terms set forth in the Lease Rider attached hereto as <u>Attachment G</u>.  You shall provide to Franchisor a fully executed copy of the lease within 10 days after its execution.

**THE PARTIES ACKNOWLEDGE AND AGREE THAT FRANCHISOR'S APPROVAL OF A LEASE DOES NOT MEAN THAT THE ECONOMIC TERMS OF THE LEASE ARE FAVORABLE; IT MEANS ONLY THAT THE LEASE CONTAINS THE LEASE TERMS THAT FRANCHISOR REQUIRES.**

D.    **Relocation.**

You may relocate the Store within the Protected Area, only with Franchisor's prior written consent. Franchisor will grant its consent if your lease expires or terminates through no fault of yours, or if the Store premises is destroyed or materially damaged by fire, flood, or other natural catastrophe (an "Innocent Loss or Casualty") and you are not in default of this Agreement or any other agreement between you and Franchisor. Selection of the relocation site and Store construction, renovation, and opening shall be governed by <u>Sections 3, 4, and 5</u> of this Agreement; provided that: (i) if the relocation occurred as a result of the loss of an Innocent Loss or Casualty, the Store must be open for business at the new location within 180 days of closing at the previous location; and (ii) if the relocation occurred for any other reason, the Store must be open for business at the new location within thirty days of closing at the previous location. You are solely responsible for all relocation costs and expenses, including your payment of Franchisor's then-current Relocation Fee, as

published in the Manual from time to time.

4.      **DRAWINGS, CONSTRUCTION, AND RENOVATION**

A.      **Specifications and Drawings.**

You assume all cost, liability, and expense for developing, constructing, and equipping the Store. Franchisor will furnish to you sample drawings and specifications for a URBAN AIR TRAMPOLINE PARK$^{TM}$ Store, including requirements for dimensions, design, image, interior layout, décor, fixtures, equipment, signs, furnishings, storefront, signage, graphics, and color schemes. It is your responsibility to have prepared all required construction plans and specifications to suit the shape and dimensions of the Store, and you must ensure that these plans and specifications comply with applicable ordinances, building codes, and permit requirements, and with lease requirements and restrictions. You shall use only registered architects, registered engineers, and professional and licensed contractors, all or some of which Franchisor may specifically designate or approve from time to time in the Manual.

You shall submit proposed construction plans, specifications, and drawings for the Store ("Plans") to Franchisor and shall, upon Franchisor's request, submit all revised or "as built" Plans during the course of such construction. Franchisor will approve or refuse to approve the Plans and notify you within 30 days after receiving the Plans. Once Franchisor has approved the Plans, the Plans shall not be substantially changed without Franchisor's prior written approval, which shall not unreasonably be withheld. Franchisor shall approve or disapprove Plan changes within 10 business days after receipt.

You may not begin site preparation or construction before Franchisor has approved the Plans. All construction must be in accordance with Plans approved by Franchisor and must comply in all respects with the Standards and with applicable laws, ordinances, local rules, and regulations.

B.      **Commencement and Completion of Construction and Build Out.**

Construction shall be performed or supervised by a general contractor or construction manager of your choice, subject to the requirements of 4.A, above. Once construction has commenced, it shall continue uninterrupted (except for interruption by reason of events constituting Force Majeure) until completed. "Force Majeure" means any act of God, strike, lock-out, or other industrial disturbance, war (declared or undeclared), riot, epidemic, fire, or other catastrophe, act of any government or other third party, and any other cause not within the control of the party affected thereby. If events constituting Force Majeure cause a delay in the commencement of the construction or build out of the Store, Franchisor shall proportionately extend the Opening Date for the Store. Notwithstanding the occurrence of any events, except events constituting Force Majeure, construction shall be completed and the Store shall be furnished, equipped and shall otherwise be ready to open for business in accordance with this Agreement no later than the Opening Date specified in the Summary Page ("Opening Date").

You agree, at your sole expense, to do or cause to be done the following, by the Opening Date:

(1)     Obtain and maintain all required building, utility, sign, health, sanitation, business, and other permits and licenses applicable to the Franchised Business;

(2)     Make all required improvements to the Store location and decorate the exterior and interior of the Store in compliance with the Plans approved by Franchisor;

(3)     Purchase or lease and install all specified and required fixtures, equipment, furnishings, and interior and exterior signs required for the Store ; and

(4)     Purchase an opening inventory for the Store of only authorized and approved products and other materials and supplies.

C.      **Acquisition of Necessary Furnishings, Fixtures and Equipment.**

You agree to use in the development and operation of the Store only the fixtures, furnishings, equipment, signs, and items of décor that Franchisor has approved as meeting its specifications and Standards for quality, design, appearance, function, and performance. You further agree to place or display at the Store

location (interior and exterior) only those signs, emblems, lettering, logos, and display materials that Franchisor has approved in writing from time to time.

You shall purchase or lease approved brands, types, or models of fixtures, furnishings, equipment, and signs only from suppliers designated or approved by Franchisor.  If you propose to purchase, lease or otherwise use any fixtures, furnishings, equipment, signs, or items of décor which have not been approved by Franchisor, you shall first notify Franchisor in writing and shall, at your sole expense, submit to Franchisor upon its request sufficient specifications, photographs, drawings, and/or other information or samples for a determination as to whether those fixtures, furnishings, equipment, and/or signs comply with Franchisor's specifications and Standards. Franchisor will, in its sole discretion, approve or disapprove the items and notify you within 30 days after Franchisor receives the request.

**D.** **Inspection, Cooperation.**

During the course of construction and/or renovation, you shall (and shall cause your architect, engineer, contractors, and subcontractors to) cooperate fully with Franchisor and its designees for the purpose of permitting Franchisor and its designees to inspect the Store location and the course of construction or renovation in order to determine whether construction or renovation is proceeding according to the Plans.

**E.** **Final Inspection.**

You shall notify Franchisor in writing at least 10 days prior to the date you expect construction and/or renovation to be completed and a certificate of occupancy to be issued.  Upon Franchisor's request, you shall submit a copy of the certificate of occupancy to Franchisor.  Franchisor reserves the right, after receiving your notice, to conduct a final inspection of the Store and its premises to determine your compliance with this Agreement.  You shall not open the Store for business unless you have satisfied the conditions set forth in Section 5, below.

**5.** **OPENING**

Franchisor will authorize the opening of the Store only after all of the following conditions have been met:

(1)   You are not in material default under this Agreement or any other agreements with Franchisor; you are not in default beyond the applicable cure period under any real estate lease, equipment lease, or financing instrument relating to the Store; and you are not in default beyond the applicable cure period with any vendor or supplier of the Store;

(2)   You are current on all obligations due to Franchisor;

(3)   Franchisor is satisfied that the Store was constructed and/or renovated substantially in accordance with approved Plans and with applicable federal, state, and local laws, regulations, and codes;

(4)   If the Store location is leased, Franchisor has received a copy of the approved and fully executed lease;

(5)   You have obtained a certificate of occupancy and any other required health, safety, or fire department certificates;

(6)   You have certified to Franchisor in writing that the installation of all items of furnishings, fixtures, equipment, signs, computer terminals, and related equipment, supplies, and other items has been accomplished;

(7)   Your Designated Manager has attended and successfully completed Franchisor's initial training program and your personnel have obtained all required safety training and certifications;

(8)   Franchisor has determined that the Store has been constructed and/or renovated and equipped substantially in accordance with the requirements of this Agreement and that you have hired and trained personnel in accordance with the requirements of this Agreement; and

(9)   Franchisor has been furnished copies of all insurance policies required by Section 16 of this

Agreement, and all such insurance is in full force and effect.

**6.**   **FEES**

**A.**   **Initial Franchise Fee.**

Upon execution of this Agreement, you shall pay Franchisor an Initial Franchise Fee in the amount specified in the Summary Page.  The parties acknowledge and agree that the Initial Franchise Fee is fully earned by Franchisor when paid and is not refundable.

**B.**   **Royalty Fee.**

You shall pay to Franchisor a nonrefundable and continuing Royalty Fee in the amount specified in the Summary Page for the right to use the System and the Proprietary Marks at the Store location and in connection with the Franchised Business.  If any taxes, fees, or assessments are imposed on Royalty Fee payments by reason of Franchisor's acting as franchisor or licensing the Proprietary Marks under this Agreement, you shall reimburse Franchisor the amount of those taxes, fees, or assessments within 30 days after receive of an invoice from Franchisor.

**C.**   **Development Fund Contribution.**

You shall contribute to the Development Fund in the amount specified in the Summary Pages, which notwithstanding the Franchise Disclosure, shall not adjust annually and you shall participate in any Advertising Cooperative formed for the region in which the Store operates as described in <u>Section 15</u> of this Agreement.

**D.**   **Administrative Fee.**

You shall pay to Franchisor an administrative fee in the amount specified on the Summary Page for each party or event scheduled at your location by the Franchisor's national call center.

**E.**   **Payment of Fees.**

You must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.  All Royalty Fees, Development Fund Contributions, and other amounts owed under this Agreement, including advertising contributions and interest charges, are payable monthly and must be received by Franchisor or credited to Franchisor's account by pre-authorized bank debit before 5:00 p.m. on the date such payment is due, as specified in the Manuals (the "Due Date").  On each Due Date, Franchisor will transfer from your commercial bank operating account ("Account") the amount reported to Franchisor by you or as determined by Franchisor by the records contained in the cash registers/computer terminals of the Store.  If you have not reported to Franchisor Gross Sales for any reporting period, Franchisor will transfer from the Account an amount calculated in accordance with its estimate of the Store's Gross Sales during the reporting period which estimate may be based on, among other things, historical financial performance of the Store and/or current and historical performance of other Franchisor.  If, at any time, Franchisor determines that you have underreported Gross Sales or underpaid the Royalty Fee, Development Fund Contributions, or other amounts due to Franchisor under this Agreement, or any other agreement, Franchisor shall initiate an immediate transfer from the Account in the appropriate amount in accordance with the foregoing procedure, including interest as provided in this Agreement.  Any overpayment will be credited against future Royalty Fees and other payments due under this Agreement.

In connection with the payment by electronic funds transfer, you shall: (1) comply with procedures specified by Franchisor in the Manual or otherwise in writing; (2) perform those acts and sign and deliver those documents as may be necessary to accomplish payment by electronic funds transfer as described in this <u>Section 6.D</u>; (3) give Franchisor an authorization in the form designated by Franchisor to initiate debit entries and/or credit correction entries to the Account for payments of the Royalty Fee, Development Fund Contributions, and other amounts payable under this Agreement, including any interest charges; and (4) make sufficient funds available in the Account for withdrawal by electronic funds transfer no later than the Due Date for payment thereof.

Notwithstanding the provisions of this <u>Section 6.D</u>, Franchisor reserves the right to modify, at its

option, the method by which you pay the Royalty Fee and other amounts owed under this Agreement, including Development Fund contributions and interest charges, upon receipt of written notice by Franchisor.

Your failure to have sufficient funds in the Account shall constitute a default of this Agreement pursuant to Section 18. You shall not be entitled to set off, deduct, or otherwise withhold any Royalty Fees, Development Fund Contributions, advertising contributions, interest charges, or other monies payable to Franchisor under this Agreement on grounds of any alleged nonperformance by Franchisor of any of its obligations or for any other reason.

**F.     Interest; Non-Sufficient Funds Charge.**

Any payments not received by the Due Date will accrue interest at the rate of 18% per annum or the highest lawful interest rate permitted by the jurisdiction in which the Store operates, whichever is less. If any check, draft, electronic or otherwise, is returned for nonsufficient funds, you shall pay to Franchisor a nonsufficient funds charge in an amount determined by Franchisor, but not to exceed $100 per transaction or the maximum allowed by applicable law, and shall reimburse Franchisor for all expenses that it incurs on account of such nonsufficient funds.

**G.     Partial Payments.**

No payment by you or acceptance by Franchisor of any monies under this Agreement for a lesser amount than due shall be treated as anything other than a partial payment on account. Your payments of a lesser amount than due with an endorsement, statement, or accompanying letter to the effect that payment of the lesser amount constitutes full payment shall be given no effect and Franchisor may accept the partial payments without prejudice to any rights or remedies it may have against you. Acceptance of payments by Franchisor other than as set forth in this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement shall not constitute a waiver of Franchisor's right to demand payment in accordance with the requirements of this Agreement or a waiver by Franchisor of any other remedies or rights available to it pursuant to this Agreement or under applicable law. Notwithstanding any designation by you, Franchisor shall have the sole discretion to apply any payments by you to any of your past due indebtedness for Royalty Fees, advertising contributions, purchases from Franchisor or its Affiliates, interest or any other indebtedness. Franchisor has the right to accept payment from any other entity as payment by you. Acceptance of that payment by Franchisor will not result in that other entity being substituted as franchisee under this Agreement.

**H.     Collection Costs and Expenses.**

You agree to pay Franchisor on demand any and all costs and expenses incurred by Franchisor in enforcing the terms of this Agreement including, without limitation, collecting any monies that you owe to Franchisor. These costs and expenses include, without limitation, costs and commissions due a collection agency, reasonable attorneys' fees, costs incurred in creating or replicating reports demonstrating Gross Sales of the Store, court costs, expert witness fees, discovery costs, and reasonable attorneys' fees and costs on appeal, together with interest charges on all of the foregoing.

**7.     RECORDKEEPING AND REPORTS**

**A.     Recordkeeping.**

You agree to use computerized cash and data capture and retrieval systems that meet Franchisor's specifications and to record Store sales electronically or on tape for all sales at or from the Store premises. You shall keep and maintain, in accordance with any procedures set forth in the Manual, complete and accurate books and records pertaining to the Franchised Business in the format and using the accounting software that Franchisor requires. Your books and records shall be kept and maintained using generally accepted accounting principles ("GAAP"). You shall preserve all of your books, records, and state and federal tax returns for at least five years after the later of preparation or filing (or such longer period as may be required by any governmental entity) and make them available and provide duplicate copies to Franchisor within five days after Franchisor's written request.

**B.      Periodic Reports.**

At Franchisor's request, you shall, at your expense, submit to Franchisor in the form prescribed by Franchisor a monthly profit and loss statement and balance sheet (both of which may be unaudited).  Each statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered.

**C.      Annual Reports.**

You shall, at your expense, submit to Franchisor no later than April 15th of each year, in the form prescribed by Franchisor, an annual profit and loss statement and balance sheet reviewed by a certified public accountant.  The statement and balance sheet shall be signed by you, your treasurer, or chief financial officer attesting that it is true, correct, and complete, and uses accounting principles applied on a consistent basis which accurately and completely reflects the financial condition of the Franchised Business during the period covered.  Franchisor also shall have the right, in its reasonable discretion, to require that you, at your expense, submit financial statements that have been reviewed by a certified public accounting firm acceptable to Franchisor for any period or periods of a fiscal year.

**D.      Other Reports.**

You shall submit to Franchisor, for review or auditing, such other forms, reports, records, information, and data as Franchisor may reasonably designate, in the form and at times and places reasonably required by Franchisor, upon request and as specified from time to time in the Manual or otherwise in writing.  At Franchisor's request, you shall furnish to Franchisor a copy of all federal and state income tax returns reflecting revenue derived from the operation of the Franchised Business, and copies of all sales tax returns, filed with the appropriate taxing authorities.

**E.      Audit Rights.**

Franchisor or its designee shall have the right at all reasonable times, both during and after the term of this Agreement, to inspect, copy, and audit your books, records, and federal, state, and local tax returns, sales tax returns and such other forms, reports, information, and data as Franchisor reasonably may designate, applicable to the operation of the Franchised Business. If an inspection or audit discloses an understatement of Gross Sales, you shall pay Franchisor, within 10 days after receipt of the inspection or audit report, the deficiency in the Royalty Fees and advertising contributions plus interest (at the rate and on the terms provided in Section 6.E) from the date originally due until the date of payment.  If an inspection or audit is made necessary by your failure to furnish reports or supporting records as required under this Agreement, or to furnish such reports, records, or information on a timely basis, or if an understatement of Gross Sales for the period of any inspection or audit is determined to be greater than 2%, you also shall reimburse Franchisor for the reasonable cost of the inspection or audit including, without limitation, the charges of attorneys and independent accountants, and the travel expenses, room, board, and compensation of Franchisor's employees or designees involved in the inspection or audit.  These remedies shall be in addition to all other remedies and rights available to Franchisor under this Agreement and applicable law.

**F.      Accounting Practices.**

If you fail to comply with any of the reporting requirements described in this Section 7 then Franchisor may require you to engage a bookkeeping service provider, designated or approved by Franchisor, to provide book keeping services for the Franchised Business for such period of time that Franchisor deems appropriate, in its sole discretion.

**8.      TRAINING AND ASSISTANCE**

**A.      Training.**

Franchisor will provide an initial training program at its headquarters or such other location as Franchisor may designate. Your Designated Manager and such other of your employees as Franchisor may reasonably require must attend and successfully complete the initial training program before the Store may

open for business. There is no charge for up to two individuals to attend the initial training program.  At your request, Franchisor may permit additional individuals to attend the same training program, subject to space availability and payment of Franchisor's then-current training fee as published in the Manual from time to time.

Your Designated Manager and other Store personnel shall attend and successfully complete to Franchisor's satisfaction all safety training courses and programs that Franchisor requires from time to time, including, without limitation, all training that may be required by the state or local municipality where your Store is located, and shall maintain such certifications at all times throughout the term of this Agreement. Franchisor may charge, and you agree to pay, a reasonable tuition for all courses and programs that it provides plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such training.

Your Designated Manager shall be responsible for training your employees in all aspects of Store operations.  Franchisor may, in its sole discretion, develop training and certification programs for your employees. Your Designated Manager shall become familiar with these programs and shall implement and provide instruction and training to your Store employees.

Franchisor may, in its sole discretion, require your Designated Manager and other of your employees to attend and complete, to Franchisor's satisfaction, such other additional and remedial training as Franchisor may from time to time reasonably deem necessary.  By way of example and not limitation, remedial training may be required if you repeatedly fail to comply with the quality and service standards set forth in the Manual, fail to comply with reporting requirements of this Agreement, experience excessive personnel problems, or receive significant customer complaints.  Franchisor may charge, and you agree to pay, a reasonable fee for each day of additional and/or remedial training provided plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such training, including travel, lodging, and dining costs for the individual(s) providing such assistance.

You are responsible for all costs and expenses of complying with Franchisor's training and certification requirements including, without limitation, tuition, fees, and registration costs, as well as salary, travel, lodging, and dining costs for all employees who participate in the training.

