# EXHIBIT D

017-316957-20

FILED
TARRANT COUNTY
5/18/2020 1:28 PM
THOMAS A. WILDER
DISTRICT CLERK

## CAUSE NO. _____

| | | |
|---|---|---|
| **CONWAY URBAN AIR, LLC** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **TARRANT COUNTY, TEXAS** |
| | § | |
| **UATP MANAGEMENT, LLC,** | § | |
| **MICHAEL O. BROWNING, JR., and** | § | |
| **ALIX WREN,** | § | |
| | § | |
| **Defendants.** | § | **_____ JUDICIAL DISTRICT** |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff, Conway Urban Air, LLC ("Conway"), files this Original Petition against Defendants UATP MANAGEMENT, Inc. ("Urban Air"), MICHAEL O. BROWNING, JR. and ALIX WREN, and for its causes of action, would respectfully show the Court as follows:

## LEVEL III CASE

1.      In compliance with Rule 190 of the Texas Rules of Civil Procedure, Plaintiff states that discovery is intended to be conducted pursuant to Rule 190.4 (Level 3).

## INTRODUCTION

2.      This action revolves around Urban Air's bad faith, improper and unjust actions and conduct in connection with Conway's franchised business, without compensation, without good cause, and in violation of the express terms of the Franchise Agreement dated May 31, 2016 between Conway and Urban Air (the "Franchise Agreement").

3.      Defendant, Urban Air, a national franchisor of indoor adventure parks, materially misled Conway and misstated material facts to induce Conway's purchase and execution of a Franchise Agreement in violation of applicable law.  Additionally, Urban Air has unilaterally and unfairly forced a series of system-wide changes on Conway in violation of the express terms of

the Franchise Agreement dated May 31, 2016 between Conway and Urban Air (the "Franchise Agreement") and the law, including, without limitation, the imposition of undisclosed fees and the implementation of programs, mandatory vendors and suppliers and material changes to the franchise system in bad faith and with complete disregard for Conway's profitability.

4.      The mandatory vendor relationships and changes, programs and initiatives compelled by Urban Air have materially diminished and impaired Conway's profitability to the substantial detriment of franchisees and the significant benefit of Urban Air who is, upon information and belief, collecting millions of dollars in fees, payments, revenues and rebates as a result of these forced relationships and wholesale, material changes which have been imposed.

5.      As detailed herein, Urban Air's conduct runs directly afoul of Urban Air's disclosures in its federally mandated Franchise Disclosure Document[1] and the express terms of the franchise agreements signed by Conway.

6.      The forced vendor relationships and material changes, which have recently been proposed or already unfairly implemented: (i) amount to unreasonable standards of performance on Conway to its financial detriment, (ii) substantially strip Conway of its contractually-based autonomy in running its business, fundamentally change the nature of Conway's business, and (iii) render the disclosures in the FDD and the terms and provisions of the Franchise Agreement signed by Conway and upon which the investment decision was made to be illusory and meaningless.

7.      As detailed herein, the misconduct of Urban Air, gives rise to Conway's claims for violation of the Arkansas Franchise Practices Act, breach of contract, fraud and declaratory judgment.

---

[1] The Federal Trade Commission governs the offer and sale of franchises in accordance with 16 CFR 436, which requires franchisors to provide pre-sale disclosures to a prospective franchisee to consider in connection with making an investment decision.

**PLAINTIFF'S ORIGINAL PETITION**                                                        **2**

## THE PARTIES

8.      Plaintiff Conway is an Arkansas limited liability company with its principal place of business in Conway, Arkansas.

9.      Defendant Urban Air is a Texas limited liability company with its principal place of business in Bedford, Texas.  Urban Air can be served with process by serving its registered agent:  Stephen Polozola, 2350 Airport Freeway, Suite 505, Bedford, Texas 76022.

10.     Defendant Michael O. Browning, Jr. ("Browning") is a citizen and resident of Texas. Browning is the CEO of Urban Air and UA Attractions, LLC. Browning can be served with process by serving him at 1316 Blue Ridge Rd, Keller, TX 76248.

11.     Defendant Alix Wren ("Wren") is a citizen and resident of Texas. Wren was the former VP of Sales for Urban Air at the relevant times alleged in this pleading. Wren can be served with process by serving her at 5713 Woodmont Ct, Plano, TX, 75093-4003.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper as the subject matter of this case and amount in controversy are within the jurisdictional limits of this court.

13.     Venue is proper in Tarrant County because Defendant Urban Air's principal office is located in Tarrant County and because Defendant Browning resides in Tarrant County.

14.     Plaintiff seeks monetary relief of over $1,000,000.00.

## FACTUAL BACKGROUND

## URBAN AIR'S INDUCEMENT OF CONWAY

15.     On or about February 11, 2016, Joe Toddy ("Joe") became interested in potentially becoming an Urban Air franchisee and began researching the franchise opportunity and sent an inquired about information concerning the brand and opportunity.

16. On February 11, 2016, Wren, VP of Sales for Urban Air, sent an email to Joe with information about the opportunity including a link to a document named "Urban-Air-Overview-Franchisee-6-23-15.pdf".

17. In connection with Wren's email, Wren advised Joe that he "will need access to approximately $1.2 million" in connection with this franchise opportunity.

18. Joe and Wren scheduled a follow up phone call for February 16, 2016.

19. Joe, Wren and Browning had a further discussion on February 24, 2016 by phone regarding the opportunity.

20. On February 25, 2016, Wren, on behalf of Urban Air, requested payment of a $500 fee for a "market analysis" in connection with a Market Development Agreement.

21. On February 26, 2016, Joe paid the $500 fee to Urban Air, which fee was paid before delivery of the Urban Air Franchise Disclosure Document and in violation of the Federal Trade Commission Amended Franchise Rule as further detailed hereinbelow.

22. On March 2, 2016, Wren, VP of Sales for Urban Air, sent Joe an email with a subject of "Urban Air Business Model and Corporate 2014 and 2015 Financials" regarding Urban Air.  (A copy of the March 2, 2016 email communications is attached hereto as Exhibit A).

23. In connection with the March 2, 2016 email, Wren provided Joe with the "Excel Business Plan and 2014 Financials for 3 Corporate locations," a financial pro forma model and other financial performance information, all of which was provided outside of the Franchise Disclosure Document and which is information that is not contained within the Franchise Disclosure Document.  (See Exh. A)[2].

---

[2] Plaintiff has only attached the cover email as Exhibit A and has not attached the specific corporate store level financials which were provided, but those financial documents are available and can be tendered.

PLAINTIFF'S ORIGINAL PETITION                                                                 4

24.     The financials for the three (3) Urban Air corporate owned locations included the 2014 and 2015 Profit and Loss statements for the corporate owned "Southlake," "Mansfield" and "Frisco" locations.