**B.**    **Pre-Opening Assistance.**

Franchisor will provide consultation and advice to you, as Franchisor deems appropriate, with regard to the development and operation of the Store, building layout, furnishings, fixtures, and equipment plans and specifications, employee recruiting, selection and training, purchasing and inventory control, and such other matters as Franchisor deems appropriate.  If this Agreement is being signed in conjunction with your first Store, Franchisor will make available one member of Franchisor's training staff to provide you two to three days of on-site Store opening assistance.  There is no additional fee for such assistance for your first Store; but if such assistance is given with respect to your second or subsequent Store(s), Franchisor may charge, and you agree to pay, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer providing such assistance.  At your request, or if Franchisor deems necessary, Franchisor will provide additional members of its training staff to provide on-site opening assistance, subject to availability of personnel; in such event, Franchisor may charge, and you agree to pay, a reasonable fee for each additional trainer plus, when applicable, reimbursement of Franchisor's out of pocket costs it incurs in connection with providing such on-site opening assistance, including travel, lodging, and dining costs for the trainer(s) providing such assistance.

**C.**    **Ongoing Assistance.**

Franchisor periodically, as it deems appropriate, will advise and consult with you in connection with the operation of your Franchised Business, and provide to you its knowledge and expertise regarding the System and pertinent new developments, techniques, and improvements in the areas of management, sales promotion, service concepts, and other areas.  Franchisor may provide these services through visits by Franchisor's representatives to the Store, the distribution of printed or filmed material, or electronic

information, meetings, or seminars, telephone communications, email communications, or other communications.

**D.    Conferences.**

Franchisor may, in its sole discretion, conduct from time to time conferences to discuss System developments including operational efficiency, personnel training, bookkeeping, accounting, inventory control, performance standards, advertising programs, and merchandising procedures.  Attendance at such conferences may be made mandatory by Franchisor, in which event your Designated Manager will be required to attend. You are responsible for all costs and expenses associated with attendance including, without limitation, salary, travel, lodging, and dining costs for conference attendees.

**9.      MANUAL**

Franchisor will loan you one copy of the Manual, which may take the form of one or more of the following: one or more loose-leaf or bound volumes; bulletins; notices; videos; CD-ROMS and/or other electronic media; online postings; e-mail and/or electronic communications; facsimiles; or, any other medium capable of conveying the Manual's contents.  Franchisor may supplement, amend, or modify the Manual from time to time by letter, electronic mail, bulletin, CD, DVD, MP3, or other communications concerning the System to reflect changes in the image, specifications, and standards relating to developing, equipping, furnishing, and operating a URBAN AIR TRAMPOLINE PARK$^{TM}$ Store, all of which will be considered a part of the Manual and will, upon delivery to you, become binding on you as if originally set forth in the Manual.  You must keep your copy of the Manual current and up to date with all additions and deletions provided by or on behalf of Franchisor and you must purchase whatever equipment and related services (including, without limitation, a CD/DVD player, and/or MP3 player, computer system, internet service, dedicated phone line, facsimile machine, etc.) as may be necessary to receive these communications.  If a dispute relating to the contents of the Manual develops, the master copy maintained by Franchisor at its principal offices shall control. The Manual is material because it will affect the way you operate your Franchised Business, but it will not conflict with or materially alter your rights and obligations under this Agreement.

The Manual contains detailed standards, specifications, instructions, requirements, methods, and procedures for management and operation of the Franchised Business.  The Manual may also contain information relating to the selection, purchase, storage, preparation, packaging, service, and sale of all products, and merchandise sold at your Store; management and employee training; marketing, advertising, and sales promotions; maintenance and repair of the Store premises; employee dress attire and appearance standards; graphics; and accounting, bookkeeping, records retention, and other business systems, procedures, and operations.  You agree to at all times operate your Franchised Business in strict compliance with the Manual (as supplemented, amended, or modified by Franchisor from time to time), to maintain the Manual at the Store, to not reproduce the Manual or any part of it, to treat the Manual as strictly confidential and proprietary, and to disclose the contents of the Manual only to those employees who have a need to know.

Upon termination or expiration of this Agreement, you shall immediately return the Manual without retaining any copies thereof.   If you lose or misplace the Manuals, Franchisor may impose a replacement fee which will not exceed $500 for each volume of the replacement Manual.

**10.     MODIFICATIONS OF THE SYSTEM**

Franchisor may, in its sole discretion, change or modify from time to time the System, any components of this System, and the requirements applicable to you by means of supplements or amendments to the Manual, including, but not limited to, modifications to the Manual, the required equipment, the signage, the building and premises of the Store (including the trade dress, décor, and color schemes), the presentation of the Proprietary Marks, and other characteristics to which you are required to adhere (subject to the limitations set forth in this Agreement); adoptions of new administrative forms and methods of report and of payment of any monies owed by Franchisee (including electronic means of reporting and payment); alterations of the products, services, programs, methods, standards, accounting and computer systems, forms, policies and procedures of the System; and additions to, deletions from, or modifications to the products and services which

your Franchised Business is authorized and/or required to offer; and additions, changes, improvements, modifications, substitutions to, of, from, or for the Proprietary Marks or copyrighted materials. You must accept and implement at the Store any such changes or modifications in the System as if they were a part of the System at the time you executed this Agreement, and you must make such expenditures as the changes or modifications in the System reasonably require.

You may set prices in your discretion; however, because enhancing the Brand's competitive position and consumer acceptance for the Brand's products and services is a paramount goal of Franchisor and its franchisees, and because this objective is consistent with the long-term interest of the System overall, Franchisor may exercise certain rights, to the fullest extent permitted by then-applicable law, with respect to pricing of products and services, including, but not limited to, establishing the maximum and/or minimum retail prices which you may charge customers for the products and services offered and sold at your Store; recommending retail prices; advertising specific retail prices for some or all products or services sold at your Store, which Franchisor may compel you to observe and honor; and developing and advertising price promotions or package promotions which may directly or indirectly impact your retail prices, and in which Franchisor may compel you to participate. Franchisor may engage in any such activity periodically or throughout the term of this Agreement, and may engage in such activity in some geographic areas but not others, or with regard to certain subsets of franchisees but not others. You acknowledge and agree that any maximum, minimum, or other prices Franchisor prescribes or suggests may or may not optimize the revenues or profitability of your Store, and you irrevocably waive any and all claims arising from or related to our prescription or suggestion of your Store's retail prices.

You acknowledge that because uniformity may not be possible or practical under many varying conditions, Franchisor reserves the right to materially vary its standards or franchise agreement terms for any franchisee, based on the timing of the grant of the franchise, the peculiarities of the particular territory or circumstances, business potential, population, existing business practices, other non-arbitrary distinctions, or any other condition which Franchisor considers important to the successful operation of the System. You have no right to require Franchisor to disclose any variation or to grant the same or a similar variation to you.

If you develop any new concepts, processes, or improvements relating to the System, whether or not pursuant to a test authorized by Franchisor, you must promptly notify Franchisor and provide Franchisor with all information regarding the new concept, process, or improvement, all of which will automatically become the property of Franchisor and its Affiliates, and which Franchisor and its Affiliates may incorporate into the System without any payment to you. You must promptly take, at your expense, all actions deemed necessary or desirable by Franchisor to vest in Franchisor the ownership of such concepts, processes, or improvements.

## 11.    PERFORMANCE REQUIREMENTS

### A.    Best Efforts.

Your Designated Manager (see <u>Section 11.K</u> below) must use full time and best efforts in the operation of the Franchised Business, and must personally supervise the day-to-day operation of the Store.

### B.    Standards, Specifications and Procedures.

You agree to comply with all System specifications, standards, and operating procedures (whether contained in the Manual or any other written communication) relating to the appearance, function, cleanliness, and operation of a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Store including, without limitation: (1) type, quality, taste, weight, dimensions, uniformity, pricing, and sale of all products sold at the Store; (2) sales and marketing procedures and customer service; (3) advertising and promotional programs; (4) layout, décor, and color scheme of the Store ; (5) appearance and dress of employees; (6) safety, maintenance, appearance, cleanliness, sanitation, standards of service, and operation of the Store; (7) submission of requests for approval of brands of products, supplies, and suppliers; (8) use and illumination of signs, posters, displays, standard formats, and similar items; (9) use of audio equipment and type and decibel levels of music; (10) use of video equipment and type and decibel level of television broadcasts (including closed captioning requirements); (11) types of fixtures, furnishings, equipment, smallwares, and packaging; and (12) the make, type, location, and decibel level of any game, entertainment, or vending machine. Mandatory specifications, standards, and

operating procedures, including upgraded or additional equipment, that Franchisor prescribes from time to time in the Manual or otherwise communicates to you shall constitute provisions of this Agreement as if fully set forth in this Agreement.

All products, merchandise, advertising materials, furniture, fixtures, equipment, smallwares, supplies, and stationery used in connection with the operation of the Store must meet Franchisor's standards and specifications, as promulgated from time to time.  Such specifications may include brand specifications ("Approved Brands"), and to the extent that Approved Brands have been identified, you may purchase and use only the Approved Brands.  Franchisor may from time to time modify its specifications, and you shall promptly comply with all such modifications.

**C.      Approved Suppliers and Distributors.**

You must purchase those products designated by Franchisor only from suppliers approved and designated by Franchisor ("Designated Suppliers"), including, but not limited to: (1) fixtures, furniture, equipment, signs, items of décor; (2) uniforms, shirts, and all merchandise and items intended for retail sale (whether or not bearing our Proprietary Marks); (3) advertising, point-of-purchase materials, and other printed promotional materials; (4) gift certificates and stored value cards; (5) stationery, business cards, contracts, and forms; (6) bags, packaging, and supplies bearing the Proprietary Marks; and (7) other products and services that we require.  In addition to Designated Suppliers, Franchisor may require you to purchase certain supplies from approved or designated third party distributors ("Designated Distributors"), and you agree to comply with all such requirements.

Franchisor may, in its sole discretion, enter into supply contracts either for all Stores or a subset of Stores situated within one or more geographic regions (each a "Systemwide Supply Contract").  Franchisor may enter into Systemwide Supply Contracts with one or more vendors of products, services, or equipment and may require all company-owned and franchised Stores in a geographic area to purchase from, use, or sell to such vendors.  If Franchisor enters into such Systemwide Supply Contracts, then immediately upon notification, you and all Stores in the geographic area must purchase the specified product, service, or equipment only from the designated supplier; provided, however, that if, at the time of such notification, you are already a party to a non-terminable supply contract with another vendor or supplier for the designated product, service, or equipment, then your obligation to purchase from Franchisor's designated supplier under the Systemwide Supply Contract will not begin until the scheduled expiration or earlier termination of your pre-existing supply contract.  Franchisor makes no representation that it will enter into any Systemwide Supply Contracts or other exclusive supply arrangements or, if it does, that you will not otherwise be able to purchase the same products and/or services at a lower price from another supplier.  Franchisor may add to, modify, substitute or discontinue Systemwide Supply Contracts or exclusive supply arrangements in the exercise of its sole discretion and business judgment.

Franchisor may also establish commissaries and distribution facilities owned and operated by Franchisor or its affiliate that Franchisor may deem a Designated Supplier or Designated Distributor. Franchisor may receive money or other benefits from Designated Suppliers and Designated Distributors based on your purchases; you agree that Franchisor has the right to retain and use all such benefits as it deems appropriate, in its sole discretion.

Franchisor may approve one or more suppliers for any goods or materials and may approve a supplier only as to certain goods or materials.  Franchisor may concentrate purchases with one or more suppliers or distributors to obtain lower prices and/or the best advertising support and/or services for any group of URBAN AIR TRAMPOLINE PARK™ Stores or any other group of Stores franchised or operated by Franchisor or its Affiliates.  Approval of a supplier may be conditioned on requirements relating to the frequency of delivery, reporting capabilities, standards of service, including prompt attention to complaints, or other criteria, and concentration of purchases, as set forth above, and may be temporary pending a further evaluation of such supplier by Franchisor.

If you propose to purchase from a previously unapproved source, you shall submit to Franchisor a written request for such approval, or shall request the supplier to submit a written request on its own behalf. Franchisor has the right to require, as a condition of its approval, that its representatives be permitted to sample

the product and inspect the supplier's facilities, and that such information, specifications, and samples as Franchisor reasonably requires be delivered to Franchisor and/or to an independent, certified laboratory designated by Franchisor for testing prior to granting approval.  A charge not to exceed the reasonable cost of the inspection and the actual cost of the test shall be paid by you.  Franchisor will notify you within 120 days of your request as to whether you are authorized to purchase such products from that supplier.  Franchisor reserves the right, at its option, to re-inspect the facilities and products of any such approved supplier and to revoke its approval of any supplier upon the suppliers' failure to meet Franchisor's criteria for quality and reliability.

**D.**     **Authorized Products and Services.**

You shall cause the Store to offer and sell all products and services that Franchisor requires, and only products and services that Franchisor approves for sale by URBAN AIR TRAMPOLINE PARK$^{TM}$ Stores. Franchisor may add, modify and discontinue authorized products and services at any time, in its sole discretion, and you shall promptly comply with all directives. The Stores hall begin offering for sale additional or modified products, and cease offering discontinued products, within 10 days of the date you receive written notice of the addition, modification, or discontinuance. All products or services offered for sale in connection with the Franchised Business shall meet Franchisor's Standards.

You shall at all times maintain an inventory of approved goods and materials sufficient in quality and variety to realize the full potential of the Store.  Franchisor may, from time to time, conduct market research and testing to determine consumer trends and the salability of new products and services.  You agree to cooperate in these efforts by participating in the URBAN AIR TRAMPOLINE PARK$^{TM}$ customer surveys and market research programs if requested by Franchisor.  All customer surveys and market research programs will be at Franchisor's sole cost and expense, unless you have volunteered to participate in the survey or market research and to share your proportionate cost.  You may not test any new product or service without Franchisor's prior written consent.

**E.**     **Computer Systems and Intranet/Extranet Systems.**

You shall acquire and use all cash registers, computer hardware and related accessories, and peripheral equipment ("Computer Systems") that Franchisor prescribes for use by Stores, and may not use any cash registers or computer hardware, accessories, or peripheral equipment that Franchisor has not approved for use by URBAN AIR TRAMPOLINE PARK$^{TM}$ Stores.  Requirements may include, among other things, connection to remote servers, off-site electronic repositories, and high speed Internet connections and service.

You shall: (1) use any proprietary software programs, system documentation manuals, and other proprietary materials provided to you by Franchisor in connection with the operation of the Franchised Business; (2) input and maintain in your computer such data and information as Franchisor prescribes in the Manual, software programs, documentation, or otherwise; and (3) purchase new or upgraded software programs, system documentation manuals, and other proprietary materials at then-current prices whenever Franchisor adopts such new or upgraded programs, manuals, and materials system-wide.  You shall enter into all software license agreements, "terms of use" agreements, and software maintenance agreements, in the form and manner Franchisor prescribes, and pay all fees charged by third party software and software service providers thereunder.  In addition, Franchisor has the right to charge, and you agree to pay, a technology fee ("Technology Fee") in an amount determined by Franchisor, in its sole discretion, as published in the Manual from time to time.

You acknowledge that Franchisor may independently access from a remote location, at any time, all information input to, and compiled by, your Computer System or an off-site server, including information concerning Gross Sales, purchase orders, inventory and expenditures.

You acknowledge that technology is ever changing and that, as technology or software is developed in the future, Franchisor may, in its sole discretion, require you to: (1) add to your Computer System memory, ports, and other accessories or peripheral equipment, or additional, new, or substitute software; (2) replace, update  or upgrade your Computer System, including but not limited to computer hardware components and software applications as Franchisor prescribes, but not to exceed three times per calendar year.

To ensure full operational efficiency, you agree to keep your Computer System in good maintenance and repair and to make additions, changes, modifications, substitutions, and replacements to your computer hardware, accessories and peripherals, software, telephone and power lines, high speed Internet connections, and other computer-related facilities as directed by Franchisor.  Upon termination or expiration of this Agreement, all computer software, disks, tapes, and other magnetic storage media shall be returned to Franchisor in good operating condition, excepting normal wear and tear.

Franchisor may, at its option, establish and maintain an intranet or extranet system through which members of the URBAN AIR TRAMPOLINE PARK™ franchise network may communicate, and through which Franchisor may disseminate updates to the Manual and other Confidential Information. Franchisor will have no obligation to establish or to maintain the intranet indefinitely, and may dismantle it at any time without liability to you.  Franchisor may establish policies and procedures for the intranet's use. Franchisor expects to adopt and adhere to a reasonable privacy policy.  However, you acknowledge that, as administrator of the intranet, Franchisor can technically access and view any communication that anyone posts on the intranet.  You further acknowledge that the intranet facility and all communications that are posted to it will become Franchisor's property, free of any claims of privacy or privilege that you or any other individual may assert.  If you fail to pay when due any amount payable to Franchisor under this Agreement, or if you fail to comply with any policy or procedure governing the intranet, Franchisor may suspend your access to any chat room, bulletin board, listserv, or similar feature the intranet includes until such time as you fully cure the breach.

**F.      Non-Cash Payment Systems.**

Within a reasonable period of time following Franchisor's request, you shall accept debit cards, credit cards, stored value cards, or other non-cash systems specified by Franchisor to enable customers to purchase authorized products, and you shall obtain all necessary hardware and/or software used in connection with these non-cash systems.

**G.      Franchisor Inspections.**

Franchisor or its designees shall have the right at any reasonable time and without prior notice to you to: (1) inspect the Store premises; (2) observe, photograph, and record the operation of the Store for such consecutive or intermittent periods as Franchisor deems necessary; (3) interview Store personnel; (4) interview customers; and (5) inspect and copy any books, records, and documents relating to the operation of the Franchised Business or, upon request of Franchisor or its designee, require you to send copies thereof to Franchisor or its designee.  You shall present to your customers those evaluation forms as are periodically prescribed by Franchisor and shall participate and/or ask your customers to participate in any surveys performed by or on behalf of Franchisor as Franchisor may direct.

You agree to cooperate fully with Franchisor or its designee in connection with any such inspection, observations, recordings, product removal, and interviews. You shall take all necessary steps to immediately correct any deficiencies detected during these inspections including, without limitation, ceasing further sales of unauthorized items and ceasing further use of any equipment, advertising materials, or supplies that do not conform to the standards and requirements promulgated by Franchisor from time to time.  Franchisor shall have the right to develop and implement a grading system for inspections and, to the extent such a system is implemented, if the Store fails to achieve a passing score on any inspection, Franchisor may require your Key Personnel and other Store personnel to attend and participate in such additional training as Franchisor deems appropriate.  If the Store fails to achieve a passing score on any two consecutive inspections or if the Store fails to achieve a passing score three or more times in any 12-month period, Franchisor may terminate this Agreement in accordance with Section 18.