25.     Wren's March 2, 2016 email represents that the financial model for Joe's franchise will be "Gross revenue of $150k per month", "Profit Margin approximately 35%", and an "Annual Internal Rate of Return of 89.73% with a Cash Multiple of 2.65%."

26.     Shortly thereafter, Urban Air provided a detailed Company Overview PowerPoint (the "Company Overview") presentation touting the alleged benefits of the Urban Air system.

27.     The Company Overview contained numerous misstatements of material fact concerning sales revenues, profitability, costs, construction and installation costs, the brand and system.

28.     In the Company Overview, Urban Air specifically represented:

> Our goal is to get **OPEN** and **PROFITABLE**, as fast as possible that's why UATP Management (Franchisor) does not markup supplies and equipment from vendors.

29.     Likewise, the Company Overview substantially understated the amount of the initial investment at $1,200,000.00 exclusive of the Initial Franchise Fee.

30.     In addition to misleading and inaccurate representations concerning revenues and profitability, the Company Overview contained misstatements and misrepresentations concerning installation costs, insurance, marketing, systems and franchisee support.

31.     Between March 2, 2016 and the execution of the May 31, 2016 Franchise Agreement, Joe participated in numerous telephone discussions with Browning, CEO of Urban Air, and Wren, VP of Sales for Urban Air concerning the Urban Air franchise opportunity.

32.     During these telephone discussions, Browning and Wren repeated various misleading and false representations concerning the financial performance, profitability and average unit volumes of Urban Air locations.

33.     In addition, the "sales pitch" used by Browning and Wren was that Urban Air was different from its competitors because Urban Air 'only' made money on initial franchise fees and royalty fees paid by Urban Air franchisees and not from purchases made by franchisees from vendors and suppliers.

34.     Urban Air repeatedly touted this fact as a differentiator and routinely represented that Urban Air did not derive revenue based on franchisee purchases from vendors and suppliers in sales discussions, presentations and communications.

35.     The absence of any markup in connection with franchisee purchases from mandatory vendors and suppliers was a major selling point for Browning, Wren and Urban Air, and was specifically intended to induce Conway to purchase an Urban Air franchise over competitive business opportunities.

36.     These representations were also communicated in connection with the Company Overview as detailed above.

## FTC REGULATIONS AND URBAN AIR'S FRANCHISE DISCLOSURE DOCUMENT

37.     On or about April 5, 2016, Joe was provided with a copy of Urban Air's Franchise Disclosure Document ("FDD") dated April 5, 2016.   (A copy of the Franchise Disclosure Document is attached hereto as Exhibit B).

38.     Joe executed the Item 23 Receipt page on April 16, 2016 (See Exh. B).

39.     The FTC has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, known as a Franchise Disclosure Document

("FDD"), concerning the franchisor, its management, and the material terms and conditions of the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee.  Prior to July 1, 2007, this is was known as the Franchise Rule, and the Amended Franchise Rule became effective as of July 1, 2007.  The FDD is a disclosure format accepted by the FTC for conveying such information to prospective franchisees.

40.     The Amended Franchise Rule requires a franchisor to provide prospective franchisees with FDD disclosures that "present all material facts accurately, clearly, concisely and legibly in plain English."  16 C.F.R. § 436.1(d).

41.     "It is an unfair and deceptive act or practice" for any franchisor to violate a provision of the Amended Franchise Rule.  16 C.F.R. § 436.2.

42.     Further, under 16 C.F.R. § 436.2(a) (emphasis added), it is an "unfair or deceptive act or practice in violation of Section 5 of the [Amended Franchise Rule] . . . (a) for any franchisor to fail to furnish a prospective franchisee with a copy of the franchisor's current disclosure document, as described in subparts C and D of this part, at least 14 calendar-days before the prospective franchisee signs a binding agreement with, *or makes any payment to, the franchisor* or an affiliate in connection with the proposed franchise sale."

### URBAN AIR'S IMPROPER, FALSE AND MISLEADING DISCLOSURES

43.     Pursuant to the Amended Franchise Rule, a franchisor is obligated to provide every prospective franchisee with an FDD, and related agreement, that details any and all of the initial and ongoing fees that a franchisor will charge to the franchisee.  16 C.F.R. § 436.5(f).

44.     16 C.F.R. § 436.5(f) expressly provides as follows:

> Item 6: Other Fees. Disclose, in the following tabular form, all other fees that  the <u>franchisee</u> must  pay  to  the <u>franchisor</u> or  its <u>affiliates</u>,  or  that the <u>franchisor</u> or its <u>affiliates</u> impose or collect in whole or in part for a third

party. State the title "OTHER FEES" in capital letters using bold type. Include any formula used to compute the fees.

If fees may increase, disclose the formula that determines the increase or the maximum amount of the increase. For example, a percentage of gross sales is acceptable if the <u>franchisor</u> defines the term "gross sales."

45.    Item 6 of the FDD sets forth the fees which Urban Air is authorized to charge franchisees.  (See Exh. B (Item 6)).

46.    Pursuant to Item 6 of the 2016 FDD, Urban Air is authorized to charge a Royalty Fee in the amount of "6% of weekly Gross Sales" and a Development Fund Fee in the amount of "1% of weekly Gross Sales," respectively.  (See Exh. B (Item 6)).

47.    In addition, in the 2016 FDD, Urban Air is authorized to charge an Administrative Fee of the "[p]ro-rata portion of call centers hourly rate plus a $5.00 commission."  (See Exh. B).

48.    Nowhere in the 2016 Urban Air FDD is there any disclosure of any "Membership Program Fee" or any "NAF Fee" payable by franchisees.

49.    Likewise, nowhere in the 2016 Urban Air FDD is Urban Air authorized to charge or obligate the payment of a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% to Urban Air.

50.    In Item 7 of the FDD, Urban Air represented that the Initial Investment associated with an Urban Air franchise ranged from $1,152,000 to $1,609,500 – significantly higher than what was represented in the Company Overview.  (See Exh. B (Item 7)).  In connection with that amount, Urban Air substantially understated, among other things, the total investment amount, construction costs and attraction costs (and which amounts materially differed from the amounts set forth in the Company Overview provided to Joe).

51.     In Item 8 of the FDD, Urban Air vaguely referenced it may receive money or benefits from suppliers and vendors for such things as conference sponsorships, but Urban Air expressly stated:

**Revenue Derived from Required Purchases and Leases**

We do not derive any revenue or material consideration from the sale of products to our franchisees.

(See Exh. B (Item 8)).

52.     In addition, Urban Air specifically represented in Item 8 of the FDD that:

We [Urban Air] periodically negotiate purchase arrangements with suppliers *for the benefit of our franchisees*, and we may establish national buying accounts with vendors whose products meet our specifications.

(*See* Exh. B (Item 8) (emphasis added)).

53.     In Item 19 of the FDD, Urban Air made false and misleading representations concerning the *"annualized"* financial performance of Urban Air franchises and claimed that the "Average Unit Profit Margin" of an Urban Air franchised business was "44%".