These inspections may take the forms of quality assurance inspections and mystery Stores.  To the extent Franchisor engages a third party service for conducting quality assurance inspections and mystery Stores, you must reimburse Franchisor its actual costs incurred in connection with inspections and mystery Stores conducted at your Store.  At Franchisor's request, Franchisor may require you to pay these amounts directly to the applicable services provider.

**H.      Upkeep of the Store.**

You shall continuously operate the Store and shall, at all times and at your sole expense, maintain in first class condition and repair (subject to normal wear and tear), in good working order, in accordance with the requirements of the System, and in compliance with all applicable laws and regulations, the interior and exterior of the Store, including, without limitation, all furniture, fixtures, equipment, furnishings, floor coverings, interior and exterior signage, interior and exterior finishes, and interior and exterior lighting.  You shall promptly and diligently perform all necessary maintenance, repairs, and replacements to the Store premises as Franchisor may prescribe from time to time including periodic interior painting and replacement of obsolete or worn out signage, floor coverings, furnishings, equipment, and décor.

**I.      Store Operations.**

You shall cause the Store to be open and operating on the days and during the hours that Franchisor designates, subject to applicable lease and/or local law or licensing limitations.  You shall operate and maintain the Franchised Business in conformity with the highest ethical standards and sound business practices and in a manner which will enhance the goodwill associated with the Proprietary Marks.

**J.      Management and Personnel.**

You shall employ a sufficient number of qualified, competent individuals to satisfy the demand for products and services offered by the Franchised Business.  You shall hire all employees of the Franchised Business, and be exclusively responsible for the terms of their employment and compensation, and for the proper training of such employees in the operation of the Store, in human resources and customer relations.  You shall employ only suitable individuals of good character and reputation who will at all times conduct themselves in a competent and courteous manner in accordance with the image and reputation of URBAN AIR TRAMPOLINE PARK$^{TM}$ and the System and, while on duty, each employee shall comply with the dress attire, personal appearance and hygiene standards set forth in the Manual.  You shall use best efforts to ensure that your employees maintain a neat and clean appearance and render competent and courteous service to all customers and are courteous and respectful to fellow employees.

**K.      Designated Manager.**

You shall designate and retain an individual to serve as your Designated Manager.  The Designated Manager as of the date of this Agreement is identified in Attachment C to this Agreement.  Unless waived in writing by Franchisor, the Designated Manager shall meet all of the following qualifications:

(1)      He or she, at all times, shall have full control over the day-to-day activities and operations of the Franchised Business and shall devote full time and best efforts to supervising the operation of the Store (and any other URBAN AIR TRAMPOLINE PARK$^{TM}$ Store that you own and operate pursuant to a franchise agreement with Franchisor) and shall not engage in any other business or activity, directly or indirectly, that requires substantial management responsibility or time commitment;

(3)      He or she shall successfully complete the initial training program and any additional training required by Franchisor; and

(4)      Franchisor shall have approved him or her as meeting its then-current Standards for such position, and not have later withdrawn such approval.

If the Designated Manager ceases to serve in, or no longer qualifies for such position, you shall designate another qualified person to serve as your Designated Manager within 30 days.  Your proposed replacement Designated Manager must successfully complete the initial training program and execute a Confidentiality and Noncompete Agreement in the form prescribed by Franchisor before assuming Designated Manager responsibilities.

**L.      Signs and Logos.**

Subject to any applicable local ordinances, you shall prominently display at the Store premises such interior and exterior signs, logos, and advertising of such nature, form, color, number, location, and size, and containing the content and information that Franchisor may from time to time direct.  You shall not display in

or about the Store premises or otherwise in connection with the Proprietary Marks any unauthorized sign, logo, or advertising media of any kind.

**M.      Entertainment Equipment.**

You shall not permit to be installed at the Store premises any juke box, vending or game machine, gum machine, game, ride, gambling or lottery device, coin or token operated machine, or any other music, film, or video device not authorized by Franchisor.

**N.      Compliance with Laws and Good Business Practices.**

You shall secure and maintain in full force in your name all required licenses, permits, and certifications relating to the operation of the Franchised Business.  You shall operate the Franchised Business in full compliance with all applicable laws, ordinances, and regulations including, without limitation, all laws or regulations governing or relating to immigration and discrimination, occupational hazards, employment laws (including, without limitation, workers' compensation insurance, unemployment insurance, and the withholding and payment of federal and state income taxes and social security taxes) and the payment of sales taxes.  All advertising and promotion for the Store shall be completely factual and shall conform to the highest standards of ethical advertising.  In all dealings with the Store's customers, suppliers, and the public, you shall adhere to the highest standards of honesty, integrity, fair dealing, and ethical conduct.  You shall refrain from any business or advertising practices that may be injurious to the good will associated with the Proprietary Marks or to the business of the URBAN AIR TRAMPOLINE PARK$^{TM}$ Brand, Franchisor or its Affiliates, the System, or other System franchisees.

You shall notify Franchisor in writing within five days after the commencement of: (1) any action, suit, or proceeding, or the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation of the Store or your financial condition; or (2) any notice of violation of any law, ordinance, or regulation relating to health or sanitation at the Store.

**O.      Payment of Taxes and Other Indebtedness.**

You shall promptly pay, when due, all taxes levied or assessed by any federal, state, or local tax authority and any and all other indebtedness incurred by you in the operation of the Franchised Business.  In the event of any bona fide dispute as to liability for taxes assessed or other indebtedness, you may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law; provided, however, in no event shall you permit a tax sale or seizure by levy of execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business or any improvements thereon.

**12.      ORGANIZATION OF THE FRANCHISEE**

**A.      Representations.**

If you are a Business Entity, you make the following representations and warranties: (1) the Business Entity is duly organized and validly existing under the laws of the state of its formation; (2) it is qualified to do business in the state or states in which the Store is located; (3) execution of this Agreement and the development and operation of the Store is permitted by its governing documents; and (4) unless waived in writing by Franchisor, its charter documents and its governing documents shall at all times provide that the activities of the Business Entity are limited exclusively to the development and operation of a single URBAN AIR TRAMPOLINE PARK$^{TM}$ Store.

If you are an individual, or a partnership comprised solely of individuals, you make the following additional representations and warranties: (1) each individual has executed this Agreement; (2) each individual shall be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement; and (3) notwithstanding any transfer for convenience of ownership pursuant to Section 17 of this Agreement, each individual shall continue to be jointly and severally bound by, and personally liable for the timely and complete performance and a breach of, each and every provision of this Agreement.

**B.**     **Governing Documents.**

If you are a corporation, copies of your Articles of Incorporation, bylaws, other governing documents, and any amendments, including the resolution of the Board of Directors authorizing entry into and performance of this Agreement, and all shareholder agreements, including buy/sell agreements, must be furnished to Franchisor.  If you are a limited liability company, copies of your Articles of Organization, operating agreement, other governing documents and any amendments, including the resolution of the Managers authorizing entry into and performance of this Agreement, and all agreements, including buy/sell agreements, among the members must be furnished to Franchisor.  If you are a general or limited partnership, copies of your written partnership agreement, other governing documents and any amendments, as well as all agreements, including buy/sell agreements, among the partners must be furnished to Franchisor, in addition to evidence of consent or approval of the entry into and performance of this Agreement by the requisite number or percentage of partners, if that approval or consent is required by your written partnership agreement or applicable law.  When any of these governing documents are modified or changed, you must promptly provide copies of the modifying documents to Franchisor.

**C.**     **Ownership Interests.**

If you are a Business Entity, you represent that all of your equity interests are owned as set forth on Attachment C to this Agreement.  In addition, if you are a corporation, you shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities of the corporation (and the number of shares owned by each).  If you are a limited liability company, you shall maintain a current list of all members (and the percentage membership interest of each member).  If you are a partnership, you shall maintain a current list of all owners of an interest in the partnership (and the percentage ownership interest of each general and limited partner).  You shall comply with Section 17 of this Agreement prior to any change in ownership interests and shall execute any necessary addenda to Attachment C as changes occur in order to ensure the information contained in Attachment C is true, accurate, and complete at all times.

**D.**     **Restrictive Legend.**

If you are a corporation, you shall maintain stop-transfer instructions against the transfer on your records of any voting securities, and each stock certificate of the corporation shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of this stock is subject to the restrictions imposed on assignment by the URBAN AIR TRAMPOLINE PARK$^{TM}$ Franchise Agreement(s) to which the corporation is a party." If you are a limited liability company, each membership or management certificate or other evidence of interest in the limited liability company shall have conspicuously endorsed upon its face the following statement: "Any assignment or transfer of an interest in this limited liability company is subject to the restrictions imposed on assignment by URBAN AIR TRAMPOLINE PARK$^{TM}$ Franchise Agreement(s) to which the limited liability company is a party."  If you are a partnership, your written partnership agreement shall provide that ownership of an interest in the partnership is held subject to, and that further assignment or transfer is subject to, all restrictions imposed on assignment by this Agreement.

**E.**     **Guarantees.**

If you are a Business Entity, each Owner (and if you are a limited partnership, each of your general partner's Owners) shall execute the Personal Undertaking and Guaranty attached hereto as Attachment D-1.

**13.**     **PROPRIETARY MARKS AND COPYRIGHTED WORKS**

**A.**     **Acknowledgments.**

You expressly understand and acknowledge that: (1) as between you and Franchisor, Franchisor is the exclusive owner of all right, title, and interest in and to the Proprietary Marks (and all goodwill symbolized by them) and the Copyrighted Works; (2) the Proprietary Marks are valid and serve to identify the System and those who are licensed to operate a Franchised Business in accordance with the System; (3) your use of the Proprietary Marks and Copyrighted Works pursuant to this Agreement does not give you any ownership interest or other interest in or to them, except the nonexclusive license to use them in accordance with this Agreement and the Standards; (4) any and all goodwill arising from your use of the Proprietary Marks and/or

the System shall inure solely and exclusively to Franchisor's benefit, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with your use of the System or the Proprietary Marks; (5) the license and rights to use the Proprietary Marks and Copyrighted Works granted hereunder to you are nonexclusive; (6) Franchisor may itself use, and grant franchises and licenses to others to use, the Proprietary Marks, Copyrighted Works, and the System; (7) Franchisor may establish, develop and franchise other systems, different from the System licensed to you herein, without offering or providing you any rights in, to, or under such other systems; and (8) Franchisor may add to, eliminate, modify, supplement, or otherwise change, in whole or in part, any aspect of the Proprietary Marks or Copyrighted Works.

**B.**     **Modification of the Proprietary Marks and Copyrighted Works.**

Franchisor reserves the right to add to, eliminate, modify, supplement, or otherwise change any of the Proprietary Marks and Copyrighted Works, in whole or in part.  You must promptly take all actions necessary to adopt all new and modified Proprietary Marks and/or Copyrighted Works and discontinue using obsolete Proprietary Marks and/or Copyrighted Works which may include, among other things, acquiring and installing, at your expense, new interior and exterior signage and graphics.

**C.**     **Use of the Proprietary Marks and Copyrighted Works.**

You shall use only the Proprietary Marks and Copyrighted Works designated by Franchisor and shall use them only in connection with the operation and promotion of the Franchised Business and in the manner required or authorized and permitted by Franchisor.  Your right to use the Proprietary Marks and Copyrighted Works is limited to the uses authorized under this Agreement and in the Manual, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights and grounds for termination of this Agreement.

You shall not use the Proprietary Marks as part of your Business Entity or other legal name.  You shall comply with all requirements of Franchisor's and applicable state and locals laws concerning use and registration of fictitious and assumed names, and shall execute any documents deemed necessary by Franchisor or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

**D.**     **Internet and Social Media Usage.**

You may not cause or allow all or any recognizable portion of the Proprietary Marks to be used or displayed as all or part of an e-mail address, Internet domain name, uniform resource locator ("URL"), or meta-tag, or in connection with any Internet home page, web site, or any other Internet-related activity without Franchisor's express written consent, and then only in a manner and in accordance with the procedures, standards and specifications that Franchisor establishes.   This prohibition includes use of the Proprietary Marks or any derivative of the Proprietary Marks as part of in the registration of any user name on any gaming website or social networking website including, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER.  Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time.

**E.**     **Assignment of Rights.**

To the extent that you or any Owner creates any derivative work based on the Proprietary Marks or Copyrighted Works ("Derivative Works"), you and each such Owner hereby permanently and irrevocably assigns to Franchisor all rights, interests, and ownership (including intellectual property rights and interests) in and to the Derivative Works, and agree to execute such further assignments as Franchisor may request.  The term "Derivative Works" shall be interpreted to include, without limitation: any and all of the following which is developed by you, or on your behalf, if developed in whole or in part in connection with your Franchised Business or Store : all products or services; all variations, modifications and/or improvements on products or services; your means, manner and style of offering and selling products and services; management techniques or protocols you may develop (or have developed on your behalf); all sales, marketing, advertising, and promotional programs, campaigns, or materials developed by you or on your behalf; and, all other intellectual property developed by you or on behalf of your Franchised Business or Store .

Franchisor may authorize itself, its affiliates, and other franchised Stores to use and exploit any such rights assigned by this <u>Section 13.E</u>.   The sole consideration for your assignment to Franchisor of the foregoing rights shall be Franchisor's grant of the Franchise conferred to you under this Agreement.   You and each Owner shall take all actions and sign all documents necessary to give effect to the purpose and intent of this <u>Section 13.E</u>.   You and each Owner irrevocably appoint Franchisor as true and lawful attorney-in-fact for you and each Owner, and authorize Franchisor to take such actions and to execute, acknowledge, and deliver all such documents as may from time to time be necessary to convey to Franchisor all rights granted herein.

**F.**       **Infringement; Notice of Claims.**

If you become aware of any infringement of the Proprietary Marks or Copyrighted Works or if your use of the Proprietary Marks or Copyrighted Works is challenged by a third party, then you must immediately notify Franchisor.   Franchisor shall have the exclusive right to take whatever action it deems appropriate.   If Franchisor or its Affiliate undertakes the defense or prosecution of any litigation pertaining to any of the Proprietary Marks or other intellectual property, you must sign all documents and perform such acts and things as, in the opinion of Franchisor's counsel, may be necessary to carry out such defense or prosecution.   If it becomes advisable at any time in the sole discretion of Franchisor to modify or discontinue the use of any Mark or Copyrighted Works, or to substitute a new mark or graphic for any Mark or Copyrighted Work, as applicable, you must promptly comply, at your expense (which may include the cost of replacement signage and/or trade dress), with such modifications, discontinuances, or substitutions.

**G.**       **Remedies and Enforcement.**

You acknowledge that in addition to any remedies available to Franchisor under this Agreement, you agree to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, a temporary restraining order and/or an injunction against violation of the provisions of this <u>Section 13</u>.

**14.**       **CONFIDENTIALITY OBLIGATIONS AND RESTRICTIVE COVENANTS**

**A.**       **Confidential Information.**

You and each Owner acknowledge that all Confidential Information belongs exclusively to Franchisor. You and each Owner agree to use and permit the use of the Confidential Information only in connection with the operation of your Franchised Business, to maintain the confidentiality of all Confidential Information, to not duplicate any materials containing Confidential Information.   You and each Owner further agree that you will not at any time, during the term of this Agreement or after expiration or earlier termination of this Agreement: (i) divulge any Confidential Information to anyone, except to other franchisees, your employees having a need to know, and your professional advisors having a need to know; (ii) divulge or use any Confidential Information for the benefit of yourself, your owners, or any third party (including any person, business entity, or enterprise of any type or nature), except in the operation of your Franchised Business, and then only in strict compliance with the Manual and System; or (iii) directly or indirectly imitate, duplicate, or "reverse engineer" any of our Confidential Information, or aid any third party in such actions.

Upon the expiration or earlier termination of this Agreement, you will return to Franchisor all Confidential Information which is then in your possession, including, without limitation, customer lists and records, all training materials and other instructional content, all financial and non-financial books and records, the Manual and any supplements to the Manual, and all computer databases, software, and manual.   Franchisor reserves the right, upon its specific written request, to require you to destroy all or certain such Confidential Information and to certify such destruction to Franchisor. You specifically acknowledge that all customer lists or information adduced by your Franchised Business is not your property, but is Franchisor's property, and you further agree to never contend otherwise.

You shall cause your Designated Manager and any employee with access to Confidential Information, including information contained in the Manuals, to sign a confidentiality agreement in a form prescribed by Franchisor, which identifies Franchisor as a third-party beneficiary of such agreement and gives Franchisor independent rights of enforcement.

The provisions of this <u>Section 14.A</u> will survive expiration or termination of this Agreement.

**B.     Covenants of the Franchisee.**

You acknowledge that you and your Owners will receive valuable specialized training and Confidential Information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques and trade secrets of Franchisor and the System.

You covenant and agree that during the term of this Agreement, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Store operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks; provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

You further covenant and agree that for a three-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon expiration or termination of this Agreement, regardless of the reason for termination, you will not, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Store operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE PARK™ Store ; (ii) is within a 25-mile radius of your former Store location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK™ Store operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

**C.     Covenants of the Franchisee's Owners.**

During the term of this Agreement, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Store operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location within the United States, its territories or commonwealths, or any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks; provided that such restriction shall not apply to less than a 5% beneficial interest in any publicly traded corporation.

For a three-year continuous and uninterrupted period (which shall be tolled during any period of noncompliance) commencing upon the earlier of (i) expiration or termination of this Agreement, regardless of the cause for termination, (ii) dissolution of the franchisee entity, or (iii) the transfer or redemption of an Owner's interest in the franchisee entity, your Owners will not, either directly or indirectly, for themselves, or through, on behalf of, or in conjunction with any person, or legal entity:

(a)  Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK™ Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System;

(b)  Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)  Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK™ Store operated by you or your Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor, at any location that (i) is, or is intended to be, located at the location of any former URBAN AIR TRAMPOLINE PARK™ Store ; (ii) is within a 25-mile radius of your former Store location; or (iii) is within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK™ Store operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

At Franchisor's request, each Owner shall execute a separate agreement containing the terms contained in this Section 14.C.

**D.      Reformation and Reduction of Scope of Covenants.**

If all or any portion of any covenant contained in this Section 14 is held to be unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor or its Affiliate is a party, you and the Owners will be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 14.  Notwithstanding the foregoing, Franchisor has the unilateral right, in its sole and absolute discretion, to reduce the scope of any covenant set forth in this Section 14, or any portion thereof, which reduction will become effective immediately upon delivery of notice of the reduction.

E.      **Acknowledgments.**

    The parties and each Owner acknowledge and agree that any claims that you or such Owner may have or allege to have against Franchisor shall not constitute a defense to the enforcement of any covenant contained in this Section 14.