54.     Section 22.A of the Franchise Agreement expressly provides: "Nothing in this agreement or any related agreement is intended to disclaim the representation made in the disclosure document provided to you by Franchisor."  (See. Exh. B).

## CONWAY'S EXECUTION OF THE FRANCHISE AGREEMENT AND URBAN AIR'S WRONGFUL, BAD FAITH CONDUCT SINCE EXECUTION.

55.     On April 6, 2016, Yadkin Bank provided Joe with a LOI for a loan for the construction and development of the franchised business.

56.     On May 18, 2016, Wren provided Joe with a construction bid template for him to use in connection with his efforts to secure bank financing and to provide detail concerning

construction costs associated with the development of an Urban Air location.  (A copy of the Construction Bid Sample provided by Wren is attached hereto as Exhibit C).

57.     The Construction Bid Sample provides that total construction costs would be $535,000, which amount is substantially understated and materially differs from the amount disclosed in the FDD.  (See Exh. C).

58.     On May 27, 2016, Stephen Polozola ("Polozola"), EVP/General Counsel of Urban Air provided another copy of the Urban Air FDD to Joe.

59.     On June 2, 2016, Browning sent email to Joe asking him the amount of loan financing he had been approved for by the bank.  Joe responded that the loan amount was $1,200,000 but that he was awaiting for final approval.

60.     On June 2, 2016, Saadia Sheikh of E. Smith Realty sent an email requesting a conference call with Joe, Randall Moore, Wren and Browning for the following week with the landlord of potential site.

61.     On June 6, 2016, Browning, Wren, Sheikh, Randall Moore, Justin Bentley and Colliers International were on a call discussing Urban Air.

62.     During that call on June 6, 2016, Browning specifically represented to everyone on the phone that the Conway Urban Air store contemplated for development by Joe would do "$3,000,000 a year" in sales revenues and that he had the "data' to prove it.

63.     On June 9, 2016, Randall Moore sent an email advising that Colliers would start preparing a lease for the contemplated location in Conway, Arkansas.

64.     On August 8, 2016, Conway executed the Franchise Agreement.  (A copy of the Franchise Agreement executed by Conway is attached as Exhibit D).

65.     On August 20, 2016, Conway executed the Lease for the premises at 200 Skyline Drive, Conway, Arkansas (the "Premises").

66.     Based on the representations, guidance and direction of Urban Air, Conway requested and was approved for SBA loan financing in the amount of $1,269,000.00.

67.     Conway's principals were required to inject $293,000 of equity in connection with this financing.  The SBA financing was secured by a lien on machinery, equipment, furniture and fixtures at the Premises, by a life insurance policy on the life of Joe, and by liens on residential and commercial property.

68.     In connection with the SBA loan financing, Joe was required to take out additional personal loans to cover the $220,000 cash injection that was required in connection with the $1,200,000 SBA loan which had been approved.

69.     On October 31, 2016, Conway received initial bank funding.

70.     On November 22, 2016, Abby Crowley of Urban Air provided Conway with a diagram of the park with attractions.

71.     On November 23, 2016, Conway received an invoice from Garth Price of Leap of Faith – Urban Air's mandatory vendor for attractions at that time – in the amount of $650,000 for the attractions which materially exceeded the amount disclosed in the Company Overview and Item 7 of the FDD, and which costs did ***not*** include the costs for the delivery or the installation of the attractions that were to be paid separately.

72.     At that point, Conway had executed a Franchise Agreement and Lease and given these agreements as well as Leap of Faith's status as the mandatory vendor, without any options, alternatives or choice, on November 27, 2016, Conway executed an agreement with Leap of Faith.

73.     On November 28, 2016, Conway paid the initial equipment deposit to Leap of Faith for the attractions in the amount of $455,000, leaving a balance due of $195,000.

74.     Notably, Urban Air failed to disclose in the FDD that the delivery costs were not included with the Item 7 cost estimate for the attractions, and Conway was also required to pay delivery costs of approximately $70,000 in addition to the $650,000 costs for the attractions – which total cost of $720,000 far exceeds disclosed range of $450,000 – $550,000 in Item 7 of the FDD.

75.     After commencement of construction, Conway experienced significant cost overruns (based on the understated initial investment costs) and delays.

76.     Joe and Browning had a series of communications and discussions during this time. Browning repeatedly stated not to worry about money and to just get the project completed.

77.     During construction, Browning agreed to "help" Conway with a "loan" of $195,000 to cover the remaining balance due Leap of Faith.

78.     However, Urban Air was neither helping in this regard nor was this actually a loan.

79.     To the contrary, despite express representations in the FDD, the Company Overview and Browning's repeated, specific and affirmative representations touting the benefits of choosing Urban Air over competitive business opportunities because Urban Air did not make any money off of franchisee purchases or "markup supplies and equipment from vendors", unbeknownst to franchisees, Urban Air did not negotiate the vendor arrangement with Leap of Faith for the benefit of franchisees (or Conway), but rather negotiated this vendor arrangement for their own benefit.

80.     Upon information and belief, in order to be recognized as the mandatory vendor to Urban Air franchisees, Urban Air mandated that Leap of Faith pay significant revenues and rebates

to Urban Air totaling approximately 50%-60% of its contract price on the franchised locations it built, which facts were first discovered by Conway in early 2020.

81.     Consequently, the price for Conway's attractions was substantially inflated and should have been considerably less if the representations of Urban Air and Browning had been truthful.

82.     Urban Air's $195,000 "loan" to Conway to pay the inflated price for the attractions should never have been needed, and the promissory note was a sham.

83.     This is further illustrated by the fact that, upon information and belief, Urban Air never paid the Leap of Faith invoice balance after allegedly "loaning" those funds to Conway to do so.

84.     The promissory note mandated by Conway was likewise illusory and usurious.  In particular, in connection with this "loan", Urban Air required Conway to pay an additional one and half percent (1.5%) royalty on gross sales (following the grand opening of the location when sales are exceedingly strong) in order to obtain the alleged benefit of the financing which, as stated, should never have been required in the first instance if the cost for the attractions were not marked up as was represented and promised to Conway.

85.     When questioned about the usurious fees charged in connection with sham promissory notes such as this, Polozola, Urban Air's EVP/General Counsel, often flippantly told franchisees "Our money is not cheap."

86.     In addition, Urban Air's financing of this amount for Conway was done even though the FDD expressly disclosed in Item 10 that "Neither [Urban Air] nor any of [Urban Air's] affiliates offer direct or indirect financing."

87.     Since that time, Leap of Faith was terminated as a mandatory vendor for Urban Air franchisees because, upon information and belief, among other things, it refused to increase the amount of rebates payable to Urban Air in connection with attraction purchases.