F.      **No Undue Hardship.**

    You and each Owner acknowledge and agree that the covenants set forth in this Section 14 are fair and reasonable. You acknowledge and agree that such covenants will not impose any undue hardship on you and that you have other considerable skills, experience, and education affording you the opportunity to derive income from other endeavors. Each Owner acknowledges and agrees that such covenants will not impose any undue hardship on him or her, and that each has other considerable skills, experience, and education affording him or her the opportunity to derive income from other endeavors.

G.      **Injunctive Relief.**

    You and each Owner acknowledge that the violation of any covenant contained in this Section 14 would result in immediate and irreparable injury to Franchisor for which there is no adequate remedy at law. The parties acknowledge and agree that, in the event of a violation of any covenant contained in this Section 14, Franchisor shall be entitled to seek injunctive relief to restrain such violation in accordance with the usual equity principles. The party in violation of any foregoing covenant shall reimburse Franchisor for any costs that it incurs (including attorneys' fees) in connection with enforcement of the provisions contained in this Section 14.

**15.     BRAND DEVELOPMENT; MARKETING**

A.      **General Requirements.**

    All of your promotional and marketing materials shall be presented in a dignified manner and shall conform to Franchisor's standards and specifications related to advertising, marketing, and trademark use. You shall submit to Franchisor samples of proposed promotional and marketing materials, and notify Franchisor of the intended media, before first publication or use. Franchisor will use good faith efforts to approve or disapprove proposed promotional and marketing materials within 10 business days after receipt. You may not use the promotional or marketing materials until Franchisor expressly approves the materials and the proposed media. Once approved, you may use the materials only in connection with the media for which they were approved. Franchisor may disapprove your promotional or marketing materials, or the media for which they were approved, at any time, and you must discontinue using any disapproved materials or media upon your receipt of written notice of disapproval.

B.      **Grand Opening Advertising.**

    You agree to spend at least the Grand Opening Advertising Amount in accordance with the Specifications to promote the opening of your Store. All grand opening advertising and promotional materials shall be submitted to Franchisor for approval pursuant to Section 15.A, above.

C.      **Development Fund.**

    Each month during the Term, you shall contribute to the Development Fund the amount set forth on the Summary Page. Franchisor has the right to use Fund monies, in its sole discretion, to pay for creative development services (including creation and modification of logos and graphics); preparing or procuring market studies; providing or obtaining marketing services (including conducting customer surveys and focus groups); developing, producing, distributing, and placing advertising (including developing and producing point-of-sale advertising and promotional materials); developing and organizing annual URBAN AIR TRAMPOLINE PARK$^{TM}$ conferences; developing product packaging; developing, updating, and hosting our web site (including development of interior pages featuring franchised and affiliate-owned URBAN AIR TRAMPOLINE PARK$^{TM}$ Stores and development of locator programs); developing, updating, and hosting an intranet or extranet system; obtaining sponsorships and endorsements; preparing and conducting sweepstakes, contests, and other prize promotions; making charitable donations; establishing and funding scholarships; and

providing and procuring public relations services and conducting public relations activities. Franchisor also may use Fund monies to reimburse itself for its costs of personnel and other administrative and overhead costs associated with providing the services described in this Section 15.C.

The parties acknowledge that Franchisor owns all rights, and retains all copyrights, in all design and content developed using Fund monies, and that Franchisor will have sole control over the creative concepts, content, form, and media placement of all advertising and promotional materials developed with Fund monies, and the allocations of Fund monies to production, placement, and other costs. Franchisor will own all copyright in any works created using Fund monies. You acknowledge and agree that Franchisor is not obligated to either expend Fund monies for placement of advertising in your trading area or ensure that the Franchised Business benefits directly or *pro rata* from the expenditure of Fund monies. Franchisor will not use Fund monies for creating or placing any advertisement that is principally a solicitation for new franchisees, but Franchisor may include in all advertising prepared using Fund monies (including Internet advertising) information concerning franchise opportunities, and a portion of Fund monies may be used to create and maintain one or more pages on Franchisor's web site devoted to advertising franchise opportunities and identifying and screening inquiries and applications submitted by franchise candidates. Fund contributions are not held in trust. Franchisor has no fiduciary duty to you or to any Owner or to any other Person with respect to the collection or expenditure of Fund monies. Upon your reasonable request, Franchisor will provide you an unaudited annual statement of Fund contributions and expenditures.

Although the Fund is intended to be perpetual, Franchisor may terminate the Fund at any time. The Fund will not be terminated, however, until all monies in the Fund have either been spent as provided in this Section 15.C or returned to the contributors of the Fund on a basis proportional to their respective contributions. Any amounts contributed to the Fund that are not spent in the year they are collected will remain in the Fund for future expenditures.

**D.      Advertising Cooperatives.**

Franchisor may, from time to time, form local or regional advertising cooperatives ("Advertising Cooperative") to pay for the development, placement, and distribution of advertising for the benefit of Stores located in the geographic region served by the Advertising Cooperative. Any Advertising Cooperative established by Franchisor will be operated solely as a conduit for the collection and expenditure of Advertising Cooperative fees for the foregoing purposes.

If Franchisor forms an Advertising Cooperative for the region in which the Store is located, you agree to participate in the Advertising Cooperative pursuant to the terms of this Section 15.D.

Franchisor shall have the exclusive right to create, dissolve, and merge each Advertising Cooperative created, in its discretion, and to create and amend the organizational and governing documents related thereto, provided that such documents shall: (1) operate by majority vote, with each URBAN AIR TRAMPOLINE PARK™ Store (including those owned by Franchisor or its Affiliates) entitled to one vote; (2) entitle Franchisor to cast one vote (in addition to any votes it may be entitled to on account of its operation of Stores in the area served by the Advertising Cooperative); (3) permit the members of the Advertising Cooperative, by majority vote, to determine the amount of required contributions; and (4) provide that any funds left in the Cooperative at the time of dissolution shall be returned to the members in proportion to their contributions during the 12-month period immediately preceding termination.

You agree to be bound by all organizational and governing documents created by Franchisor and, at Franchisor's request, shall execute all documents necessary to evidence or affirm your agreement. The Advertising Cooperative shall begin operating on a date determined in advance by Franchisor.

No advertising or promotional plans or materials may be used by the Advertising Cooperative or furnished to its members without Franchisor's prior approval. All advertising plans and materials must conform to the Standards and must be submitted to Franchisor for approval according to the procedures set forth in Section 15.A of this Agreement.

E.      **Restriction Against Internet Advertising.**

You may not establish or maintain a web site or other presence on the World Wide Web portion of the Internet, including gaming websites or social networking websites such as, but not limited to, FACEBOOK, MYSPACE, LINKEDIN, FOURSQUARE, YELP, URBANSPOON, or TWITTER, which reflects any of the Proprietary Marks or any of Franchisor's copyrighted works, that includes the terms "URBAN AIR TRAMPOLINE PARK" as part of its URL or domain name, that otherwise states or suggests your affiliation with URBAN AIR TRAMPOLINE PARK$^{TM}$ or its franchise system, or that uses or displays any collateral merchandise offered at the Store, without Franchisor's express written consent, and then only in a manner and in accordance with the procedures, standards and specifications that Franchisor establishes.  Our social media and networking policies will be provided to you in the Manual, and may be modified, amended, or terminated by us at any time

F.      **Loyalty Programs, Prize Promotions, and Promotional Literature**

You shall participate in and offer to your customers all customer loyalty and reward programs, and all contests, sweepstakes, and other promotions that Franchisor may develop from time to time.  Franchisor will communicate to you in writing the details of each such program and promotion, and you shall promptly display all point-of-sale advertising and promotion-related information at such places within the Store as Franchisor may designate.  You shall purchase and distribute all coupons, clothing, toys, and other collateral merchandise (and only the coupons, clothing, toys, and collateral merchandise) designated by Franchisor for use in connection with each such program and promotion.

To the extent that Franchisor develops or authorizes the sale of gift certificates and/or stored value cards, you shall acquire and use all computer software and hardware necessary to process their sale and to process purchases made using them.  All proceeds from the sale of all gift certificates and stored value cards belong exclusively to Franchisor, and you shall remit the proceeds of such sales to Franchisor according to the procedures that Franchisor prescribes periodically. Franchisor shall reimburse or credit to you (at Franchisor's option) the redeemed value of gift cards and stored value cards accepted as payment for products and services sold by the Store.

You also shall display at the Store all promotional literature and information as Franchisor may reasonable require from time to time.  This may include, among other things, establishing a bulletin board for posting local school and community events and displaying signage or other literature containing information about the URBAN AIR TRAMPOLINE PARK$^{TM}$ Store franchise offering.

You also agree to honor such credit cards, courtesy cards, and other credit devices, programs, and plans as may be issued or approved by us from time to time.  Any reasonable and customary service charges or discounts from reimbursements charged on such cards or authorizations will be at your sole expense.

16.     **INSURANCE**

A.      **Obligation to Maintain Insurance.**

You shall be responsible for all loss or damage arising from or related to your development and operation of the Franchised Business, and for all demands or claims with respect to any loss, liability, personal injury, death, property damage, or expense whatsoever occurring upon the premises of, or in connection with the development or operation of, the Store .  You shall maintain in full force and effect throughout the term of this Agreement that insurance which you determine is necessary or appropriate for liabilities caused by or occurring in connection with the development or operation of the Store, including the minimum coverages described in Section 16.B below.  Franchisor, and any entity with an insurable interest designated by Franchisor, shall be an additional named insured in such policies to the extent each has an insurable interest.

B.      **Minimum Insurance Coverage.**

All insurance policies shall be written by an insurance company or companies satisfactory to Franchisor, in compliance with the standards, specifications, coverages, and limits set forth in the Manual or other written directives.  Such policy or policies shall include, at a minimum, the following types of coverages, with minimum limits prescribed by Franchisor: comprehensive general liability insurance, including broad

form contractual liability, liquor liability, personal injury, advertising injury, completed operations, products liability, and fire damage coverage; "all risks" property insurance and tenant's liability coverage, including coverage for fire, vandalism, and malicious mischief; personal property coverage; automobile liability coverage for owned and non-owned vehicles; workers' compensation insurance; spoilage and business interruption insurance; such insurance as may be required by the landlord of the Store premises; and such insurance as necessary to provide coverage under the indemnity provisions set forth in <u>Section 20.B</u> below. In connection with any construction, renovation, refurbishment, or remodeling of the Store, you also shall maintain Builder's All Risks insurance, and in connection with new construction or substantial renovation, refurbishment, or remodeling of the Store, you shall maintain performance and completion bonds in forms and amounts, and written by carrier(s), reasonably satisfactory to Franchisor.

Franchisor shall have the right to establish and modify the minimum required coverages and to require different or additional kinds of insurance to reflect inflation, changes in standards of liability, higher damage awards, or other relevant changes in circumstances. All insurance requirements will be communicated to you via the Manual. You shall receive written notice of any modifications to the insurance requirements and shall take prompt action to secure the additional coverage or higher policy limits. All such insurance policies shall include a waiver of subrogation in favor of Franchisor and its Affiliates, and their respective officers, directors, shareholders, partners, members, agents, representatives, independent contractors, servants, and employees.

**C.**     <u>**Insurance Policy Requirements.**</u>

The following general requirements apply to each insurance policy you are required to maintain under this Agreement:

(1)      Each insurance policy must be specifically endorsed to provide that the coverage must be primary and that any insurance carried by any additional insured will be excess and non-contributory.

(2)      Each insurance policy must name Franchisor and its Affiliates, and their respective partners, officers, subsidiaries, affiliates, shareholders, directors, regional directors, agents, and employees as additional named insureds on a primary non-contributory basis on an Additional Insured Grantor of Franchise Endorsement per form CG2029 (or an endorsement form with comparable wording acceptable to Franchisor).

(3)      No insurance policy may contain a provision that in any way limits or reduces coverage for you in the event of a claim by Franchisor or its Affiliates.

(4)      Each insurance policy must extend to, and provide indemnity for, all of your obligations and liabilities to third parties and all other items for which you are required to indemnify Franchisor under this Agreement.

(5)      Each insurance policy must be written by an insurance company that has received and maintains "A- VII" or better rating by the latest edition of Best's Insurance Rating Service.

(6)      No insurance policy may provide for a deductible amount that exceeds $5,000, unless otherwise approved in writing by Franchisor, and your co-insurance under any insurance policy must be 80% or greater.

**D.**     <u>**Delivery of Certificate.**</u>

No later than 30 days after this Agreement is executed by Franchisor, and on each policy renewal date thereafter, you shall submit evidence of satisfactory insurance and proof of payment therefore to Franchisor. The evidence of insurance shall include a statement by the issuer that the policy or policies will not be cancelled or materially altered without at least 30 days' prior written notice to Franchisor. Upon request, you also shall provide to Franchisor copies of all or any policies, and policy amendments and riders.

**E.**     <u>**Minimum Insurance Requirements Not a Representation of Adequacy.**</u>

You acknowledge that no requirement for insurance contained in the Agreement constitutes advice or a representation by Franchisor that only such policies, in such amounts, are necessary or adequate to protect you from losses in connection with your business under this Agreement. Maintenance of this insurance, and

the performance of your obligations under this <u>Section 16</u>, shall not relieve you of liability under the indemnification provisions of this Agreement.

**F.**      **Franchisor's Right to Procure Insurance.**

If you fail to procure or maintain at least the insurance required by this <u>Section 16</u>, as revised from time to time pursuant to the Manual or otherwise in writing, Franchisor shall have the immediate right and authority, but not the obligation, to procure such insurance and charge its cost to you, in which case you shall pay Franchisor, immediately upon demand, reimbursement of all out-of-pocket costs incurred by Franchisor in obtaining such insurance on your behalf plus an administrative fee equal to 10% of the annual premium(s) for all insurance policies obtained by Franchisor on your behalf.

**17.**      **TRANSFER**

**A.**      **Transfer by Franchisor.**

Franchisor shall have the right, in its sole discretion and without your consent, to assign this Agreement and/or all of its rights and/or obligations hereunder in a related or third party transaction, may sell any or all of its assets (including its rights in and to the Proprietary Marks and the System); may issue new shares through an initial public offering and/or private placement; may merge with and/or acquire other companies, or may merge into or be acquired by another company; and may pledge its assets to secure payment of its financial obligations.

**B.**      **Transfer by Franchisee.**

You understand and acknowledge that Franchisor has entered into this Agreement in reliance on your business skill, financial capacity, personal character, experience, and demonstrated or purported ability in customer service operations. Accordingly, you may not sell or transfer your interest in this Agreement or the assets of the Store (except in the ordinary course of your business) without Franchisor's prior written consent. In addition, if you are a Business Entity, no Owner may transfer or assign his or her equity interest in the Business Entity without Franchisor's prior written consent. For purposes of this <u>Section 17.B</u> the term "transfer" means and includes an actual assignment, sale, or transfer of an interest, or a collateral assignment or pledge of the interest as security for performance of an obligation.

You must notify Franchisor in writing at least 60 days prior to the date of any such intended transfer. Any purported transfer, by operation of law or otherwise, not having the written consent of Franchisor shall be null and void and shall constitute a material breach of this Agreement. Franchisor shall not unreasonably withhold its consent to any transfer, but may, in its sole discretion, require any or all of the following as conditions of its consent:

(1)      All of your accrued monetary obligations and all other outstanding obligations to Franchisor and its Affiliates and your suppliers shall be up to date, fully paid, and satisfied;

(2)      You must be in full compliance with this Agreement and any other agreements between you and Franchisor, its Affiliates, and your suppliers;

(3)      You and each Owner shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its Affiliates and their respective officers, directors, shareholders, agents, and employees in their corporate and individual capacities, including, without limitation, claims arising under federal, state, and local laws, rules, and ordinances; provided, however, that any release will not be inconsistent with any state statute regulating franchising;

(4)      The transferee shall demonstrate to Franchisor's satisfaction that the transferee meets Franchisor's then-current educational, managerial, and business standards; possesses a good moral character, business reputation, and credit rating; has the aptitude and ability to operate the Franchised Business; and has sufficient equity capital to operate the Franchised Business;

(5)      The transferee shall sign Franchisor's then-current form of franchise agreement for the remaining term (and if the transferee is a Business Entity, then the transferee's Owners shall jointly and

severally guarantee your obligations under this Agreement in writing in a form satisfactory to Franchisor), and you shall pay to Franchisor the Transfer Fee in the amount set forth in the Summary Page;

(6)     If deemed necessary by Franchisor, the transferee shall agree to update, remodel, refurbish, renovate, modify, or redesign the Store, at transferee's sole expense, to conform to Franchisor's then-current standards and specifications for a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Store;

(7)     You agree to remain liable for all direct and indirect obligations to Franchisor in connection with the Franchised Business prior to the effective date of the transfer, shall continue to remain responsible for its obligations of nondisclosure, noncompetition, and indemnification as provided elsewhere in this Agreement, and all other obligations that survive termination, expiration, or transfer and shall execute any and all instruments reasonably requested by Franchisor to further evidence such obligation;

(8)     The transferee shall comply with Franchisor initial training requirements;

(9)     You or the transferor must provide Franchisor with a copy of the agreements of purchase and sale between the transferor and the transferee.  The economic terms of the transfer may not materially and adversely affect, in Franchisor's sole judgment, the post-transfer viability of the Franchised Business.

**C.    <u>Security Interest.</u>**

You may grant a security interest in this Agreement or the franchise represented by this Agreement only to the limited extent permitted by Section 9-408 of the Uniform Commercial Code.  Any such security interest may only attach to an interest in the proceeds of the operation of the Franchised Business and may not under any circumstances entitle or permit the secured party to take possession of or operate the Franchised Business or to transfer your interest in the franchise without Franchisor's consent.

**D.    <u>Public and Private Offerings.</u>**

If you are a Business Entity and you intend to issue equity interests pursuant to a public or private offering, you shall first obtain Franchisor's written consent, which consent shall not be unreasonably withheld. You must provide to Franchisor for its review a copy of all offering materials (whether or not such materials are required by applicable securities laws) at least 60 days prior to such documents being filed with any government agency or distributed to investors.  No offering shall imply (by use of the Proprietary Marks or otherwise) that Franchisor is participating in an underwriting, issuance, or offering of your securities, and Franchisor's review of any offering shall be limited to ensuring compliance with the terms of this Agreement. Franchisor may condition its approval on satisfaction of any or all of the conditions set forth in <u>Section 17.B</u> and on execution of an indemnity agreement, in a form prescribed by Franchisor, by you and any other participants in the offering.  For each proposed offering, you shall pay to Franchisor a retainer in an amount determined by Franchisor, which Franchisor shall use to reimburse itself for the reasonable costs and expenses it incurs (including, without limitation, attorneys' fees and accountants' fees) in connection with reviewing the proposed offering.