88.     The Conway franchised location opened to the public on July 7, 2017.

89.     Despite Urban Air's representations in the Company Overview that the Initial Investment would be $1,200,000 and the representations in the FDD that the Initial Investment would range from $1,152,000 to $1,609,500, the Initial Investment associated with the construction, development and opening of the franchised business was over $1,940,000.

90.     Likewise, as a result of the understated cost estimates and the insufficiency of the SBA loan proceeds, one of Conway's owners (Bobby Toddy, Sr.) was required to borrow against three properties that did not previously have debt.  In particular, Mr. Toddy Sr. was required to borrow $85,000 on his home that had been paid off, $103,000 on a commercial building that had been previously paid off and $37,000 on a family farm that had no mortgage and that has been in the Toddy family since before 1902 in order to open, construct and develop the franchised location.

91.     By July 2019, Conway fully repaid the sham promissory note in the amount of $195,000 plus an additional 1.5% of royalties.

92.     In addition to the wrongfully inflated costs associated with the purchase of attractions, Urban Air has not negotiated purchase arrangements with other vendors and suppliers "for the benefit of franchisees."

93.     Rather, upon information and belief, has collected and is still collecting millions of dollars in payments, revenues and rebates based on franchisee purchases from mandatory vendors and suppliers.

94.     Urban Air franchisees, including Conway, are being charged supra-competitive prices for various mandatory goods, products, services, supplies and equipment.

95.     Urban Air has mandated vendors for various mandatory goods, products, services, supplies and equipment to charge these above-market prices in bad faith and despite Urban Air's various claims to the contrary.

96.     Urban Air has compelled Conway to use various vendors (e.g. marketing, insurance, HR, socks, etc.) which have caused Conway to suffer substantial damages and incur increased costs, which have greatly impacted Conway's business and operations.

97.     In April 2019, Urban Air initiated a Membership Program without proper or sufficient due diligence, testing, evaluation or analysis prior to its implementation.

98.     In connection with the Membership Program, Urban Air collects all revenues for memberships sold by Conway and is responsible for distributing such revenues to Conway.

99.     Even though the Urban Air franchise agreement does not obligate Conway to pay a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% or authorize Urban Air to charge such fees, since April 2019, Urban Air has been wrongfully imposing a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5% upon Conway, which violates the express terms and provisions of the Franchise Agreement.

100.     Moreover, *neither* the "Membership Program Fee" of 2.5% nor the "NAF Fee" of 5% were even disclosed in the FDD as required by law in violation of Amended Franchise Rule, 16 C.F.R. § 436.5(f).

101.     Likewise, Urban Air is wrongfully charging fees to Conway in order to fund Urban Air's development and implementation of the Membership Program, which total cost is estimated to be approximately $4,000,000, and which amounts to approximately $40,000 per franchised

location and is essentially the cost of an additional initial franchise fee, which no franchisee agreed to pay.

102.    In connection with the implementation of the Membership Program, Urban Air improperly and fraudulently induced Conway to execute the "Amendment to Franchise Agreement (Membership Program)" under false pretenses and in bad faith.

103.    Specifically, Urban Air misrepresented to Conway that execution of the "Amendment to Franchise Agreement (Membership Program)" solely related to the implementation of the Membership Program and was immediately necessary in order for the franchisee to receive payment of Membership Revenues collected by Urban Air.

104.    On May 23, 2019, Polozola emailed Joe as follows: "Joe – Would you mind executing the Membership ACH and Agreement that I sent to you via DocuSign?  Not only does this document outline the membership program but it also allows us to push membership funds into your account.  Without this form, we will have to mail you checks for the membership revenue, which will cause a delay in you receiving your funds."

105.    However, the "Amendment to Franchise Agreement (Membership Program)" materially altered and modified the Conway Franchise Agreement in several respects and is unenforceable for lack of consideration.

106.    In addition, the Franchise Agreement does not authorize Urban Air to charge marketing or advertising fees to Conway and no such fees were disclosed to Conway in the Urban Air FDD.  (See Exh. D).

107.    To the contrary, the Franchise Agreement merely obligates Conway to a "Local Marketing Expenditure" of "5% of monthly Gross Sales."  (*See* Exh. D).

108.    Moreover, Item 6 of the Urban Air FDD provided to Conway expressly states that the "Local Marketing Expenditure" shall be "***Payable to the person providing the services***, which may be us."  (See B (emphasis added)).

109.    Notwithstanding the express disclosure that the "Local Marketing Expenditure" shall be "[p]ayable to the person providing the services," Urban Air recently announced the implementation of a new, mandatory "local" marketing program with Zimmerman as the vendor providing local marketing services but is mandating that franchisees pay "four percent (4%) of monthly Gross Sales" directly to Urban Air in connection with this program.

110.    Urban Air's imposition and collection of "four percent (4%) of monthly Gross Sales" constitutes new, undisclosed fees and runs afoul of the express disclosure set forth in the Urban Air FDD and the express provisions of the Franchise Agreement executed by Conway.

111.    In addition, at no time have Franchisees authorized Urban Air to automatically withdraw or ACH those fees from their accounts.

112.    Instead, once again, under fraudulent and false pretenses, Urban Air has sought the execution of an updated "ACH Authorization" from Conway and other Urban Air franchisees for this purpose.

113.    Polozola, EVP/General Counsel for Urban Air, has repeatedly misled and misrepresented to franchisees that "Section 6.F. of your Franchise Agreement requires that 'you must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.'  Previously, we sent you the attached ACH form for execution.  However, to date, we have not received your executed ACH form."

114.     Contrary to Polozola's claims, the "ACH Authorization" that Urban Air has sought to have executed greatly exceeds the scope and express terms and provisions of the applicable forms of franchise agreement and the franchisee's obligations thereunder.

115.     In the Franchise Agreement, there is no obligation for franchisees to allow or provide for funds to be collected via ACH on behalf of "UATP Management, LLC, UA Attractions, LLC and their subsidiaries and affiliates", which are improperly defined collectively in the ACH Authorization as "Franchisor".

116.     To the contrary, the Franchise Agreement only permits UATP Management LLC (as "Franchisor" under the Franchise Agreement) to collect the fees which are set forth in the Franchise Agreement.

117.     Consequently, the authorization Urban Air procured from Conway is overly broad, improper and inconsistent with the express terms and provisions of the Franchise Agreement.

118.     In connection with the local marketing services to be provided by Zimmerman, Urban Air has taken the position that it is permitted to mandate Zimmerman as a "vendor" and charge and collect four percent (4%) of monthly Gross Sales from franchisees on behalf of Zimmerman.

119.     However, this ignores the plain language of the Franchise Agreement drafted by Urban Air which mandates that the "Local Marketing Expenditure" shall be "payable to the person providing the services," which is Zimmerman and not Urban Air.

120.     Moreover, Zimmerman has not been designated as the exclusive vendor.  Rather, Conway is required to use other vendors as well in order to meet the contractually required local marketing spend.

121.    Consequently, Conway is going to be required to spend far in excess of five percent (5%) of monthly Gross Sales on local marketing.