**E.    <u>Right of First Refusal.</u>**

If you receive a bona fide offer to purchase your interest in this Agreement or all or substantially all of the assets of the Franchised Business, or if any Owner receives a bona fide offer to purchase his or her equity interests in you, and you or such Owner wishes to accept such offer, you or the Owner must deliver to Franchisor written notification of the offer and, except as otherwise provided herein, Franchisor shall have the right and option, exercisable within 30 days after receipt of such written notification, to purchase the seller's interest on the same terms and conditions offered by the third party.  If the bona fide offer provides for the exchange of assets other than cash or cash equivalents, the bona fide offer shall include the fair market value of the assets and you shall submit with the notice an appraisal prepared by a qualified independent third party evidencing the fair market value of such assets as of the date of the offer.  Any material change in the terms of any offer prior to closing shall constitute a new offer subject to the same right of first refusal by Franchisor as in the case of an initial offer.  If Franchisor elects to purchase the seller's interest, closing on such purchase must occur by the later of:  (1) the closing date specified in the third party offer; or (2) within 60 days from the date of notice to the seller of Franchisor's election to purchase.  Franchisor failure to exercise the option

described in this Section 17.E shall not constitute a waiver of any of the transfer conditions set forth in this Section 17.

**F.      Transfer Upon Death or Mental Incapacity.**

If any Owner dies or becomes incapacitated, Franchisor shall consent to the transfer of the former Owner's interest in this Agreement or equity interest in the franchisee (as applicable) to his or her spouse or heirs, whether such transfer is made by will or by operation of law, if, in Franchisor's sole discretion and judgment, the transferee meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to conduct the Franchised Business herein; has at least the same managerial and financial criteria required by new franchisees; and has sufficient equity capital to operate the Franchised Business.  If said transfer is not approved by Franchisor, the executor, administrator, or personal representative of such person shall transfer the former Owner's interest to a third party approved by Franchisor within six months after such death, mental incapacity, or disability.  Such transfer shall be subject to Franchisor's right of first refusal and to the same conditions as any *inter vivos* transfer.

**G.      Non-Waiver of Claims.**

Franchisor's consent to a Transfer shall not constitute a waiver of any claims it may have against the transferring party, and it will not be deemed a waiver of Franchisor's right to demand strict compliance with any of the terms of this Agreement, or any other agreement to which Franchisor and the transferee are parties, by the transferee.

**18.     DEFAULT AND TERMINATION**

**A.      Automatic Termination.**

This Agreement will terminate automatically, without notice and without an opportunity to cure, if you become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by you or such a petition is filed against you and you do not oppose it; if you are adjudicated bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof, is filed against you; if any court of competent jurisdiction appoints a receiver or other custodian (permanent or temporary) for you or your business assets, or any part thereof; if proceedings for a composition with creditors under any state or federal law is instituted by or against you; if a final judgment is entered against you and remains unsatisfied or of record for 30 days or longer, unless a *supersedeas* bond is filed; if you are dissolved, voluntarily or involuntarily; if execution is levied against any assets of you, the Store, or the Franchised Business; if any proceedings to foreclose any lien or mortgage against you, the Store, the Franchised Business, or the assets, equipment, or premises of any of the same, is instituted and not dismissed within 30 days; or if the real or personal property of you, the Store,the Franchised Business is sold after levy thereupon by any sheriff, marshal, constable, or other authorized law enforcement personnel.

**B.      Termination without Opportunity to Cure.**

Franchisor may terminate this Agreement, by delivering to you written notice of termination, upon the occurrence of any of the following events of default:

(1)      You fail to identify a site for the Store in accordance with Section 3.A, or your failure to open the Store for business in accordance with Section 4.B and Section 5;

(2)      Your abandonment of the Store (for purposes of this provision "abandonment" will be deemed to occur if you fail to operate the Store on three or more consecutive days or if you otherwise convey an intention to close the Store), or lose the right to possess the Store premises;

(3)      The making of any false or materially misleading representations in your franchise application or during the franchise application process;

(4)      Your conviction, or any Owner's, conviction of a felony, a crime involving moral turpitude or any other crime which is likely to materially and adversely affect System or the goodwill associated with the

Proprietary Marks, or if you or any Owner is held liable in any civil action involving allegations of fraud or unfair trade practices or similar allegations;

(5)     Violation of any confidentiality or non-compete obligations, as described in <u>Section 14</u>, by you or any Owner;

(6)     The Store fails two consecutive quality assurance inspections during any rolling 12-month period or fails three quality assurance inspections during any rolling 24-month period;

(7)     Termination for cause of any other franchise agreement between Franchisor and you or your Affiliate; or

(8)     Delivery of three or more notices of default during any rolling 24-month period, whether or not the event(s) of default described in such notices ultimately are cured.

**C.     <u>Termination with Opportunity to Cure.</u>**

Franchisor may terminate this Agreement, by delivery of written notice of default, upon the occurrence of any of the following events of default and your failure to take appropriate corrective action during the applicable cure period:

(1)     You fail to pay any monies owed to Franchisor or its Affiliates or your trade creditors within ten (10) days after delivery of written notice of a deficiency;

(2)     You misuse the Proprietary Marks, the Copyrighted Works, or Franchisor's other intellectual property (which includes, without limitation, offering or selling unauthorized products or services under or in conjunction with the Proprietary Marks), and fail to correct the misuse within five (5) days after delivery of written notice;

(3)     The Store is cited for violation of health, sanitation, or safety laws or regulations, and fails to cure the violation within five (5) days after receiving the citation; or

(4)     You fail to comply with any provision of this Agreement (except as otherwise provided in this <u>Section 18</u>) and fail to take appropriate corrective action within thirty (30) days after delivery of written notice of a deficiency.

**D.     <u>Other Remedies.</u>**

In addition to its termination rights, Franchisor shall have the right to require the Store closed during any period in which (1) it is in violation of applicable health, sanitation, or safety laws or regulations, or (2) Franchisor determines, in its sole discretion, that continued operation of the Store poses a risk to public health or safety.

**E.     <u>Step-In Rights.</u>**

To prevent any interruption of business of the Franchised Business and any injury to the goodwill and reputation thereof which may be caused thereby, you hereby authorize Franchisor, and Franchisor shall have the right, but not the obligation, to operate the Franchised Business for as long as Franchisor deems necessary and practical, and without waiver of any other rights or remedies Franchisor, may have under this Agreement, if you are in default of your obligations under this Agreement.  If Franchisor undertakes to operate the Franchised Business, Franchisor shall have the right to collect and pay from the revenues of the Franchised Business all expenses relating to the operation of the Franchised Business including, without limitation, Royalty Fees and Development Fund contributions, employee salaries, reimbursement of Franchisor's expenses incurred in connection with such operation, and a reasonable management fee.  You shall indemnify and hold Franchisor harmless from any and all claims arising from the alleged acts and omissions of Franchisor and its representatives.

## 19.   OBLIGATIONS UPON EXPIRATION OR TERMINATION

### A.   Expiration or Termination of Franchise.

Upon termination or expiration of this Agreement, you shall have no further right to use the Proprietary Marks, Copyrighted Works or other intellectual property owned and licensed to you by Franchisor. You may no longer hold yourself out as a URBAN AIR TRAMPOLINE PARK[TM] franchisee, and you shall refrain from representing any present or former affiliation with Franchisor or the URBAN AIR TRAMPOLINE PARK[TM] franchise System.  You shall immediately pay all sums due and owing to Franchisor and its Affiliates.

You shall immediately take all actions necessary to cancel any assumed or fictitious name containing the Proprietary Marks, and shall do all things necessary to transfer to URBAN AIR TRAMPOLINE PARK[TM] or its designee the Store's telephone number(s).  You hereby grant to Franchisor and its representatives power of attorney for the specific purpose of executing all documents and doing all things necessary to effect such cancellations and transfers.

You shall immediately surrender to Franchisor all copies of all materials in your possession including the Manual and all other documentation relating to the operation of the Franchised Business in your possession, and all copies thereof, and shall retain no copy or record of any of the foregoing, excepting only your copy of this Agreement, any correspondence between the parties and any other documents which you reasonably need for compliance with any provision of law.

Further, you agree that, upon termination or expiration of this Agreement, for any reason, you will immediately comply with our then-current debranding checklist, which shall require you to, among other things:

(1)    Remove and destroy all interior and exterior signage, point of sale materials, business forms, and stationery received from us;

(2)    Delete from all computer hard drives all materials, information, communications, manuals, and marketing and promotion materials received from us;

(3)    Remove all decals containing the Urban Air or Urban Air Trampoline Park name, the Marks, any slogans, or orange, black, and blue color scheme;

(4)    Repaint or remove all orange, black, and blue colors from all equipment, padding, walls, doors, floors, and other surfaces;

(5)    Promptly instruct all third-party internet sites and telephone directories to remove all listings identifying the location as an Urban Air Trampoline Park;

(6)    Return all uniforms, sales materials, operations manuals, and other items that contain any Confidential Information;

(7)    Cancel all fictitious or assumed names or equivalent registrations relating to your use of any of the Proprietary Marks;

(8)    Change your corporate and legal business name, if necessary, so that it does not contain any of the Proprietary Marks; and

(9)    Return to us all signs, sign-faces, sign-cabinets, marketing materials, forms, packaging, and other materials that contain any of the Marks.

### B.   Franchisor's Option to Assume Lease and Purchase Assets.

Upon termination or expiration of this Agreement, Franchisor shall have the option, but not the obligation, to assume your lease for the Store premises by delivering to you written notice of its election within 30 days after termination or expiration of this Agreement.  If Franchisor exercises its option, it shall also have the right, but not the obligation, to purchase the Store's furnishings, equipment, graphics, signage, smallwares, and saleable inventory for the Purchase Price.  Franchisor shall also have the right, but not the obligation, to assume any equipment leases and other contracts relating to the operation of the Store as Franchisor, in its sole discretion, agrees to assume.  Closing on the purchase of assets shall occur no later than 60 days after Franchisor exercises its option.

With respect to the foregoing paragraph, Purchase Price shall the fair market value, determined in a manner consistent with reasonable depreciation of the equipment, signs, inventory, materials and supplies, provided that the Franchised Business will be valued as an independent business and its value will not include any value for the Franchise or any rights granted by this Agreement, the Proprietary Marks, or participation in the network of Urban Air Trampoline Park businesses.  The fair market value will not include the goodwill you developed since your commencement of the operations, the goodwill of the Marks, and the System.  The length of the remaining term of the lease will also be considered in determining the Franchised Business's fair market value.

Franchisor may exclude from the assets purchased hereunder cash or its equivalent and any equipment, signs, inventory, materials, and supplies that are not reasonably necessary (in function or quality to the Franchised Business' operations as determined by Franchisor or that Franchisor has not approved as meeting standards for an Urban Air Trampoline Park, and the Purchase Price will reflect such exclusions.

If we are unable to agree on the fair market value of the Franchised Business, the fair market value will be determined by one (1) independent qualified appraiser that Franchisor appoints in our business judgment.  Franchisor will appoint the appraiser within fifteen (15) days after the date we determine we are unable to agree on the Franchised Business' fair market value.  Franchisor and Franchisee will share equally the fees and expenses of the appraiser and Franchisor and Franchisee will agree to take reasonable actions to cause the appraiser to complete the appraisal within thirty (30) days after the appraiser's appointment.

The Purchase Price will be paid at the closing of the purchase, which will take place not later than ninety (90) days after determination of the Purchase Price.  Franchisor has the right to set off against the Purchase Price and thereby reduce the Purchase Price by, any and all amounts Franchisee owes Franchisor.

At the closing, Franchisee agrees to deliver instruments transferring (1) good and merchantable title to the assets purchased, free and clear of all liens and encumbrances (other than liens and security interests acceptable to us, if any), with all sales and other transfer taxes paid by Franchisee, (2) all licenses and permits of the Franchised Business which may be assigned or transferred, and (3) the leasehold interest in the premises in which the Franchised Business operates and improvements therein.

If you cannot deliver clear title to all of the purchased assets, or if there are other unresolved issues, the closing of the sale will, at our election, be accomplished through an escrow arrangement with an independent escrow agent selected by Franchisor.

Franchisee and its owners agree to execute general releases, in form satisfactory to Franchisor, of any and all claims against Franchisor or its members, officers, directors, managers, employees, agents, successors and assigns.

If Franchisor elects not to assume your lease for the Store premises, Franchisor shall have the option to purchase, or may require you to destroy, any graphics, signage, or other materials bearing the Proprietary Marks.  To the extent that Franchisor elects to purchase any such items, the purchase price shall be equal to fully depreciated book value of such items.  You shall immediately remove from the Store premises all items bearing the Proprietary Marks and Copyrighted Works and modify the trade dress as necessary to distinguish the premises from a URBAN AIR TRAMPOLINE PARK™ Store.  If you fail or refuse to comply with the requirements of this Section 19.B, Franchisor and its representatives shall have the right to enter on the Store premises, without liability for trespass or other civil tort, for purposes of making such changes, at your expense, which you shall pay upon demand.

Franchisor shall have the right to offset against the purchase price of any items purchased from you pursuant to this Section 19.B any of the following: (1) amounts that you owe to Franchisor or its Affiliates; (2) lease transfer fees (if any), other costs owed to your landlord, and the costs of renovating the Store premises so that it meets Franchisor's then-current standards and specifications (if Franchisor elects to assume the lease for the Store premises); (3) the costs of de-identifying the Store premises in accordance with this Section 19.B, if you fail to do so (if Franchisor does not elect to assume the lease for the Store premises); and (4) all costs incurred by Franchisor relating to its purchase of the Store's assets (including the cost of an independent appraiser, if necessary).

C.     **Compliance with Post Term Obligations.**

You and each Owner shall comply with all covenants and obligations which, by their nature, survive termination of this Agreement including, without limitation, the confidentiality obligations and restrictive covenants set forth and described in Section 14 of this Agreement and the indemnification obligations set forth and described in Section 20.B of this Agreement.

20.     **INDEPENDENT CONTRACTOR AND INDEMNIFICATION**

A.     **Independent Contractor.**

The parties acknowledge and agree that this Agreement does not create a fiduciary relationship between them, that you will operate the Franchised Business as an independent contractor, and that nothing in this Agreement shall be construed to create a partnership, joint venture, agency, employment, fiduciary relationship, master-servant relationship, or legal relationship of any kind.

None of your employees will be considered to be employees of Franchisor or its Affiliates.  Neither you nor any of your employees whose compensation you pay may in any way, directly or indirectly, expressly or by implication, be construed to be an employee of Franchisor or its Affiliates for any purpose, including with respect to any mandated or other insurance coverage, tax or contributions, or requirements pertaining to withholdings, levied or fixed by any city, state, or federal governmental agency.  Neither Franchisor nor its Affiliates will have the power to hire or fire your employees. You expressly agree, and will never contend otherwise, that Franchisor's authority under this Agreement to certify certain of your employees for qualification to perform certain functions for your Franchised Business does not directly or indirectly vest in Franchisor or its Affiliates the power to hire, fire, or control any such employee.  You further acknowledge and agree, and will never contend otherwise, that you alone will exercise day-to-day control over all operations, activities, and elements of your Franchised Business and that under no circumstance shall Franchisor or its Affiliates do so or be deemed to do so. You further acknowledge and agree, and will never contend otherwise, that the various requirements, restrictions, prohibitions, specifications, and procedures of System which you are required to comply with under this Agreement, whether set forth in the Manual or otherwise, do not directly or indirectly constitute, suggest, infer, or imply that Franchisor or its Affiliates controls any aspect or element of the day-to-day operations of your Franchised Business, which you alone control, but constitute only standards to which you must adhere when exercising your control of the day-to-day operations of your Franchised Business.

Except as otherwise expressly authorized by this Agreement, neither party hereto will make any express or implied agreements, warranties, guarantees, or representations or incur any debt in the name of or on behalf of the other party, or represent that the relationship between Franchisor and you are other than that of franchisor and franchisee.  Franchisor does not assume any liability, and will not be deemed liable, for any agreements, representations, or warranties made by you which are not expressly authorized under this Agreement, nor will Franchisor be obligated for any damages to any person or property which directly or indirectly arise from or relate to the operation of the Franchised Business.

During the term of this Agreement, you shall identify yourself as the owner of the Store operating under a franchise granted by Franchisor, and shall apply for all permits, certificates of occupancy, and business licenses in your own name.  Additionally, your individual name (if you are an individual) or your corporate name (if you are a Business Entity) must appear prominently on all invoices, order forms, receipts, business stationery, and contracts.  You shall not use the Proprietary Marks to incur or secure any obligation or indebtedness on behalf of Franchisor.  You shall display at the Store, in a conspicuous location, a form of notice approved by Franchisor, stating that you are an independent franchised operator of the URBAN AIR TRAMPOLINE PARK$^{TM}$ Franchised Business.

B.     **Indemnification.**

You shall defend at your own cost and indemnify and hold harmless to the fullest extent permitted by law, Franchisor and its Affiliates, and their respective directors, officers, employees, agents, shareholders, designees, and representatives (collectively, the "Franchisor Indemnities") from all Losses and Expenses incurred in connection with any action, suit, proceeding, claim, cause of action, demand, investigation, or

formal or informal inquiry (regardless of whether any of the foregoing is reduced to judgment), or any settlement of the foregoing, which actually or allegedly, directly or indirectly, arises out of, is based upon, is a result of, or is in any way related to any of the following: (1) any actual or alleged infringement or any other violation or any other alleged violation of any patent, trademark, copyright, or other proprietary right owned or controlled by third parties by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (2) any actual or alleged violation or breach of any contract, federal, state, or local law, regulation, ruling, standard, or directive of any industry standard by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (3) any actual or alleged libel, slander, or any other form of defamation by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (4) any actual or alleged violation or breach of any warranty, representation, agreement, or obligation in this Agreement by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise; (5) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, arising out of or related to the design, construction, conversion, build out, outfitting, remodeling, renovation, upgrading, or operation of the Franchised Business, whether any of the foregoing was approved by Franchisor; (6) any and all acts, errors, or omissions engaged in by you or the Franchised Business or any of their respective the owners, officers, directors, management, employees, agent, servants, contractors, subcontractors, partners, proprietors, affiliates or representatives, or any third party acting on behalf of or at the direction of such persons or entities, whether in connection with the Franchised Business or otherwise, including, but not limited to, any personal injury, death, or property damage suffered or caused by any delivery person or vehicle serving your Franchised Business; (7) all liabilities arising from or related to your offer, sale, and/or delivery of products and/or services as contemplated by this Agreement; (8) any and all latent or other defects in the Store,whether or not discoverable by Franchisor or you; (9) the inaccuracy, lack of authenticity, or nondisclosure of any information by any customer of the Store; (10) your establishment, construction, opening, or operation of your Store, including, but not limited to, any personal injury, death, or property damage suffered or caused by any customer, visitor, operator, employee, or guest of the Store; crimes committed on or near any of the premises or facilities of or vehicles used by your Franchised Business; any services or products provided by you at or from the Store or otherwise related to the operation of the Franchised Business; (11) any services or products provided by any affiliated or nonaffiliated participating entity; (12) any action by any customer, visitor, operator, employee, or guest of the Store or any other facility of your Franchised Business; and, (13) any damage to the property of you or Franchisor, their agents, or employees, or any third person, firm, or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of Franchisor or any of its agents or employees, or resulted from any strict liability imposed on Franchisor or any of its agents or employees. You agree to take all steps reasonably necessary to insure that all employees of Franchised Business are competent to perform the tasks required of a franchisee and will not intentionally harm others, including, but not limited to appropriate drug and alcohol tests and background checks for criminal, fraudulent and motor vehicle offenses.