122.    The new program and attendant fees are also inconsistent with Browning's routine, repeated and consistent proclamations to Conway and other Urban Air franchisees that the franchisee local marketing expenditure shall be capped at $7,000 per month.

123.    The manner in which this new marketing program is being administered further undermines Urban Air's claims in this regard as Conway is prohibited from directly interfacing with Zimmerman representatives.

124.    To the contrary, all franchisee communications relating to local marketing are required to be directed to Urban Air corporate marketing employees *who have not even been hired yet* despite the anticipated roll out of this program which was scheduled for March 2020 but has been temporarily delayed as a result of Covid-19.

125.    Consequently, Zimmerman is not a true mandatory vendor and the four percent (4%) of monthly Gross Sales is a new, undisclosed fee, which is improper and unlawful.

126.    Furthermore, representatives of Urban Air have made clear that while Urban Air will not allegedly "profit" or otherwise derive revenue by virtue of the relationship with Zimmerman in 2020, representatives of Urban Air have made clear that Urban Air will do so in future years, which is improper and unlawful based on Urban Air's disclosures in the FDD, as detailed and demonstrated below.

127.    Since opening, Urban Air has repeatedly engaged in a pattern and practice of aggressive communications, retaliatory conduct, bullying tactics, non-responsiveness to Conway's communications and requests and has otherwise dealt with Conway in bad faith and in a commercially unreasonable manner.

128.    Urban Air has failed to support Conway and other Urban Air franchisees and has implemented programs, mandated vendors and suppliers, and imposed fees, charges and costs upon Conway and other Urban Air franchisees with complete disregard for franchisee profitability and, in certain instances, in violation of the terms and provisions of the Franchise Agreement.

129.    For example, as noted above, Urban Air unilaterally forced franchisees, who have already invested millions of dollars, to fund the development of and implementation of a Membership Program.

130.    Urban Air  has undertaken this action in bad faith to drive its own revenues and without performing sufficient due diligence or analysis on the impact it would have on unit economics.

131.    The membership program is materially diminishing and impairing franchisee profitability to the substantial detriment of franchisees and the significant benefit of Urban Air who is collecting millions of dollars in membership fees.

132.    Another example involves Urban Air's mandatory vendor for socks.  Urban Air has mandated that Conway and other franchisees purchase socks from an approved vendor at above-market prices where alternative suppliers are available to provide socks of the same make and/or quality to Conway and other Urban Air franchisees at approximately $0.50 less per pair.

133.    In light of the fact that franchisees across the system purchase upwards of 8,000 to 10,000 pairs of socks per month, allowing purchases from alternate vendors, or if the mandatory vendor charged at-market cost, franchisees would save between $4,000 and $5,000 per month.

134.    Instead, Urban Air mandates the more expensive vendor in bad faith so that it may reap the benefit of substantial rebates from its sock vendor to its sole significant benefit and the substantial detriment of franchisees.

135.    In fact, upon information and belief, the current sock vendor is making $0.04 per pair of socks purchased and Urban Air is making $0.25 per pair of socks purchased.

136.    Another example involves Urban Air's mandatory vendor for insurance.  Urban Air mandated an insurance broker who took advantage of the mandatory vendor relationship by devising a vast scheme and artifice to defraud by which the insurance broker failed to properly counsel and advise Conway and other Urban Air franchisees in connection with the procurement of various insurance coverages, overcharged Conway and other Urban Air franchisees and then financed the inflated premiums it procured with an entity the insurance broker owned and controlled, which relationship between the insurance brokerage company and the premium finance company was concealed and never disclosed to Urban Air franchisees.

137.    The insurance broker held itself out as an industry expert possessing specialized knowledge and expertise to assist adventure park owners, including Urban Air franchisees.

138.    In designating the insurance broker as the mandatory and only approved vendor for insurance solutions, Urban Air forced its franchisees to rely on the insurance broker as an expert in providing insurance solutions, assistance, advice, counsel and guidance.

139.    Urban Air franchisees relied on and trusted the insurance broker to provide guidance, counsel and advice, to act in their best interests in procuring insurance coverages, and not to mislead them.

140.    Urban Air franchisees relied on and trusted the insurance broker to advocate for them in connection with the procurement of insurance coverages and to use its specialized knowledge to procure the best possible insurance coverages at the best price.

141.    However, the insurance broker lacked the specialized knowledge it proclaimed to possess and intentionally engaged in a scheme to: (1) overcharge Urban Air franchisees; and (2)

"double dip" by virtue of the fact that the insurance broker's affiliate financed the very premiums which the insurance broker caused to be inflated, which relationship was concealed.

142.   Urban Air franchisees have identified various mistakes, errors and omissions in connection with mandatory insurance broker's procurement of various insurance coverages.

143.   As a result, Urban Air franchisees have made numerous, reasonable requests to use alternative vendors for insurance – which insurance coverages are specifically detailed and mandated in the franchise agreement.

144.   However, Urban Air has unreasonably rejected the use of various alternative insurance vendors in bad faith.  Urban Air's position in this regard is wholly unreasonable and unjustified.  Such a mandate is akin to mandating the purchase of a specific make, model and specification of a vehicle but refusing to allow the franchisee to purchase the vehicle meeting those make, model and specification requirements from an automobile dealer of the franchisee's own choosing.

145.   In the face of the Covid-19 pandemic, Urban Air has even gone so far as to initiate a litigation matter for tortious interference against an insurance broker who worked with several Urban Air franchisees to procure alternative, superior property and workers' compensation insurance at a lower cost claiming in that case that the broker was not an approved vendor.

146.   However, Urban Air's claims have been asserted in bad faith, further demonstrate that Urban Air is not actually interested in its franchisees' profitability and runs directly afoul of Urban Air's December 18, 2019 systemwide announcement to the entire franchise system that "Franchisees are free to shop all other insurance through the broker of their choice, assuming such policies contain the various terms and endorsements required by Urban Air."

147.    There is no sound business justification or rationale for refusing to allow a franchisee to procure the insurance specifically proscribed in the Franchise Agreement from a broker of its own choosing, particularly where superior coverage can be procured at a lower cost.

148.    Likewise, Urban Air recently announced its intention to implement a "captive" insurance program, which will provide Urban Air with a substantial windfall and millions of dollars of additional revenues at the expense of Urban Air franchisees.

149.    Urban Air is touting the "captive" insurance program as a significant benefit to Urban Air franchisees; however, it is Urban Air itself that stands to benefit from the "captive" insurance program, not Urban Air franchisees as the cost of insurance will not materially decrease, if it will decrease at all.  Likewise, such a program runs afoul of various disclosures in the FDD.

150.    The "captive" insurance program is not really a "captive" at all.  Instead, Urban Air is merely creating its own insurance company and it is actually a carefully designed wealth transfer scheme to further profit from Urban Air franchisees to the tune of millions and millions of dollars.