**THE INDEMNIFICATION REQUIRED UNDER THIS SECTION 20.B SHALL APPLY TO ALL CLAIMS, <u>INCLUDING THOSE THAT ARISE, OR ARE ALLEGED TO ARISE, AS A RESULT</u>**

**OF FRANCHISOR'S OWN NEGLIGENCE OR GROSS NEGLIGENCE, IF ANY, WHETHER FRANCHISOR'S NEGLIGENCE OR GROSS NEGLIGENCE IS THE SOLE, CONTRIBUTING, OR CONCURRING CAUSE OF SUCH ALLEGED DAMAGES THAT MIGHT BE ASSERTED.**

For purposes of this Agreement, the term "Losses and Expenses" means, without limitation, all claims, losses, liabilities, costs, and expenses including compensatory, exemplary, incidental, consequential, statutory, or punitive damages or liabilities; fines, penalties, charges, expenses, lost profits, attorneys' fees, expert fees, costs of investigation, court costs, settlement amounts, judgments, compensation for damages to Franchisor's reputation and goodwill, costs of or resulting from delays, and financing; travel, food, lodging, and other expenses necessitated by Franchisor's need or desire to appear before, or witness the proceedings of, courts or tribunals (including arbitration tribunals), or governmental or quasi-governmental entities, including those incurred by Franchisor's attorneys or experts to attend any of the same; costs of advertising material and media/time/space, and costs of changing, substituting, or replacing the same; and any and all expenses of recall, refunds, compensation, public notices, and all other amounts incurred by Franchisor in connection with the matters described above.  All such Losses and Expenses incurred by Franchisor will be chargeable to and payable by you pursuant to this Section 20.B, regardless of any actions, activities, or defenses undertaken by Franchisor or the subsequent success or failure of such actions, activities, or defenses.

You shall give Franchisor written notice of any event of which you are aware for which indemnification is required within 3 days of your actual or constructive knowledge of such event. At your expense and risk, Franchisor may elect to assume (but under no circumstance is obligated to undertake) the defense and/or settlement thereof, provided that Franchisor will seek your advice and counsel. Any assumption by Franchisor shall not modify your indemnification obligation. Franchisor may, in its sole and absolute discretion, take such actions as it deems necessary and appropriate to investigate, defend, or settle any event, or take other remedial or corrective actions with respect thereof as may be, in Franchisor's sole and absolute discretion, necessary for the protection of the Franchisor Indemnities or the System.  Under no circumstances will Franchisor or the Franchisor Indemnities be required to seek recovery from third parties or to otherwise mitigate their losses to maintain a claim against you; in no event will a failure to pursue recovery from third parties or to mitigate loss reduce the amounts recoverable by Franchisor or the Franchisor Indemnities from you.  The indemnification obligations provided by this Section 20.B will survive the expiration or termination of this Agreement.

## 21.   NOTICES

All notices, requests, and reports required or permitted under this Agreement must be in writing and must be personally delivered, sent by expedited delivery service or certified or registered mail, return receipt requested, first-class postage prepaid, or by facsimile (provided that the sender confirms the facsimile by sending an original confirmation copy by certified mail or expedited delivery service within five calendar days after transmission) to the respective parties at the addresses reflected in the Summary Page, unless and until a different address has been designated by written notice to the other party.  Any notice will be deemed to have been given at the time of personal delivery or receipt; provided, however, that if delivery is rejected, delivery will be deemed to have been given at the time of such rejection.

## 22.   SEVERABILITY AND CONSTRUCTION

### A.   Entire Agreement.

This Agreement, all attachments to this Agreement, and all ancillary agreements executed contemporaneously with this Agreement constitute the final and fully integrated agreement between the parties with regard to the subject matter of this Agreement and supersede any and all prior negotiations, understandings, representations and agreements. Nothing in the preceding sentence, however, is intended to disclaim or require you to waive reliance on any representation made in the Franchise Disclosure Document provided to you by Franchisor.

### B.   Modification.

This Agreement may be modified only by a written document, signed by both parties.

**C.    Written Consent.**

Whenever this Agreement requires the prior approval or consent of Franchisor, you shall make a timely written request to Franchisor therefore and such approval or consent shall be obtained in writing.

**D.    No Waiver.**

No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by you with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms herein.  Franchisor's waiver of any particular default by you shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature, nor shall any delay, forbearance, or omission of Franchisor to exercise any power or right arising out of any breach or default by you of any of the terms, provisions, or covenants hereof affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by you of any terms, covenants, or conditions of this Agreement.

**E.    Severability.**

Except as expressly provided to the contrary herein, each section, part, term, and/or provision of this Agreement shall be considered severable, and if, for any reason, any section, part, term, and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms and/or provisions of this Agreement as may remain otherwise intelligible, and the latter shall continue to be given full force and effect and bind the parties hereto, and said invalid sections, parts, terms and/or provisions shall be deemed not to be a part of this Agreement; provided, however, that if Franchisor determines that such finding of invalidity or illegality adversely affects the basic consideration of this Agreement, Franchisor, at its option, may terminate this Agreement.

**F.    Captions and Headings; References to Gender; Counterparts.**

All captions in this Agreement are intended solely for the convenience of the parties, and none of the captions shall be deemed to affect the meaning or construction of any provision hereof.  All references herein to the masculine, neuter, or singular shall be construed to include the masculine, feminine, neuter, or plural. This Agreement may be executed in one or more originals, each of which shall be deemed an original.

**G.    Persons Bound.**

All acknowledgments, promises, covenants, agreements and obligations herein made or undertaken by you shall be deemed jointly and severally undertaken by all of the parties executing this Agreement as franchisee hereunder.  As used in this Agreement, the term "you" shall include all persons who succeed to the interest of the original franchisee by transfer or operation of law.

**H.    Franchisor's Judgment.**

Whenever this Agreement or any related agreement grants, confers, or reserves to Franchisor the right to take action, refrain from taking action, grant or withhold consent, or grant or withhold approval, Franchisor will, unless the provision specifically states otherwise, have the right to engage in such activity at its option taking into consideration its assessment of the long term interests of the System overall.  You acknowledge and recognize, and any court or judge is affirmatively advised, that if those activities and/or decisions are supported by Franchisor's business judgment, neither said court, said judge, nor any other person reviewing those activities or decisions will substitute his, her, or its judgment for Franchisor's judgment. When the terms of this Agreement specifically require that Franchisor not unreasonably withhold approval or consent, any withholding of our approval or consent will be considered reasonable if you are in default or breach under this Agreement.

23.     **GOVERNING LAW AND FORUM SELECTION**

A.      **Governing Law.**

        This Agreement is made in and takes effect upon its acceptance and execution by Franchisor at its headquarters in Fort Worth, Texas.  This Agreement shall be and all claims arising out of or related to the relationship created hereby shall be governed by and interpreted and construed under the substantive laws of the State of Texas, without regard to it conflicts of laws principles, except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. Section 1051 et seq.) and U.S. Copyright Act, 17 U.S.C. Section 101 et seq.).

B.      **Jurisdiction and Venue.**

        Except as expressly provided by applicable state law, the parties agree that  **ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT AND ANY CLAIM AFFECTING ITS VALIDITY, CONSTRUCTION, EFFECT, PERFORMANCE OR TERMINATION SHALL BE RESOLVED EXCLUSIVELY BY THE FEDERAL OR STATE COURTS LOCATED IN TARRANT COUNTY, TEXAS, TO THE JURISDICTION OF WHICH THE PARTIES HEREBY IRREVOCABLY SUBMIT.**

The parties hereby waive all questions of personal jurisdiction or venue for the purpose of carrying out this provision.  Notwithstanding the foregoing, you acknowledge and agree that Franchisor may bring and maintain an action against you in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders, and preliminary and permanent injunctions.

C.      **Remedy.**

        Unless otherwise specified in this Agreement, no right or remedy conferred upon or reserved by Franchisor or you by this Agreement is intended and it shall not be deemed to be exclusive of any other right or remedy provided or permitted herein, by law or at equity, but each right or remedy shall be cumulative of every other right or remedy.

        You may not under any circumstances make any claim for money damages based on any claim or assertion that Franchisor has unreasonably withheld or delayed any consent or approval under this Agreement, and you hereby waive any such claim for damages, whether by way of affirmative claim, setoff, counterclaim, or defense.  Your sole remedy for any such claim will be an action or proceeding for specific performance of the applicable provision(s) of this Agreement.

D.      **Waiver of Jury Trial.**

        **EACH PARTY HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THIS AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE.**

E.      **Contractual Limitations Period.**

        Any and all claims and actions arising out of or relating to this Agreement, the parties' relationship, or the operation of the Store (including any defenses and any claims of set-off or recoupment), must be brought or asserted before the expiration of the earlier of: (1) the time period for bringing an action under any applicable state or federal statute of limitations; (2) two years after the date upon which a party discovered, or should have discovered, the facts giving rise to an alleged claim; or (3) two years after the first act or omission giving rise to an alleged claim, whichever occurs first; or it is expressly acknowledged and agreed by all parties that such claims or actions shall be irrevocably barred.

F.      **Waiver of Punitive Damages.**

        The parties hereby waive to the fullest extent permitted by law any right to or claim of any punitive,

exemplary, or multiple damages against the other.

**G.**     **Attorneys' Fees.**

If either party commences a legal action against the other party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

**24.**     **ACKNOWLEDGMENTS**

**A.**     **Receipt of Disclosure Document.**

You hereby acknowledge that you received from Franchisor its current franchise disclosure document, together with a copy of all proposed agreements related to the sale of the Franchise, at least 14 calendar days prior to the execution of this Agreement or at least 14 days before you paid us any consideration in connection with the sale or proposed sale of the Franchise granted by this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.A]** _____

**B.**     **Receipt of Agreement.**

You hereby acknowledge that you received from Franchisor this Agreement with all blanks filled in at least seven calendar days prior to the execution of this Agreement. You represent that you have read this Agreement in its entirety and that you have been given the opportunity to clarify any provisions that you did not understand and to consult with an attorney or other professional advisor. You further represent that you understand the terms, conditions, and obligations of this Agreement and agree to be bound thereby.

**[Please initial to acknowledge that you have read and understand this Section 24.B]** _____

**C.**     **Independent Investigation.**

You acknowledge and represent that you are entering into this Agreement, all attachments hereto, and all ancillary agreements executed contemporaneously with this Agreement, as a result of your own independent investigation of all aspects relating to the Franchised Business, and not as a result of any representations about Franchisor or your reliance on any such representations (if made) by its stakeholders, officers, directors, employees, agents, representatives, independent contractors, or franchisees which are contrary to the terms set forth in this Agreement or any franchise disclosure document required or permitted to be given to you pursuant to applicable law. You have been advised and given the opportunity to independently investigate, analyze, and construe the business opportunity being offered under this Agreement, the terms and provisions of this Agreement, and the prospects for the Franchised Business, using the services of legal counsel, accountants, or other advisers of your own choosing; you have either consulted with these advisors or have deliberately declined to do so. You further recognize that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon your skills and ability as an independent business person. This offering is not a security as that term is defined under applicable federal and state securities laws.

**[Please initial to acknowledge that you have read and understand this Section 24.C]** _____

**D.**     **No Representations; No Reliance.**

You acknowledge and represent that, except for representations made in Franchisor's current franchise disclosure document, neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representations, warranties, or guarantees, express or implied, as to the potential revenues, profits, expenses, sales volume, earnings, income, or services of the business venture contemplated under this Agreement, and that you have not relied on any such representations (if made) in making your decision to purchase a URBAN AIR TRAMPOLINE PARK™ franchise. You further acknowledge and represent that neither Franchisor nor its representatives have made any statements inconsistent with the terms of this Agreement.

**[Please initial to acknowledge that you have read and understand this Section 24.D]** _____

**E.**      **No Financial Performance Representations; No Reliance.**

You specifically acknowledge that the only financial performance information furnish by Franchisor is set forth in Item 19 of its current franchise disclosure document; that no officer, director, employee, agent, representative or independent contractor of Franchisor is authorized to furnish you with any other financial performance information; that, if they nevertheless do, you will not rely on any such financial performance information given to you by any such individual; and, that if any such individual attempts to or actually does give you any such financial performance information in contravention of this provision, you will immediately communicate such activity to us.  For the purpose of this Section 24.E, "financial performance information" means information given, whether orally, in writing, or visually which states, suggests or infers a specific level or range of historic or prospective sales, expenses and/or profits of franchised or non-franchised Stores.

**[Please initial to acknowledge that you have read and understand this Section 24.E]** _____

**F.**      **No Licensure Representations; No Reliance.**

You acknowledge that neither Franchisor nor its Affiliates, nor any of their respective stakeholders, officers, directors, employees, agents, representatives, independent contractors, has made any representation or statement on which you have relied regarding your ability to procure any required license, permit, certificate or other governmental authorization that may be necessary or required for you to carry out the activities contemplated by this Agreement

**[Please initial to acknowledge that you have read and understand this Section 24.F]** _____

**G.**      **Reasonable Restrictions.**

You have carefully considered the nature and extent of the restrictions upon you set forth in this Agreement, including, without limitation, the covenants not to compete, the restrictions on assignment, and the rights, obligations, and remedies conferred upon you under this Agreement.  You acknowledge that such restrictions, rights, obligations, and remedies: (a) are reasonable, including, but not limited to, their term and geographic scope; (b) are designed to preclude competition which would be unfair to Franchisor; (c) are fully required to protect Franchisor's legitimate business interests; and, (d) do not confer benefits upon Franchisor that are disproportionate to your detriment.

**[Please initial to acknowledge that you have read and understand this Section 24.G]** _____

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Franchise Agreement to be effective on the day and year first written above.


**UATP MANAGEMENT, LLC**
a Texas limited liability company.


By:   _____
            MICHAEL BROWNING, JR., President

**FRANCHISEE:**

          ,
a

By:   _____
            , its

URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
FRANCHISE AGREEMENT

ATTACHMENT A

GLOSSARY OF ADDITIONAL TERMS

Capitalized terms will have the following meanings, unless otherwise defined in this Agreement.

"**Advertising Cooperative**" means a group of URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Stores formed to facilitate marketing and advertising placement in a particular geographic area.

"**Affiliate**" means any entity that is wholly or partly owned by another entity, that shares common ownership with another entity, or that has an ownership interest in another entity.

"**Business Entity**" means a corporation, limited liability company, limited partnership, or other entity created pursuant to statutory authority.

"**Closed Market**" means any facility serving a captive market, including but not limited to, shopping malls, enclosed shopping centers, and any other enclosed or open retail center (including an "outlet mall") with an aggregate gross leasable area in excess of 350,000 square feet amusement parks; airports, train stations and other centers of mass transportation; travel plazas; casinos; public facilities; college and school campuses; arenas, stadiums, and ballparks; hotels and guest lodging facilities; day care facilities of any kind; resorts; condominium and cooperative facilities; office buildings; convention centers; military bases and installations; government facilities; and any other public attraction or venue or mass gathering events or locations.

"**Competitive Business**" means any business or enterprise that engages in, or grants franchises or licenses for, the operation of indoor trampoline park businesses featuring wall-to-wall trampolines, foam pits, and related activities.

"**Confidential Information**" means all information, knowledge, elements, trade secrets, and know-how utilized or embraced by the System, or which otherwise concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software; including, but not limited to: the Standards and all elements of the System and all products, services, equipment, technologies, policies, standards, requirements, criteria, and procedures which now or in the future are a part of the System; all information contained in the Manual, including supplements to the Manual; Franchisor's standards and specifications for product preparation, packaging, and service; all specifications, sources of supply, all procedures, systems, techniques and activities employed by Franchisor or by you in the offer and sale of products and/or services at or from your Franchised Business; all pricing paradigms established by Franchisor or by you; all of Franchisor's and/or your sources, or prospective sources, of supply and all information pertaining to same, including wholesale pricing structures, the contents of sourcing agreements, and the identity of vendors and suppliers; Franchisor's specifications, and your final plans, for the construction, buildout, design, renovation, décor, equipment, signage, furniture, fixtures and trade dress elements of your Store; the identify of, and all information relating to, the computer and POS hardware and software utilized by Franchisor and you; all information and data pertaining to Franchisor's and/or your advertising, marketing, promotion, and merchandising campaigns, activities, materials, specifications and procedures; all customer lists and records generated and/or otherwise maintained by your Franchised Business; all internet/web protocols, procedures, and content related to the System and your Franchised Business; Franchisor's training and other instructional programs and materials; all elements of Franchisor's recommended staffing, staff training, and staff certification policies and procedures; all communications between you and Franchisor, including the financial and other reports you are required to submit to Franchisor under this Agreement; additions to, deletions from, and modifications and variations of the components of the System and the other systems and methods of operations which Franchisor employs now or in the future; all other knowledge, trade secrets, or know-how concerning the methods of operation of

your Franchised Business which may be communicated to you, or of which you may be apprised, by virtue of operation under the terms of the Franchise Agreement; and all other information, knowledge, and know-how which either Franchisor or its affiliates, now or in the future, designate as "Confidential Information."

"**Franchise Site Application**" means the form of application prescribed by Franchisor, from time to time, and used to evaluate proposed sites for the Store premises.