151.    Upon information and belief, the insurance company being formed by Urban Air is not licensed in every state in which a franchise is located and does not possess an A.M. Best rating of not less than A-VII.   Consequently, upon information and belief, it does not meet the requirements for acceptable insurance carriers as set forth by Urban Air in its own Franchise Agreement.

152.    Urban Air has repeatedly boasted about the availability of "good driver" benefits under the program for franchisees who participate.  When pressed, Urban Air disclosed that the "good driver" benefit would only amount to approximately $1,000 per year to the franchisee compared to the millions of dollars that Urban Air would make under the new insurance program.

153.    Vendors and suppliers have advised franchisees that Urban Air is repeatedly mandating that such vendors and suppliers pay significant fees, payments, revenues and rebates to Urban Air in order to continue to be recognized as a mandatory vendor and supplier to Urban Air franchisees.

154.    Vendors and suppliers have advised franchisees that franchisee costs for goods, products, services, supplies and equipment could be lower if Urban Air did not mandate payment of fees, payments, revenues and rebates to Urban Air

155.    Since June 2019, an association of Urban Air franchisees has repeatedly attempted to engage with Urban Air management and Urban Air's equity stakeholders in a dialogue to address the significant and substantial issues, concerns and challenges facing Urban Air franchisees, which requests for such dialogue have been repeatedly rejected by Urban Air.

156.    The franchisee concerns include but are not limited to the following:

a. Memberships – issues with pricing, data, program details, the funding of the development of the membership program (which, as noted, the fees and costs associated with the development of the membership program were unilaterally implemented and charged to franchisees in violation of the Franchise Agreement).

b. Marketing – Urban Air's mandatory implementation of an alleged new marketing "vendor" and the imposition of additional fees associated with same, which fees were neither disclosed in the FDD or agreed upon in the franchise agreements.

c. Return on Investment/Profitability Issues and challenges facing Urban Air franchisees.

d. Above-market pricing on various goods, products, supplies and equipment.

e.  Franchisor's receipt of substantial rebates to its own benefit and the substantial detriment of Urban Air franchisees demonstrating that Urban Air is not negotiating vendor and supplier arrangements for the benefit of franchisees.

f.  Unavailability of replacement parts - attractions are down in virtually every park leading to negative social media reviews and demands for refunds; some parks have had parts on order for two (2) years.

g.  Delays, construction costs, cost overruns - despite having built over 100 parks, such issues are still being experienced by franchisees on every project and Urban Air has failed to solve these challenges and problems.

h.  Terms of current franchise agreements.  Urban Air has materially modified and changed the terms of the Urban Air franchise agreement.  The agreement now contains broad, unfair and aggressive repurchase rights, broad reservations of rights to compete within protected territories, and higher and additional fees, among other problematic provisions.  Such terms and issues greatly impact resale value and marketability of existing locations.

i.  Lack of transparency in connection with Urban Air's fees, royalty statements and reports.  Franchisees are unable to decipher the amounts charged by Urban Air and requests for clarifications and explanations are often ignored.

j.  Insurance – overpriced insurance premiums and various issues with Urban Air's mandatory insurance vendor's procurement of insurance coverages for franchisees and that vendor's wrongful financing of those premiums through their affiliate, which relationship between the vendor and the finance company was concealed and not disclosed to franchisees.

k. "Captive" Insurance Program – the "captive" insurance program is not a true "captive" insurance program but rather is a carefully tailored wealth transfer scheme designed to further line Urban Air's pockets with millions of dollars of revenue at the expense of the franchisees.  The "captive" program does not offer any financial savings or additional benefits to the current insurance program in place.

l. Cannibalization – Urban Air continues to sell areas and approve sites in very close proximity to existing locations without performing sufficient due diligence, analysis and examination of critical market demographics to determine if the locations are too close together which greatly impacts the success and profitability of both locations.

m. Revenue Collection – Urban Air recently unveiled a plan to collect all revenues on behalf of all franchisees in connection with an sales and then to remit such monies to franchisees less alleged fees and amounts owed to Urban Air, which runs afoul of the express provisions of the franchise agreement and creates an employment relationship.

157.    Despite repeated requests, Urban Air management and its equity stakeholders have failed and refused to address the significant challenges, issues and concerns of the APFA and continue to implement changes and modifications to the Urban Air franchise system in bad faith and in violation of the Franchise Agreement, and which in the aggregate, unfairly and materially change the system for franchisees.

158.    Urban Air's extensive, unilateral and unfair implementation of mandatory, material and wholesale changes to the Urban Air system and business model have served to drastically

  
change the nature of the business and the contractual relationship between the parties and further have served to render the Franchise Agreement illusory.

159.     The imposition of fees, charges and costs associated with Urban Air's Membership Program and Zimmerman, among other things, were not properly disclosed to Urban Air franchisees, run afoul of Urban Air's contractual rights under the franchise agreement, violate the FTC's Amended Franchise Rule and constitute a clear violation of the express regulations and disclosure requirements governing franchisors that have been promulgated by the FTC.

160.     Likewise, Urban Air's egregious collection of fees, payments, revenues and rebates and failure to negotiate purchase arrangements with mandatory vendors and suppliers for the benefit of Urban Air franchisees runs directly counter to Urban Air's disclosures in the Urban Air FDD and Urban Air's contractual obligations under the Franchise Agreement, violate the FTC's Amended Franchise Rule and constitute a clear violation of the express regulations and disclosure requirements governing franchisors that have been promulgated by the FTC.

161.     Over the years, Urban Air has also engaged in a pattern and practice of aggressive communications, retaliatory conduct, bullying tactics and non-responsiveness to franchisees who have challenged, criticized or taken issue with Urban Air's mandates, programs and initiatives.

162.     Such action by Urban Air has been intended to send a message to all of the Urban Air franchisees, muzzle franchisee communications and interfere with them from associating with one another.

## COUNT I – VIOLATION OF ARKANSAS FRANCHISE PRACTICES ACT
## (AGAINST ALL DEFENDANTS – URBAN AIR, BROWNING AND WREN)

163.     Plaintiff realleges and incorporates the allegations of paragraphs 1 through 162 as if fully set forth herein.

164.    The Arkansas Franchise Practices Act (the "Act"), § 4-72-202 *et seq*. applies to franchised businesses established or maintained in the State of Arkansas.

165.    Plaintiff's Urban Air franchise is located in Conway, Arkansas.

166.    Pursuant to the § 4-72-202 of the Act, "Person" means:

> a natural person, corporation, partnership, trust, or other entity, and, in case of an entity, "person" shall include any other entity which has a majority interest in such entity or effectively controls such other entity as well as the individual officers, directors, and other persons in active control of the activities of each entity.

167.    Pursuant to Section 4-72-202(8) of the Act, "good faith" means "honesty in fact in the conduct or transaction concerned."