"**Gross Sales**" means the dollar aggregate of: means the dollar aggregate of: (1) the sales price of all items, goods, wares and merchandise sold, and the charges for all services you perform, whether made for cash, on credit or otherwise, without reserve or deduction for inability or failure to collect, including sales and services (A) originating at the Store premises even if delivery or performance is made offsite from the Store premises, (B) placed by mail, facsimile, telephone, the internet and similar means if received or filled at or from the Store premises, and (C) that you in the normal and customary course of your operations would credit or attribute to the operation of the Franchised Business; and (2) all monies, trade value or other things of value that you receive from Store operations at, in, or from the Store premises that are not expressly excluded from Gross Sales.  Gross Sales does not include: (1) the exchange of merchandise between Stores  (if you operate multiple franchises) if the exchanges are made solely for the convenient operation of your business and not for the purpose of depriving us of the benefit of a sale that otherwise would have been made at, in, on or from the Store premises; (2) returns to shippers, vendors, or manufacturers; (3) sales of fixtures or furniture after being used in the conduct of the Franchised Business; (4) the sale of gift certificates and stored value cards (the redemption value will be included in Gross Sales at the time of redemption); (5) insurance proceeds; (6) sales to employees at a discount; (7) cash or credit refunds for transactions included within Gross Sales (limited, however, to the selling price of merchandise returned by the purchaser and accepted by you); (8) the amount of any city, county, state or federal sales, luxury or excise tax on such sales that is both (A) added to the selling price or absorbed therein and (B) paid to the taxing authority.  A purchase returned to the Store may not be deducted from Gross Sales unless the purchase was previously included in Gross Sales.

"**Manual**" means the series of documents, publications, bulletins, materials, drawings, memoranda, CDs, DVDs, MP3s, and other media Franchisor may loan you from time to time, which sets forth the System's operating systems, procedures, policies, methods, standards, specifications, and requirements for operating your Store,and which contains information and knowledge necessary and material to the System, and designated by Franchisor as the mandatory guide for the development and operation of URBAN AIR TRAMPOLINE PARK$^{TM}$ Stores, including, without limitation, the URBAN AIR TRAMPOLINE PARK$^{TM}$ confidential and proprietary Operations Manual, as Franchisor may, in its sole discretion, revise, amend, modify, or update from time to time upon notice of such revisions, amendment, modification, or update to you or your Affiliates.

"**Owners**" means you and your spouse if you are an individual, or each individual or entity holding a beneficial ownership in you and/or the franchisee individual(s) or entity(ies) that enter into any Franchise Agreements pursuant to this Agreement if you are a Business Entity.  It includes all officers, directors, and shareholders of a corporation, all managers and members of a limited liability company, all general and limited partners of a limited partnership, and the grantor and the trustee of the trust.  If any Owner is a Business Entity, then the term "Owner" also includes the Owners of that Business Entity.

"**Person**" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, a limited liability company, a government, or any department or agency thereof, a trust, and any other incorporated or unincorporated association or organization.

"**Proprietary Marks**" means the trade names, service marks, trademarks, logos, emblems, and indicia of origin as Franchisor may designate in writing for use in connection with the System, including, but not limited to, the collection of trademarks listed in the chart below for the country in which your Store is located.

"**Protected Area**" means the geographic or other area identified in Attachment B to this Agreement.

"**Site Selection Area**" means the geographical area identified in the Summary Page.

"**Standards**" means the standards, specifications, policies, procedures, and techniques that Franchisor has

developed relating to the location, establishment, operation, and promotion of Franchisor's Franchised Businesses, all of which may be changed by Franchisor in its sole discretion.  The Standards include, among other things: required and recommended business practices; product preparation techniques; presentation standards; standards and specifications for Store design and appearance; customer service standards; sales techniques and procedures; and other management, operational, and accounting procedures.

"**Term**" means a number of years as reflected on the Summary Page.

## LISTING OF PROPRIETARY MARKS

Our affiliate, UATP Management, LLC has applied to register the following marks on the Principal Register of the U.S. Patent and Trademark Office.

| Mark | Serial No. | Application Date |
|------|-----------|------------------|
| URBAN AIR TRAMPOLINE PARK (Standard Character Word Mark) | 86/501,218 | January 12, 2015 |
| GET UP. GET FLY (Standard Character Word Mark) | 86/503,565 | January 14, 2015 |
| URBAN AIR TRAMPOLINE PARK (Stylized and/or with design) | 86605583 | April 22, 2015 |

CURRENTLY, WE DO NOT HAVE A FEDERAL REGISTRATION FOR THESE MARKS. THEREFORE, THESE MARKS DO NOT HAVE MANY OF THE LEGAL BENEFITS AND RIGHTS INHERENT IN FEDERALLY REGISTERED TRADEMARKS.  IF OUR RIGHT TO USE THESE MARKS IS CHALLENGED, YOU MAY HAVE TO CHANGE TO AN ALTERNATIVE MARK, WHICH MAY INCREASE YOUR EXPENSES.

**URBAN AIR TRAMPOLINE PARK<sup>TM</sup>**
**FRANCHISE AGREEMENT**

**ATTACHMENT B**

**APPROVED LOCATION AND PROTECTED AREA**


Section 1.A.      The Approved Location is at:

Section 1.B.      The Protected Area is a          radius surrounding the Store location.


     IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this <u>Attachment B</u> on the date set forth below to be effective on the day and year first written above.

**FRANCHISOR:**

UATP MANAGEMENT, LLC
a Texas limited liability company.


By:  _____
      MICHAEL BROWNING, JR.,
      President


**FRANCHISEE:**

   ,
a

By:  _____
      , its

**URBAN AIR TRAMPOLINE PARK<sup>TM</sup>**
**FRANCHISE AGREEMENT**

**ATTACHMENT C**

**FRANCHISEE'S OWNERS AND KEY PERSONNEL**

A.    The following is a list of all shareholders, partners, members, or other investors owning a direct or indirect interest in the Franchisee, and a description of the nature of their interest, each of whom shall execute the Undertaking and Guaranty substantially in the form set forth in Attachment D-1 to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | OWNERSHIP INTEREST IN FRANCHISEE | NATURE OF INTEREST |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

B.    The following is a list of all of Franchisee's Owners and key personnel, each of whom shall execute the Confidentiality Agreement and Non-Competition Agreement substantially in the form set forth in Attachment D-2 to the Franchise Agreement:

| NAME, ADDRESS, AND TELEPHONE NUMBER | POSITION |
|---|---|
|  |  |
|  |  |
|  |  |

C.    Franchisee's Designated Manager is:

Telephone Number:

Email Address:

URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
FRANCHISE AGREEMENT

**ATTACHMENT D-1**

**UNDERTAKING AND GUARANTY**

By virtue of executing a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Franchise Agreement dated ("Franchise Agreement"), ("Franchisee"), has acquired the right and franchise from UATP MANGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Franchised Business ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK<sup>TM</sup> ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

Pursuant to the terms and conditions of the Franchise Agreement, each of the undersigned hereby acknowledges and agrees as follows:

1.      I have read the terms and conditions of the Franchise Agreement and acknowledge that the execution of this Undertaking and Guaranty and the undertakings of the Owners in the Franchise Agreement are in partial consideration for, and a condition to, the granting of the rights under the Franchise Agreement.  I understand and acknowledge that Franchisor would not have granted such rights without the execution of this Undertaking and Guaranty and the other undertakings of the Owners in the Franchise Agreement.

2.      I own a beneficial interest in the Franchisee, and I am included within the term "Owner" as defined in the Franchise Agreement.

3.      I, individually and jointly and severally with the other Owners, hereby make all of the covenants, representations, warranties, and agreements of the Owners set forth in the Franchise Agreement, and agree that I am obligated to and will perform thereunder, including, without limitation, the provisions regarding compliance with the Franchise Agreement in Section 11, the use of confidential information in Section 14, the covenants in Section 14, the transfer provisions in Section 17, the choice of law and venue provisions in Section 23, and the indemnification obligations in Section 20.

4.      I, individually and jointly and severally with the other Owners, unconditionally and irrevocably guarantee to Franchisor and its successors and assigns that all obligations of the Franchisee under the Franchise Agreement will be punctually paid and performed.  Upon default by the Franchisee or upon notice from Franchisor, I will immediately make each payment and perform each obligation required of the Franchisee under the Franchise Agreement. Without affecting the obligations of any Owner under this or any other Undertaking and Guaranty, Franchisor may, without notice to any Owner, waive, renew, extend, modify, amend, or release any indebtedness or obligation of the Franchisee or settle, adjust, or compromise any claims that Franchisor may have against the Franchisee.  I waive all demands and notices of every kind with respect to the enforcement of this Undertaking and Guaranty, including notices of presentment, demand for payment or performance by the Franchisee, any default by the Franchisee or any guarantor, and any release of any guarantor or other security for this Undertaking and Guaranty or the obligations of the Franchisee.  Franchisor may pursue its rights against me without first exhausting its remedies against the Franchisee and without joining any other guarantor and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.  Upon Franchisor's receipt of notice of the death of any Owner, the estate of the deceased will be bound by the foregoing Undertaking and Guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in that event, the obligations of the Owners who survive such death will continue in full force and effect.

5.      No modification, change, impairment, or suspension of any of Franchisor's rights or remedies shall in any way affect any of my obligations under this Undertaking and Guaranty. If the Franchisee has pledged other security or if one or more other persons have personally guaranteed performance of the Franchisee's obligations, I agree that Franchisor's release of such security will not affect my liability under this Undertaking and Guaranty.

6.      I agree that any notices required to be delivered to me will be deemed delivered at the time delivered by hand; one Business Day after delivery by Express Mail or other recognized, reputable overnight courier; or three Business Days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the address identified on the signature line below.  I may change this address only by delivering to Franchisor written notice of the change.

7.      I understand that Franchisor's rights under this Undertaking and Guaranty shall be in addition to, and not in lieu of, any other rights or remedies available to Franchisor under applicable law;

8.      I agree to be bound individually to all of the provisions of the Franchise Agreement including, without limitation, the litigation and dispute resolution provisions set forth in <u>Section 23</u>, and I irrevocably submit to the jurisdiction of the state court situated in Tarrant County, Texas, or the U.S. District Court for the Northern District of Texas, Fort Worth Division; and

9.      **<u>I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE</u>**.

10.      This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by Franchisor.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Development Agreement.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has executed this Undertaking and Guaranty to be effective on the day and year first written above.

**OWNER**

_____
Signature

Name:
Address:          _____
Telephone:       _____

## UNDERTAKING AND GUARANTY

By virtue of executing a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Franchise Agreement dated ("Franchise Agreement"), ("Franchisee"), has acquired the right and franchise from UATP MANGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Franchised Business ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK<sup>TM</sup> ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

Pursuant to the terms and conditions of the Franchise Agreement, each of the undersigned hereby acknowledges and agrees as follows:

1.      I have read the terms and conditions of the Franchise Agreement and acknowledge that the execution of this Undertaking and Guaranty and the undertakings of the Owners in the Franchise Agreement are in partial consideration for, and a condition to, the granting of the rights under the Franchise Agreement.  I understand and acknowledge that Franchisor would not have granted such rights without the execution of this Undertaking and Guaranty and the other undertakings of the Owners in the Franchise Agreement.

2.      I own a beneficial interest in the Franchisee, and I am included within the term "Owner" as defined in the Franchise Agreement.

3.      I, individually and jointly and severally with the other Owners, hereby make all of the covenants, representations, warranties, and agreements of the Owners set forth in the Franchise Agreement, and agree that I am obligated to and will perform thereunder, including, without limitation, the provisions regarding compliance with the Franchise Agreement in Section 11, the use of confidential information in Section 14, the covenants in Section 14, the transfer provisions in Section 17, the choice of law and venue provisions in Section 23, and the indemnification obligations in Section 20.

4.      I, individually and jointly and severally with the other Owners, unconditionally and irrevocably guarantee to Franchisor and its successors and assigns that all obligations of the Franchisee under the Franchise Agreement will be punctually paid and performed.  Upon default by the Franchisee or upon notice from Franchisor, I will immediately make each payment and perform each obligation required of the Franchisee under the Franchise Agreement. Without affecting the obligations of any Owner under this or any other Undertaking and Guaranty, Franchisor may, without notice to any Owner, waive, renew, extend, modify, amend, or release any indebtedness or obligation of the Franchisee or settle, adjust, or compromise any claims that Franchisor may have against the Franchisee.  I waive all demands and notices of every kind with respect to the enforcement of this Undertaking and Guaranty, including notices of presentment, demand for payment or performance by the Franchisee, any default by the Franchisee or any guarantor, and any release of any guarantor or other security for this Undertaking and Guaranty or the obligations of the Franchisee.  Franchisor may pursue its rights against me without first exhausting its remedies against the Franchisee and without joining any other guarantor and no delay on the part of Franchisor in the exercise of any right or remedy will operate as a waiver of the right or remedy, and no single or partial exercise by Franchisor of any right or remedy will preclude the further exercise of that or any other right or remedy.  Upon Franchisor's receipt of notice of the death of any Owner, the estate of the deceased will be bound by the foregoing Undertaking and Guaranty, but only for defaults and obligations under the Franchise Agreement existing at the time of death, and in that event, the obligations of the Owners who survive such death will continue in full force and effect.

5.      No modification, change, impairment, or suspension of any of Franchisor's rights or remedies shall in any way affect any of my obligations under this Undertaking and Guaranty. If the Franchisee has pledged other security or if one or more other persons have personally guaranteed performance of the

Franchisee's obligations, I agree that Franchisor's release of such security will not affect my liability under this Undertaking and Guaranty.

6.     I agree that any notices required to be delivered to me will be deemed delivered at the time delivered by hand; one Business Day after delivery by Express Mail or other recognized, reputable overnight courier; or three Business Days after placement in the United States Mail by Registered or Certified Mail, Return Receipt Requested, postage prepaid and addressed to the address identified on the signature line below.  I may change this address only by delivering to Franchisor written notice of the change.

7.     I understand that Franchisor's rights under this Undertaking and Guaranty shall be in addition to, and not in lieu of, any other rights or remedies available to Franchisor under applicable law;

8.     I agree to be bound individually to all of the provisions of the Franchise Agreement including, without limitation, the litigation and dispute resolution provisions set forth in Section 23, and I irrevocably submit to the jurisdiction of the state court situated in Tarrant County, Texas, or the U.S. District Court for the Northern District of Texas, Fort Worth Division; and

9.     **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE**.

10.    This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by Franchisor.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Development Agreement.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, has executed this Undertaking and Guaranty to be effective on the day and year first written above.

**OWNER**

_____
Signature

Name:
Address:
Telephone:

**URBAN AIR TRAMPOLINE PARK<sup>TM</sup>**
**FRANCHISE AGREEMENT**

**ATTACHMENT D-2**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

In consideration of my being a _____ of _____ ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.  Through a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> Franchise Agreement dated _____ ("Franchise Agreement"), Franchisee has acquired the right and franchise from UATP MANAGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK<sup>TM</sup> franchise Store ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK<sup>TM</sup> ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

2.  Franchisor possesses certain proprietary and confidential information, knowledge, elements, and know-how which is utilized in the operation of the System, including, without limitation, the Operations Manual, trade secrets, copyrighted materials, methods, and other techniques and know-how which concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software, as further defined in the Franchise Agreement ("Confidential Information").

3.  Any and all manuals, trade secrets, copyrighted materials, methods, information, knowledge, know-how, and techniques which Franchisor specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

4.  I acknowledge that, as a _____ of the Franchisee, Franchisor and Franchisee have or will furnish me with valuable specialized training and will disclose Confidential Information to me in furnishing to me the training program and subsequent ongoing training and other general assistance during the term of this Agreement.

5.  I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and I acknowledge that the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

6.  The Confidential Information is proprietary, involves trade secrets of Franchisor, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by Franchisor as confidential. Unless Franchisor otherwise agrees in writing, I will not disclose and/or use the Confidential Information except in connection with the operation of the Franchised Business as a _____ of the Franchisee, and then only in strict compliance with the Manual and System and only to such employees having a need to know; I will not directly or indirectly imitate, duplicate, or "reverse engineer" any Confidential Information or any other information designated by Franchisor as confidential or aid any third party in such actions; and I will continue not to disclose and/or use any Confidential Information or any other information designated by Franchisor as confidential even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

7.  Except as otherwise approved in writing by Franchisor, I will not (either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person, or legal entity) at any time while I am employed by or associated with the Franchisee, or at any time during the uninterrupted three-year

period (which will be tolled during any period of noncompliance) after I cease to be employed by or associated with the Franchisee (or the three-year period after the expiration or earlier termination of the Franchise Agreement, whichever occurs first):

(a)     Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK$^{TM}$ Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System defined and described in the Franchise Agreement;

(b)     Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)     Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK$^{TM}$ Store operated by Franchisee or its Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor.  While I am employed by or associated with the Franchisee, this restriction shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks.  After I cease to be employed by or associated with the Franchisee (or after the expiration or earlier termination of the Franchise Agreement, whichever occurs first), this restriction shall apply to any business that is or is intended to be located at the location of any former URBAN AIR TRAMPOLINE PARK$^{TM}$ Store or within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK$^{TM}$ Store then operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

8.     I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9.     I understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

10.     Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or Franchisor may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and Franchisor all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and Franchisor, any claim I have against the Franchisee or Franchisor is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

11.     This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Development Agreement.

12.     With respect to all claims, controversies and disputes, I irrevocably consent to personal jurisdiction and submit myself to the jurisdiction of the state courts located in Tarrant County, Texas, and the United States District Court for the Northern District of Texas.  I acknowledge that this Agreement has been entered into in the state of Texas, and that I am to receive valuable information emanating from Franchisor's headquarters in Fort Worth, Texas.  In recognition of the information and its origin, I hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Texas as set forth above.  Notwithstanding the foregoing, I acknowledge and agree that Franchisor may bring and maintain an action against me in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.

13.     **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE**.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Confidentiality and Non-Competition Agreement to be effective on the day and year first written above.


_____
Signature

Name:
Address:
Telephone:


**ACKNOWLEDGED BY FRANCHISEE**

,
a


By:  _____
        , its

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

In consideration of my being a _____ of _____ ("Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.  Through a URBAN AIR TRAMPOLINE PARK$^{TM}$ Franchise Agreement dated _____ ("Franchise Agreement"), Franchisee has acquired the right and franchise from UATP MANAGEMENT, LLC ("Franchisor") to establish and operate a URBAN AIR TRAMPOLINE PARK$^{TM}$ franchise Store ("Franchised Business") and the right to use in the operation of the Franchised Business Franchisor's trade names, trademarks, service marks, including the service mark URBAN AIR TRAMPOLINE PARK$^{TM}$ ("Proprietary Marks") and the system developed by Franchisor and/or its affiliates for operation and management of Franchised Businesses ("System"), as they may be changed, improved, and further developed from time to time in Franchisor's sole discretion.

2.  Franchisor possesses certain proprietary and confidential information, knowledge, elements, and know-how which is utilized in the operation of the System, including, without limitation, the Operations Manual, trade secrets, copyrighted materials, methods, and other techniques and know-how which concerns Franchisor's systems of operation, programs, services, products, customers, practices, materials, books, records, financial information, manuals, computer files, databases, or software, as further defined in the Franchise Agreement ("Confidential Information").