168.    Section 4-72-206(1) of the Act prohibits any franchisor from requiring a franchisee in connection with a franchise agreement "to assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability imposed by the [Act]."

169.    Section 4-72-206 of the Act entitled "Unlawful practices of franchisors" further provides:

> It shall be a violation of this subchapter for any franchisor, through any officer, agent, or employee to engage directly or indirectly in any of the following practices:
>
> . . .
>
> (2) To prohibit directly or indirectly the right of free association among franchisees for any lawful purpose;
>
> . . .

(6) To refuse to deal with a franchise in a commercially reasonable manner and in good faith.

170.     Section 4-72-207 of the Act entitled "Misleading and fraudulent schemes – Penalty – Prosecutions" provides:

(a) It shall be unlawful for any person, directly or indirectly, in connection with the offer, sale, purchase, transfer, or assignment of any franchise in this state to knowingly:

(1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

(b) Any violation of this section shall be a Class B felony.

(c) Prosecutions for offenses committed in violation of this section must be commenced within five (5) years from the date of the crime or within five (5) years from the date of the commission of the last overt act in furtherance of the scheme to defraud.

171.     Section 4-72-208 of the Act entitled "Franchisee's remedies" provides, in pertinent part:

(a) Any franchisee who is harmed by a violation or violations of § 4-72-207 shall be entitled to recover treble damages in a civil action and, where

appropriate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation.

(b) Any franchisee who is harmed by a violation of any other section of this subchapter shall be entitled to recover actual damages in a civil action and, where appropriate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation.

172.    In violation of § 4-72-206 of the Act, by virtue of the misconduct, actions and conduct detailed herein, Urban Air unlawfully prohibited Conway from the right of free association with other franchisees and failed and refused to deal with Conway in a commercially reasonable manner and in good faith.

173.    In violation of § 4-72-207 of the Act, by virtue of the misconduct, actions and conduct detailed herein, Urban Air, Browning and Wren employed a device, scheme and artifice to default, made untrue statements of material fact, including but not limited to false statements of material fact concerning revenues and profitability of Urban Air franchises (both within and outside of the FDD in violation of the FTC Amended Franchise Rule), and engaged in acts, practices, and a course of business which operated as a fraud or deceit upon Conway, including the receipt of fees prior to providing the FDD in express violation of the FTC Amended Franchise Rule and the Act.

174.    By virtue of Defendants' violations of the Act, Plaintiff has been damaged.

175.    As a result of Defendants' actions and misconduct, Plaintiff has suffered and continue to suffer injury and have incurred and are continuing to incur monetary damages.

176.    Plaintiff seeks damages, treble damages and attorneys' fees and costs of litigation in accordance with the Act in an amount that has yet to be determined in excess of $2,500,000.

## COUNT II – BREACH OF CONTRACT (FRANCHISE AGREEMENT)

## (AGAINST DEFENDANT URBAN AIR)

177.     Plaintiff realleges and incorporates the allegations of paragraphs 1 through 162 as if fully set forth herein.

178.     The Franchise Agreement is an enforceable agreement between Conway and Urban Air.

179.     Conway fully performed its obligations under the Franchise Agreement.

180.     Urban Air materially breached the Franchise Agreement in several ways including but not limited to the following respects:

    a.  By charging fees in excess of the 6% Royalty Fee, 1% Development Fund Fee and the Administrative Fee which were not authorized by the Franchise Agreement.

    b.  By imposing and charging a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5% which was never disclosed to Conway, which Conway never agreed to pay and which was not an agreed upon contractual obligation in the Franchise Agreement.

    c.  By charging Conway supra-competitive prices for mandatory goods, products, services, supplies and equipment and mandated vendors who charged supra-competitive prices for mandatory goods, products, services, supplies and equipment.

    d.  By failing to negotiate for the benefit of franchisees and failing to use its market power due to volume purchases for the benefit of franchisees.

    e.  By failing to negotiate purchase arrangements with suppliers for the benefit of Conway and the other Urban Air franchisees.

     f.   By failing to provide promised support and assistance to Conway.

181.   As a proximate result of Urban Air's breaches of contract as alleged herein, Plaintiff has been damaged in amounts to be proven at trial.

182.   Pursuant to the Franchise Agreement and Chapter 38 of the Texas Civil Practice & Remedies Code, Plaintiff also seeks recovery of the attorney's fees incurred in bringing this action.

## COUNT III – FRAUD

## (AGAINST ALL DEFENDANTS – URBAN AIR, BROWNING AND WREN)

183.   Plaintiff realleges and reincorporates the allegations of paragraphs 1 through 162 as if fully set forth herein.

184.   As alleged with specificity and particularity herein, Defendants Urban Air, Browning and Wren knowingly made false and misleading statements of fact to Plaintiff.

185.   In particular, Defendants Urban Air, Browning and Wren falsely misrepresented the costs associated with the construction and development of an Urban Air franchised location and the profitability of an Urban Air franchised business.

186.   Defendants Urban Air, Browning and Wren knew or should have known that these representations were false, misleading and inaccurate at the time they were made.

187.   Defendants Urban Air, Browning and Wren made the false statements with the intent to defraud the Plaintiff and in order to induce the Plaintiff to rely on the statements.

188.   Plaintiff believed the false statements made to them and acted in reliance upon those beliefs to their detriment.

189.   As a result of their detrimental reliance on Defendants' Urban Air, Browning and Wren's fraudulent statements, Plaintiff has been damaged in an amount to be proven at trial.

## COUNT IV – DECLARATORY JUDGMENT

## (AGAINST URBAN AIR)

190.    Plaintiff realleges and incorporates the allegations of paragraphs 1 through 162 as if fully set forth herein.

191.    The Texas Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a), grants the Court, in cases of actual controversy such as this one, the power to issue judgments declaring the rights and other legal relations of any interested party, whether or not further relief is or could be sought.

192.    Certain disputes have arisen between Conway, on the one hand, and Urban Air, on the other, arising out of and relating the franchise agreement between Urban Air and Conway.