3.  Any and all manuals, trade secrets, copyrighted materials, methods, information, knowledge, know-how, and techniques which Franchisor specifically designates as confidential shall be deemed to be Confidential Information for purposes of this Agreement.

4.  I acknowledge that, as a _____ of the Franchisee, Franchisor and Franchisee have or will furnish me with valuable specialized training and will disclose Confidential Information to me in furnishing to me the training program and subsequent ongoing training and other general assistance during the term of this Agreement.

5.  I will not acquire any interest in the Confidential Information, other than the right to utilize it in the operation of the Franchised Business during the term hereof, and I acknowledge that the use or duplication of the Confidential Information for any use outside the System would constitute an unfair method of competition.

6.  The Confidential Information is proprietary, involves trade secrets of Franchisor, and is disclosed to me solely on the condition that I agree, and I do hereby agree, that I shall hold in strict confidence all Confidential Information and all other information designated by Franchisor as confidential. Unless Franchisor otherwise agrees in writing, I will not disclose and/or use the Confidential Information except in connection with the operation of the Franchised Business as a _____ of the Franchisee, and then only in strict compliance with the Manual and System and only to such employees having a need to know; I will not directly or indirectly imitate, duplicate, or "reverse engineer" any Confidential Information or any other information designated by Franchisor as confidential or aid any third party in such actions; and I will continue not to disclose and/or use any Confidential Information or any other information designated by Franchisor as confidential even after I cease to be in that position unless I can demonstrate that such information has become generally known or easily accessible other than by the breach of an obligation of Franchisee under the Franchise Agreement.

7.  Except as otherwise approved in writing by Franchisor, I will not (either directly or indirectly, for myself or through, on behalf of, or in conjunction with any person, or legal entity) at any time while I am employed by or associated with the Franchisee, or at any time during the uninterrupted three-year period (which will be tolled during any period of noncompliance) after I cease to be employed by or associated with the Franchisee (or the three-year period after the expiration or earlier termination of the Franchise Agreement, whichever occurs first):

(a)     Divert or attempt to divert any present or prospective customer of any URBAN AIR TRAMPOLINE PARK[TM] Store to any Competitive Business, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act that is harmful, injurious, or prejudicial to the goodwill associated with the Proprietary Marks and the System defined and described in the Franchise Agreement;

(b)     Employ or seek to employ any person who is or has within the previous 60 days been employed by Franchisor or an Affiliate of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

(c)     Own, maintain, advise, operate, engage in, be employed by, make loans to, invest in, provide any assistance to, or have any direct or indirect interest in (as owner or otherwise) or relationship or association with, any Competitive Business other than a URBAN AIR TRAMPOLINE PARK[TM] Store operated by Franchisee or its Affiliates pursuant to a then-currently effective Franchise Agreement with Franchisor.  While I am employed by or associated with the Franchisee, this restriction shall apply to any location within the United States, its territories or commonwealths, and any other country, province, state, or geographic area in which Franchisor or its Affiliates have used, sought registration of, or registered the Proprietary Marks or similar marks, or have operated or licensed others to operate a business under the System or the Proprietary Marks or similar marks.  After I cease to be employed by or associated with the Franchisee (or after the expiration or earlier termination of the Franchise Agreement, whichever occurs first), this restriction shall apply to any business that is or is intended to be located at the location of any former URBAN AIR TRAMPOLINE PARK[TM] Store or within a 25-mile radius of any other URBAN AIR TRAMPOLINE PARK[TM] Store then operating under the System and Proprietary Marks in existence or under development at the time of such termination or transfer.

8.      I agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Agreement is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an un-appealed final decision to which Franchisor is a party, I expressly agree to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Agreement.

9.      I understand and acknowledge that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in this Agreement, or any portion thereof, without my consent, effective immediately upon receipt by me of written notice thereof, and I agree to comply forthwith with any covenant as so modified.

10.     Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with the Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and the Franchisee irreparable harm; therefore, I acknowledge and agree that the Franchisee and/or Franchisor may apply for the issuance of an injunction preventing me from violating this Agreement, and I agree to pay the Franchisee and Franchisor all the costs it/they incur(s), including, without limitation, legal fees and expenses, if this Agreement is enforced against me.  Due to the importance of this Agreement to the Franchisee and Franchisor, any claim I have against the Franchisee or Franchisor is a separate matter and does not entitle me to violate, or justify any violation of this Agreement.

11.     This Agreement shall be construed under the laws of the State of Texas.  The only way this Agreement can be changed is in writing signed by both the Franchisee and me.  Any capitalized terms contained in but not defined by this Guaranty and Personal Undertaking shall have the same meaning prescribed to that word in the Franchise Development Agreement.

12.     With respect to all claims, controversies and disputes, I irrevocably consent to personal jurisdiction and submit myself to the jurisdiction of the state courts located in Tarrant County, Texas, and the United States District Court for the Northern District of Texas.  I acknowledge that this Agreement

has been entered into in the state of Texas, and that I am to receive valuable information emanating from Franchisor's headquarters in Fort Worth, Texas.  In recognition of the information and its origin, I hereby irrevocably consent to the personal jurisdiction of the state and federal courts of Texas as set forth above.  Notwithstanding the foregoing, I acknowledge and agree that Franchisor may bring and maintain an action against me in any court of competent jurisdiction for injunctive or other extraordinary relief against threatened conduct that will cause it loss or damages, under the usual equity rules, including the applicable rules for obtaining restraining orders and preliminary and permanent injunctions.

13.      **I WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM, WHETHER AT LAW OR IN EQUITY, INVOLVING FRANCHISOR, WHICH ARISES OUT OF OR IS RELATED IN ANY WAY TO THIS AGREEMENT, THE FRANCHISE AGREEMENT, THE PERFORMANCE OF ANY PARTY UNDER THE FRANCHISE AGREEMENT, AND/OR THE OFFER OR GRANT OF THE FRANCHISE**.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Confidentiality and Non-Competition Agreement to be effective on the day and year first written above.


_____

Signature

Name:
Address:          _____
Telephone:        _____

**ACKNOWLEDGED BY FRANCHISEE**


    ,
a

By: _____
       , its

**URBAN AIR TRAMPOLINE PARK**<sup>TM</sup>
**FRANCHISE AGREEMENT**

**ATTACHMENT E**

**ELECTRONIC DEBT AUTHORIZATION**

**Authorization Agreement for Direct Payments (ACH Debits)**

I (we) hereby authorize UATP Management, LLC., a Texas limited liability company, hereinafter called Franchisor, to initiate debit entries to my (our ) ☐ Checking Account/ ☐ Savings Account (select one) indicated below at the depository financial institution named below, hereafter called DEPOSITORY, and to debit the same to such account.  I (we) acknowledge that the origination of ACH transactions to my (our) account must comply with the provisions of U.S. law.

Depository Name:                    Branch:

City:              State:                Zip:

Routing Number:          Account Number:

This authorization is remain in full force and effect until Franchisor has received written notification from me (or either of us) or its termination in such time and in such manner as to afford Franchisor and DEPOSITOR a reasonable opportunity to act on it.

Name(s):_____          ID Number:_____
        (Please Print)

Date:_____          Signature:_____


**NOTE:  DEBIT AUTHORIZATIONS MUST PROVIDE THAT THE RECEIVER MAY REVOKE THE AUTHORIZATION ONLY BY NOTIFYING THE ORIGINATOR IN THE MANNER SPECIFIED IN THE AUTHORIZATION**

## URBAN AIR TRAMPOLINE PARK<sup>TM</sup>
## FRANCHISE AGREEMENT

## ATTACHMENT F

## TELEPHONE ASSIGNMENT AGREEMENT

THIS TELEPHONE ASSIGNMENT AGREEMENT is made on       , by and between       ("Assignor") and UATP MANAGEMENT, LLC or its designee ("Assignee").

## BACKGROUND

A.     The Assignee has developed and owns the proprietary system ("**System**") for the operation of a Store under the trademark and logo URBAN AIR TRAMPOLINE PARK<sup>TM</sup> (the "**Franchised Business**");

B.     The Assignor has been granted a license to operate a Franchised Business pursuant to a Franchise Agreement dated     , in accordance with the System;

C.     In order to operate its Franchised Business, the Assignor shall be acquiring one or more telephone numbers, telephone listings and telephone directory advertisements; and

D.     As a condition to the execution of the Franchise Agreement, the Assignee has required that the Assignor assign all of its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements to the Assignee in the event of a termination of the Franchise Agreement;

## AGREEMENT

In consideration of the foregoing, the mutual premises herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     Assignment.  In the event of termination of the Franchise Agreement, and in order to secure continuity and stability of the operation of the System, the Assignor hereby sells, assigns, transfers and conveys to the Assignee all of its rights, title and interest in and to certain telephone numbers, telephone listings and telephone directory advertisements pursuant to which Assignor shall operate its Franchised Business in accordance with the terms of the Franchise Agreement; provided, however, such Assignment shall not be effective unless and until the Franchise Agreement is terminated in accordance with the provisions thereof.

2.     Representation and Warranties of the Assignor.  The Assignor hereby represents, warrants and covenants to the Assignee that:

(a)     As of the effective date of the Assignment, all of the Assignor's obligations and indebtedness for telephone, telephone listing services and telephone directory advertisement services shall be paid and current;

(b)     As of the date hereof, the Assignor has full power and legal right to enter into, execute, deliver and perform this Agreement;

(c)     This Agreement is a legal and binding obligation of the Assignor, enforceable in accordance with the terms hereof;

(d)     The execution, delivery and performance of this Assignment does not conflict with, violate, breach or constitute a default under any contract, agreement or instrument to which the Assignor is a party or by which the Assignor is bound, and no consent of nor approval by any third party is required in connection herewith; and

(e)     The Assignor has the specific power to assign and transfer its right, title and interest in its telephone numbers, telephone listings and telephone directory advertisements, and the Assignor has obtained all necessary consents to this Assignment.

3.     <u>Miscellaneous</u>.  The validity, construction and performance of this Assignment shall be governed by the laws of the State of Texas.  All agreements, covenants, representations and warranties made herein shall survive the execution hereof.  All rights of the Assignee shall inure to its benefit and to the benefit of its successors and assigns.

IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Telephone Assignment Agreement to be effective on the day and year first written above.

**ASSIGNEE:**

UATP MANAGEMENT, LLC
a Texas limited liability company.

By: _____

MICHAEL BROWNING, JR.,
President

**ASSIGNOR:**

,
a

By: _____

, its

## URBAN AIR TRAMPOLINE PARK™
## FRANCHISE AGREEMENT

## ATTACHMENT G

## LEASE RIDER

THIS AGREEMENT is made and entered into on _____, 2015, by and among UATP MANAGEMENT, LLC, having its principal offices at 317 S. Jenkins, Suite C Grapevine, Texas 76051 ("Franchisor"), _____, having its principal offices at _____ ("Landlord"), and         , having its principal offices at    .    ("Tenant").

## BACKGROUND

A.      Landlord and Tenant have executed a lease agreement dated _____ ("Lease") for the premises located at        ("Leased Premises") for use by Tenant as a business to be opened pursuant to Franchisor's proprietary marks and system in connection with a Franchise Agreement dated     by and between Franchisor and Tenant  ("Franchise Agreement");

B.      A condition to the approval of Tenant's specific location by Franchisor is that the Lease for the Leased Premises designated for the operation of a URBAN AIR TRAMPOLINE PARK™ franchise Store ("Franchised Business") contain the agreements set forth herein;

C.      Landlord acknowledges that Franchisor requires the modifications to the Lease set forth herein as a condition to its approving the Leased Premises as a site for the Franchised Business, and that Landlord agrees to modify and amend the Lease in accordance with the terms and conditions contained herein; and

D.      According to Section 3.C of the Franchise Agreement, all rights, title and interest in and to the Lease must be assigned to Franchisor, at Franchisor's option, upon the termination of the Franchise Agreement;

## AGREEMENT

In consideration of the mutual undertakings and commitments set forth herein, the receipt and sufficiency of which are hereby acknowledged, agree as follows:

1.      Use Clause.  The Leased Premises shall be used solely for the operation of a URBAN AIR TRAMPOLINE PARK™ Store and identified by the mark URBAN AIR TRAMPOLINE PARK™ or such other name as may be specified by Franchisor.  Landlord acknowledges that such use shall not violate any then-existing exclusive rights granted to any existing tenant of Landlord.  Landlord consents to Tenant's use of Franchisor's marks and signs, décor items, color schemes and related components of Franchisor's proprietary system.  Landlord further acknowledges that during the term of this Lease or any extension thereof, Landlord will not lease space to another business operating an indoor trampoline park featuring wall-to-wall trampolines, foam pits, and related activities within the same shopping center in which the Franchised Business is located.

2.      Termination of the Franchise Agreement.  If the Franchise Agreement between Franchisor and Tenant is terminated for any reason during the term of the Lease or any extension thereof,  Tenant, upon the written request of Franchisor, shall assign to Franchisor all of its rights, title and interest in and to the Lease, and Franchisor or any affiliate designated by Franchisor may agree to assume from the date of assignment all of Tenant's obligations remaining under the Lease, and may assume Tenant's occupancy rights, and the right to sublease the premises, for the remainder of the term of the Lease.  If Franchisor elects to accept the assignment of the Lease from Tenant, it shall give Tenant and Landlord written notice of its election to acquire the leasehold interest.  Landlord hereby consents to the assignment of the Lease from Tenant to Franchisor, and shall not charge any fee or accelerate rent under the Lease.  Alternatively, in the event of a termination of the Franchise Agreement, Franchisor

may elect to enter into a new lease with Landlord containing terms and conditions no less favorable than the Lease.  Upon Landlord's receipt of written notice from Franchisor advising Landlord that Franchisor elects to enter into a new lease, Landlord shall execute and deliver such new lease to Franchisor for its acceptance.  Landlord and Tenant shall deliver possession of the Leased Premises to Franchisor, free and clear of all rights of  Tenant or third parties, subject to Franchisor executing an acceptance of the assignment of Lease or new lease, as the case may be.

3. <u>Tenant's Agreement to Vacate Leased Premises</u>.  Tenant agrees to peaceably and promptly vacate the Leased Premises and, subject to Franchisor's right to acquire any such property pursuant to its Franchise Agreement with Tenant, to remove its personal property therefrom upon the termination of the Franchise Agreement.  Any property not removed or otherwise disposed of by Tenant shall be deemed abandoned.

4. <u>Delivery of Possession</u>.  If Landlord may not legally obtain possession of the Leased Premises or if Landlord is unable to deliver the Leased Premises to Franchisor within six (6) months from the date Franchisor notifies Landlord of its election to continue the use of the Leased Premises, then Franchisor shall have the right at any time thereafter to rescind its election to acquire a leasehold interest  in the Leased Premises and to terminate the Lease or any new lease between it and Landlord for the Leased Premises, and Landlord shall release Franchisor from all of its obligations under the Lease or any new lease.

5. <u>Entry</u>.  Franchisor may enter the Leased Premises without the consent of Landlord or Tenant to make any modification necessary to protect Franchisor's proprietary system or marks or to cure any default under the Franchise Agreement or under the Lease, without being guilty of trespass or any other crime or tort.

6. <u>Amendment of Lease</u>.  Landlord and Tenant agree not to amend the Lease in any respect, except with the prior written consent of Franchisor.

7. <u>Franchisor Not a Guarantor</u>.  Landlord acknowledges and agrees that notwithstanding any terms or conditions contained in this Agreement or any other agreement, Franchisor shall in no way be construed as a guarantor or surety of Tenant's obligations under the Lease.  Notwithstanding the foregoing, in the event Franchisor becomes the tenant by assignment of the Lease in accordance with the terms hereof or enters into a new lease with Landlord, then Franchisor shall be liable for all of the obligations of Tenant on its part to be performed or observed under the Lease or a new lease.

8. <u>Document to Govern</u>.  The terms and conditions contained herein modify and supplement the Lease.  Whenever any inconsistency or conflict exists between this Agreement and the Lease, the terms of this Agreement shall prevail.

9. <u>Waiver.</u>  Failure of Franchisor to enforce or exercise any of its rights hereunder shall not constitute a waiver of the rights hereunder or a waiver of any subsequent enforcement or exercise of its rights hereunder.

10. <u>Amendment of Agreement</u>.  This Agreement may be amended only in writing signed by all parties hereto.

11. <u>Notices.</u>  Landlord shall mail to Franchisor copies of any letters and notices it gives to Tenant related to the Lease or the Leased Premises concurrently with giving such letters and notices to Tenant.  If Tenant fails to cure any default within the period provided in the Lease, if any, Landlord shall give Franchisor immediate written notice of such failure to cure.  All notices shall be delivered by certified mail at the addresses designated in the heading of this Agreement or to such other addresses as the parties hereto may, by written notice, designate.

12. <u>Binding Effect</u>.  This Agreement shall be binding upon the parties hereto, their heirs, executors, successors, assigns and legal representatives.

13. <u>Severability</u>.  If any provision of this Agreement or any part thereof is declared invalid by any court of

competent jurisdiction, such act shall not affect the validity of this Agreement and the remainder of this Agreement shall remain in full force and effect according to the terms of the remaining provisions or part of provisions hereof.

14. <u>Remedies</u>.  The rights and remedies created herein shall be deemed cumulative and no one such right or remedy shall be exclusive at law or in equity of the rights and remedies which Franchisor may have under this or any other agreement to which Franchisor and Tenant are parties.

15. <u>Attorneys' Fees.</u>  If any of the parties to this Agreement commences a legal action against another party arising out of or in connection with this Agreement, the prevailing party shall be entitled to have and recover from the other party its reasonable attorneys' fees and costs of suit; the term "prevailing party" means a party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it.

16. <u>Applicable Law.</u>  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas.

17. <u>Certain Acknowledgments</u>.  Landlord and Tenant acknowledge and agree that all interior and exterior signage and related items (collectively, the "Leased/Licensed Assets") are the sole property of Franchisor.  Tenant shall have no rights to pledge in any manner the Leased/Licensed Assets and Landlord shall have no rights to place any liens on or make any claims to the Leased/Licensed Assets.

 IN WITNESS WHEREOF, the undersigned, intending to be legally bound, have executed this Lease Rider to be effective on the day and year first written above.

**UATP MANAGEMENT, LLC**
a Texas limited liability company.


By: _____
  MICHAEL BROWNING, JR.,
  President

**LANDLORD NAME**
 a _____.


By: _____
  _____ (name)
  _____ (title)


**TENANT NAME**
 ,
a


By: _____
  , its