193.    These disputes include:

   a.    Whether Urban Air may, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the "Membership Program Fee" of 2.5% to Urban Air.

   b.    Whether Urban Air may, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the "NAF Fee" of 5% to Urban Air.

   c.    Whether Urban Air may, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the fees and costs for the development and implementation of the Urban Air Membership Program.

   d.    Whether Urban Air's implementation of the Membership Program and associated fees is permitted under the Franchise Agreement.

   e.    Whether the "Amendment to Franchise Agreement (Membership

Program)" was procured fraudulently and under false pretenses and is therefore unenforceable.

f.   Whether the "Amendment to Franchise Agreement (Membership Program) is unenforceable for lack of consideration.

g.   Whether Urban Air may require Conway to execute a new ACH Authorization which is inconsistent with terms and provisions of the franchise agreement and which imposes obligations which are greater than those agreed upon in the Franchise Agreement and whether such authorization which has been previously signed is unenforceable and in violation of the terms of the Franchise Agreement.

h.   Whether Urban Air may, without Conway's consent, unilaterally amend the franchise agreements and require the payment of four percent (4%) of monthly Gross Sales directly to Urban Air for local store marketing services provided by Zimmerman.

i.   Whether Urban Air has negotiated purchase agreements "for the benefit of franchisees."

j.   Whether Urban Air through its various actions, as fully detailed herein, abused its authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and has dealt with Urban Air franchisees in bad faith, in an unfair manner and in contravention of the intention and spirit of the franchise agreements, and in violation of the Act.

k.   Whether Urban Air may unilaterally implement a "captive" insurance

program which is, in actuality, not a "captive" insurance program based on the disclosures set forth in the Franchise Disclosure Document and the Franchise Agreement.

l.   Whether the insurance company that Urban Air is establishing meets the minimum requirements of an acceptable insurance carrier as set forth in the Franchise Disclosure Document and the Franchise Agreement.

m.   Whether Urban Air may mandate vendors for insurance and whether Urban Air is unreasonably withholding approval of alternative insurance brokers that are industry experts who can arrange for more comprehensive coverages at lower cost.

n.   Whether Urban Air's implementation of undisclosed fees violates the registration and disclosure regulations of the FTC thereby constituting a violation of the Act and the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPCPA"), Texas Bus. & Comm. Code § 17.41, et. seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, entitling Conway to injunctive and declaratory relief pursuant to the Act and the DTPCPA.

194.   Urban Air has already implemented, effectuated and/or evidenced its intent to take additional and continued actions in furtherance of the drastic, material system-wide changes detailed above.

195.   Therefore, an actual controversy has arisen and now exists between Plaintiff, on the one hand, and Urban Air, on the other, concerning Conway's rights under the express terms of the Franchise Agreement, and Urban Air's right, if any, to take the actions, engage in the conduct and

implement the changes detailed herein.

196.   Pursuant to the Texas Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a), Conway accordingly desires a judicial determination declaring that:

   a.   Urban Air may not, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the "Membership Program Fee" of 2.5% to Urban Air.

   b.   Urban Air may not, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the "NAF Fee" of 5% to Urban Air.

   c.   Urban Air may not, without Conway's consent, unilaterally amend the franchise agreements and require the payment of the fees and costs for the development and implementation of the Urban Air Membership Program.

   d.   Urban Air's implementation of the Membership Program and associated fees is not permitted under Urban Air's franchise agreement.

   e.   The "Amendment to Franchise Agreement (Membership Program)" was procured fraudulently and under false pretenses and is therefore unenforceable.

   f.   The "Amendment to Franchise Agreement (Membership Program) is unenforceable for lack of consideration.

   g.   Urban Air may not require Conway to execute a new ACH Authorization which is inconsistent with terms and provisions of the franchise agreement and which imposes obligations which are greater than those agreed upon in the franchise agreement and declare that such authorizations which have been previously signed are unenforceable and in violation of the terms of the franchise agreement.

   h.   Urban Air may not, without Conway's consent, unilaterally amend the franchise

agreements and require the payment of four percent (4%) of monthly Gross Sales directly to Urban Air for local store marketing services provided by Zimmerman.

i.  Urban Air has not negotiated purchase agreements "for the benefit of franchisees" by virtue of the substantial fees, payments, rebates and revenues it has derived and continues to derive based on franchise purchases from mandatory vendors and suppliers.

j.  Urban Air through its various actions, as fully detailed herein, abused its authority under the franchise agreements, failed to exercise such authority in good faith and in a commercially reasonable manner, and has dealt with Conway in bad faith, in an unfair manner and in contravention of the intention and spirit of the Franchise Agreement and the Act.

k.  Urban Air may not unilaterally implement a "captive" insurance program which is, in actuality, not a "captive" insurance program based on the disclosures set forth in the Franchise Disclosure Document and the Franchise Agreement.

l.  The insurance company that Urban Air is establishing does not meets the minimum requirements of an acceptable insurance carrier based on the applicable terms and provisions of the Franchise Disclosure Document and the Franchise Agreement.

m. Urban Air may not mandate vendors for insurance and that Urban Air is unreasonably withholding approval of alternative insurance brokers that are industry experts who can arrange for more comprehensive coverages at lower cost.

n.  Urban Air's implementation of undisclosed fees constitutes a violation of the registration and disclosure regulations of the FTC thereby constituting a violation of the Act and the Texas Deceptive Trade Practices and Consumer Protection Act

("DTPCPA"), Texas Bus. & Comm. Code § 17.41, et. seq., which prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce, entitling Conway to injunctive and declaratory relief pursuant to the Act and the DTPCPA.

197.    There is a justiciable controversy between Urban Air and Conway as to the issues detailed herein.

198.    A judicial declaration is necessary and appropriate at this time under the circumstances so that the parties to this action may ascertain their rights and duties under the Franchise Agreement and applicable law.

199.    As detailed herein, the facts have sufficiently crystallized to permit an intelligent and useful decision to be made, and the issues are fit for a judicial determination.

200.    Pursuant to §37.009 of the Texas Civil Practice & Remedies Code, Plaintiff requests that the Court award it the attorney's fees incurred in obtaining any declaratory judgment.

## COUNT V – ATTORNEYS' FEES

## (AGAINST ALL DEFENDANTS – URBAN AIR, BROWNING AND WREN)

201.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs of this Original Petition with the same force and effect as though fully set forth at length.

202.    Plaintiff is entitled to attorneys' fees pursuant to the Franchise Agreement, the Arkansas Franchise Practices Act, Texas Civil Practice & Remedies Code § 38.001, *et seq.*,  and Tex. Civ. Prac. & Rem. Code Ann. § 37.009.

## PRAYER

WHEREFORE, Plaintiff Conway Urban Air LLC, prays this Court enter judgment against UATP Management, LLC, Michael O. Browning, Jr. and Alix Wren, jointly and severally, in an amount in excess of $2,500,000 and for Plaintiff's reasonable and necessary attorneys' fees for maintaining this action, and any other relief which this Court may deem to be just, equitable and proper.

Respectfully submitted,

*/s/ Robert L. Chaiken*
Robert L. Chaiken
State Bar No. 04057830
rchaiken@chaikenlaw.com
Carrie P. Kitner
State Bar No. 24074921
ckitner@chaikenlaw.com
**CHAIKEN & CHAIKEN, P.C.**
5717 Legacy Dr., Suite 250
Plano, Texas 75024
Telephone: (214) 265-0250
Facsimile:   (214) 265-1537

Andrew P. Bleiman
(*pro hac vice* application to be submitted)
andrew@marksklein.com
Mark I. Fishbein
(*pro hac vice* application to be submitted)
mark@marksklein.com
Marks & Klein, LLP
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
Facsimile: (732) 219-0625

**ATTORNEYS FOR PLAINTIFF**