# EXHIBIT E

FILED
TARRANT COUNTY
2/24/2020 12:35 PM
THOMAS A. WILDER
DISTRICT CLERK

141-314472-20

## CAUSE NO. 141-314472-20

| | | |
|---|---|---|
| UATP MANAGMENT, INC. | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | TARRANT COUNTY, TEXAS |
| | § | |
| JERROD PHILLIPS, URBAN AIR OF | § | |
| BENTON, LLC and RDAD HOLDINGS, | § | |
| LLC, | § | |
| | § | |
| **Defendants.** | § | 141st JUDICIAL DISTRICT |

## ORIGINAL ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

Jerrod Phillips, Urban Air of Benton, LLC and RDAD Holdings, LLC file their Original Answer, Affirmative Defenses, Counterclaim, Third-Party Petition and Amended Verified Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction and in support respectfully show as follows:

## GENERAL DENIAL

In accordance with the Rule 92 of the Texas Rules of Civil Procedure, Defendant generally denies the material allegations contained in Plaintiff's Original Petition, and any subsequent petitions filed by this Plaintiff and request that this Court require Plaintiff to prove such allegations by a preponderance of the evidence.

## AFFIRMATIVE DEFENSES

Pleading further, alternatively, and to the extent necessary, all of Plaintiff's claims are barred in whole or part due to the following affirmative defenses:

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**     **1**

Unofficial Copy

FIRST AFFIRMATIVE DEFENSE

(Failure to State a Claim)

1.      Plaintiff's Complaint and its purported causes of action alleged therein fail to state

facts sufficient to constitute a cause of action against Defendants.

SECOND AFFIRMATIVE DEFENSE

(Unclean Hands)

2.      Defendants are informed and believe and, based upon such information and belief,

allege that Plaintiff is barred, in part of in whole, from recovery of any damages, based upon the

doctrine of unclean hands.

THIRD AFFIRMATIVE DEFENSE

(Waiver)

3.      Defendants are informed and believe and, based upon such information and belief,

allege that Plaintiff has engaged in conduct and activity sufficient to constitute a waiver of any

right to assert the claims upon which it now seeks relief.

FOURTH AFFIRMATIVE DEFENSE

(Misrepresentation)

4.      Plaintiff's Complaint is barred, in whole in or in part, because in doing the things

alleged in the Complaint, Defendants acted in reliance on misrepresentations by Plaintiff.

FIFTH AFFIRMATIVE DEFENSE

(Performance of Duties)

5.      Defendants have fully performed in their contractual, statutory, and other duties, if

any, to Plaintiff, and Plaintiff is therefore estopped from asserting any claim or claims against

Defendants.

Unofficial Copy

## SIXTH AFFIRMATIVE DEFENSE

### (Fault of Plaintiff/Third-Parties)

6.      Any injury or damage allegedly suffered by Plaintiff was caused or contributed to by the negligence, fault, bad faith, breach of contract, or other wrongful or tortious conduct of Plaintiff and/or persons or entities other than Defendants, and such conduct offsets, eliminates, or comparatively reduces the liability, if any, of Defendants.

## SEVENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate)

7.      If Plaintiffs suffered any damages by reason of any acts, omissions, or courses of conduct on the part of Defendants, all or part of the damages were caused or attributable to the failure of Plaintiffs to act reasonably or prudently to mitigate their damages.

## EIGHTH AFFIRMATIVE DEFENSE

### (Failure to Perform)

8.      As a result of Plaintiff's own failures to perform under the terms of the alleged agreement(s), Plaintiff is barred from any relief under said agreement(s).

## NINTH AFFIRMATIVE DEFENSE

### (Breach of Contract)

9.      Plaintiff has breached the agreement(s) they seek to enforce against Defendants. Plaintiff's breach has released Defendants of any further duty under such agreement(s).

## TENTH AFFIRMATIVE DEFENSE

### (Reasonableness and Good Faith)

10.      Defendants acted reasonably and in good faith at all times material herein, based upon all relevant facts and circumstances known to them at the time they so acted.

Unofficial Copy

<u>ELEVENTH AFFIRMATIVE DEFENSE</u>

(Estoppel)

11.     Defendants are informed and believe and, based upon such information and belief, allege that Plaintiff's claims are barred by the doctrine of estoppel.

<u>TWELFTH AFFIRMATIVE DEFENSE</u>

(Arkansas Franchise Practices Act)

12.     Defendants are informed and believe and, based upon such information and belief, allege that Plaintiff has engaged in conduct and activity that violates the Arkansas Franchise Practices Act, § 4-72-202, *et seq*., thereby eliminating Plaintiff's ability assert the claims upon which it now seeks relief.

**<u>ORIGINAL COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION</u>**

Counter-Plaintiffs/Third-Party Plaintiffs, URBAN AIR OF BENTON LLC ("UA Benton"), JERROD PHILLIPS and RDAD HOLDINGS, LLC (collectively, "Counter-Plaintiffs") file this Original Counterclaim, Third-Party Petition and Verified Application for Temporary Restraining Order, Temporary Injunction and Permanent Injunction complaining of Counter-Defendant UATP MANAGEMENT, Inc. ("Urban Air"), and Third-Party Defendants UA ATTRACTIONS, LLC, MICHAEL O. BROWNING, JR. and ALIX WREN, and for their causes of action, would respectfully show the Court as follows:

**<u>LEVEL III CASE</u>**

1.     In compliance with Rule 190 of the Texas Rules of Civil Procedure, Counter-Plaintiffs/Third Party Plaintiffs state that discovery is intended to be conducted pursuant to Rule 190.4 (Level 3).

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**                    **4**

## INTRODUCTION

2.      This action revolves around Urban Air's bad faith, retaliatory, improper and unjust termination of UA Benton's franchised business, without compensation, without good cause, and in violation of the express terms of the Franchise Agreement dated September 30, 2017 between UA Benton and Urban Air (the "Franchise Agreement").

3.      Urban Air's claims against UA Benton and the unlawful termination of UA Benton's Franchise Agreement were fabricated in direct retaliation for Facebook messages about a new Urban Air marketing initiative which were posted by Jerrod Phillips, one of UA Benton's principals, on the Urban Air franchisee Facebook group page *four days before* this lawsuit was commenced, and which Urban Air had immediately removed and taken issue with.

4.      Urban Air's claims and improper termination of UA Benton's Franchise Agreement based on alleged monies due by UA Benton to Urban Air were manufactured, improper and pretextual as UA Benton was not in default of its payment obligations under the Franchise Agreement.

5.      Urban Air's termination of UA Benton's Franchise Agreement is unjustified under the express terms of the agreement and is unlawful.  In terminating UA Benton, Urban Air is sending a message to all of the Urban Air franchisees, is seeking to muzzle franchisee communications and interfere with them from associating with one another while putting other franchisees on notice not to disagree with Urban Air's programs or initiatives or speak out against Urban Air or they will face significant consequences for such actions, including termination of their franchise agreement and litigation like UA Benton.

6.      As detailed herein, the misconduct of Urban Air and its affiliate, UA Attractions LLC, gives rise to UA Benton's claims for violation of the Arkansas Franchise Practices Act,

Unofficial Copy

breach of contract, fraud, declaratory judgment and injunctive relief.

## THE PARTIES

7.     Counter-Plaintiff/Third-Party Plaintiff UA Benton is an Arkansas limited liability company with its principal place of business in Benton, Arkansas.

8.     Counter-Plaintiff/Third-Party Plaintiff Jerrod Phillips ("Jerrod") is a citizen and resident of Arkansas and is a member of UA Benton.

9.     Counter-Plaintiff/Third-Party Plaintiff RDAD Holdings, LLC is an Arkansas limited liability company with its principal place of business in  Bryant, Arkansas and is a member of UA Benton.

10.     Counter-Defendant Urban Air is a Texas limited liability company with its principal place of business in Bedford, Texas.  Urban Air is the Plaintiff in this action and will be served with this pleading through the e-filing system.

11.     Third Party Defendant UA Attractions LLC ("UA Attractions") is a Texas limited liability company with its principal place of business in Bedford, Texas.  UA Attractions can be served with process by serving its registered agent: Stephen Polozola, 2350 Airport Freeway, Suite 505, Bedford, Texas, 76022.

12.     Third Party Defendant Michael O. Browning, Jr. ("Browning") is a citizen and resident of Texas. Browning is the CEO of Urban Air and UA Attractions, LLC. Browning can be served with process by serving him at 1316 Blue Ridge Rd, Keller, TX 76248.

13.     Third Party Defendant Alix Wren ("Wren") is a citizen and resident of Texas. Wren was the former VP of Sales for Urban Air at the relevant times alleged in this pleading. Wren can be served with process by serving her at 5713 Woodmont Ct, Plano, TX, 75093-4003.

Unofficial Copy

## FACTUAL BACKGROUND

### Urban Air's Inducement of UA Benton and Execution of the Franchise Agreement

14.     In August 2016, Jerrod Phillips ("Jerrod") and Diana Phillips ("Diana") opened Hangtime Trampoline Park in Benton, Arkansas.

15.     In August 2017, Jerrod and Diana received a communication from Urban Air postmarked August 11, 2017 (the "Conversion Letter")  which was signed by Wren, VP of Sales for Urban Air, concerning a conversion opportunity for Jerrod and Diana's Hangtime Trampoline Park.  (A copy of the Conversion Letter is attached as Exhibit A).

16.     The Conversion Letter threatened that Urban Air was "planning on opening a Corporate Store [in the Benton market] later this year."

17.     The Conversion Letter 'offered' Jerrod and Diana "the opportunity to convert to an Urban Air location rather than compete with an Urban Air Corporate Store." (See Exh. A).

18.     The Conversion Letter specifically represented that "Urban Air Adventure Parks Average **44% profit margins** on **$3.5 million in revenue**".   (See Exh. A (emphasis in original)).

19.     In addition, shortly thereafter, Urban Air provided a detailed PowerPoint (the "PowerPoint") presentation touting the alleged benefits of the Urban Air system.  (A copy of the PowerPoint is attached hereto as Exhibit B).

20.     The PowerPoint contained numerous misstatements of material fact concerning sales revenues, profitability, costs, installation costs, the brand and system.  (See Exh. B).

21.     For example, the PowerPoint represented that "Urban Air Adventure Parks Average **44% profit margins** on **$3.5 million in revenue**".   (See Exh. B, p. 3 (emphasis in original)).

ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND   **7**
AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION AND PERMANENT INJUNCTION

22.     The PowerPoint further stated that "Average Urban Air Adventure Park operates at 44% profits." (See Exh. B, p. 40).

23.     The PowerPoint contained misleading information concerning gross revenues, gross profit and operating expenses of Urban Air locations over a four month period. (See Exh. B).

24.     In addition to misleading and inaccurate representations concerning revenues and profitability, the PowerPoint contained misstatements and misrepresentations concerning installation costs, insurance, marketing, systems and franchisee support. (See Exh. B).

25.     In particular, the PowerPoint falsely claimed that one of the benefits of joining Urban Air was: "Access to our EXCLUSIVE Insurance Program. BEST rates in the industry, typical savings of $5,000 per month." (See Exh. B, p. 41 (emphasis in original)).

26.     Subsequent to the receipt of the Conversion Letter, later in August 2017, Jerrod and Diana participated in a telephone discussion with Browning, CEO of Urban Air, and Wren, VP of Sales for Urban Air.

27.     During the telephone discussion in August 2017, Browning and Wren repeated the misleading and false representations concerning the financial performance and average unit volumes of Urban Air locations.

28.     In addition, Browning specifically represented to Jerrod and Diana that if Hangtime was converted to an Urban Air location, Urban Air would not charge royalty fees during the first six (6) months of operation, that Urban Air would "discount" the price of attractions by $366,000, and that Urban Air would not charge an initial franchise fee of $30,000.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**              **8**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

29.     Browning's concessions and offer concerning the waiver of royalty fees and the "discount" on the price of attractions were made to induce Jerrod and Diana to sign a franchise agreement and convert their location to an Urban Air Adventure Park.

30.     However, upon information and belief, the alleged $366,000 "discount" on attractions was not really a discount at all.

31.     Instead, upon information and belief, the alleged "discount" was Urban Air merely foregoing a rebate from Urban Air's mandatory supplier based on the UA Benton's purchase of attractions.

32.     On August 25, 2017, Jerrod was provided with a copy of Urban Air's Franchise Disclosure Document ("FDD") dated April 25, 2017 as amended May 11, 2017.  (A copy of the FDD, which includes the executed Franchise Agreement, is attached hereto as Exhibit C).

33.     Counter-Plaintiff UA Benton and Counter-Defendant Urban Air are parties to the Franchise Agreement dated September 30, 2017 for an Urban Air Adventure Park location at 1512 Military Road, Benton, AR 72015 (the "Benton Location").  (See Exh. C).

34.     Due to mistake or inadvertence of the parties, or fraud on the part of Urban Air, Urban Air's agreements to (i) waive UA Benton's royalty fees for a period of six (6) months and (ii) provide the $366,000 "discount" were not incorporated into the final Franchise Agreement.

35.     On or about April 23, 2018, UA Benton signed the First Amendment to Franchise Agreement.  (A copy of the First Amendment to Franchise Agreement is attached hereto as Exhibit D).

36.     Section 6 of the Franchise Agreement sets forth the fees which Urban Air is authorized to charge UA Benton.  (See Exh. C).

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**          **9**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

37.     Pursuant to Section 6.B. of the Franchise Agreement, Urban Air is authorized to charge a Royalty Fee in the amount of "7% of weekly Gross Sales".  (See Exh. C).

38.     Pursuant to Section 6.C. of the Franchise Agreement, Urban Air is authorized to charge an Administrative Fee of the "[p]ro-rata portion of call centers hourly rate plus a $5.00 commission".  (See Exh. C).

39.     Nowhere in the FDD is there any disclosure of any "Membership Program Fee" or any "NAF Fee" payable by franchisees.

40.     Likewise, the Franchise Agreement does not authorize Urban Air to charge or obligate UA Benton to pay a "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% to Urban Air.

41.     The Franchise Agreement was never amended to modify the fees due and payable by UA Benton.

42.     Even though the Franchise Agreement does not obligate UA Benton to pay the "Membership Program Fee" of 2.5% or a "NAF Fee" of 5% or authorize Urban Air to charge such fees, since April 2019, Urban Air has been wrongfully imposing a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5% upon UA Benton, which violates the express terms and provisions of the Franchise Agreement.

43.     In addition, since the roll out of the Membership Program by Urban Air in April 2019, Urban Air has wrongfully withheld Membership Revenue from UA Benton (which amount now exceeds $135,000) and has failed to pay such amounts to UA Benton despite repeated demands.

44.     UA Benton and UA Attractions LLC ("UA Attractions"), Urban Air's mandatory vendor and affiliate, are parties to a Purchase and Installation Agreement for Park Attractions

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**       **10**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

("Installation Agreement") dated September 11, 2018.  (A copy of the Installation Agreement is attached hereto as Exhibit E).

45.     Pursuant to Section 3.A of the Installation Agreement, UA Attractions was obligated to commence performance of the "Work" (as defined therein) within fourteen days of the delivery of the initial Attraction containers to the Project.  (See Exh. E).

46.     On January 6, 2019, the first shipping container with Attractions was delivered to the Benton Location.

47.     Notwithstanding the express provisions of the Installation Agreement, UA Attractions did not commence performance of the "Work" within fourteen days.

48.     Instead, UA Attractions did not commence "Work" until February 6, 2019 – more than 14 days after the initial container of attractions was delivered – in violation of the Installation Agreement.

49.     Thereafter, throughout the course of the project, UA Benton received little to no feedback, support, guidance or assistance from Urban Air or UA Attractions related to substantial issues and problems which were encountered during the installation process.

50.     Moreover, UA Attractions failed to properly install various attractions and equipment, complete the work or provide all necessary and required parts and equipment to UA Benton in violation of the Installation Agreement.

51.     In order to open, UA Benton was forced to engage various contractors of its own and perform work that UA Attractions failed to complete in violation of the Installation Agreement, and UA Benton incurred substantial additional costs in connection with same.

52.     In fact, to date, UA Benton has incurred $56,981.21 of additional costs for various items and work which UA Attractions was contractually obligated to provide but did not.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**                                                   **11**

53.     In total, UA Benton spent in excess of $1,100,000 in connection with the construction and development of the Benton Location.

54.     Although UA Attractions claimed to have "completed" construction and installation on March 27, 2019, several issues and problems with the construction and installation existed and have remained, many of which UA Attractions has failed and refused to remedy to this date – almost a year later.

55.     On March 27, 2019, notwithstanding the substantial construction and installation issues and problems including items which were not completed at that time, UA Benton nonetheless issued payment to UA Attractions, but Benton withheld five percent (5%) of the final installation payment (totaling $26,750) pending UA Attractions' completion of those unfinished items and various fixes.

56.     Further, to date, there are several outstanding items and issues (which UA Benton has paid UA Attractions for), but which items can only be provided or produced by UA Attractions or Urban Air due to the alleged proprietary nature of these items to Urban Air.  These items include but are not limited to:

    a.   Modifications to Apex ramp which was installed incorrectly.

    b.   Drop Zone mats do not fit and have not been installed.

    c.   Netting/barrier on each side of Warrior Course was not installed.

    d.   Carpet area incomplete in Rockwall Area.

    e.   UA Attractions crew broke square blue foot to Ropes Course by over tightening the part.  No replacement part has been received.

    f.   Sky Coaster missing 2 safety latches that were never installed.

Unofficial Copy

g.   Wipeout has electrical problems in main box that need to be repaired, which has caused the attraction to be non-operational on numerous days.

h.   Wipeout has an ongoing motor issue that needs to be fixed.  Several replacement parts are also needed for the Wipeout.  These parts were requested in July 2019 but have never been provided.

i.   Signage erroneously provided with Texas laws contained on it, not Arkansas.  Replacements have not been sent despite many requests.

j.   Weight limit signs have not been provided.

k.   Battle Beam (UA Attractions welder burnt padding and replacement has never been provided).

57.   On March 30, 2019, UA Benton opened the Benton Location to the public.

**Urban Air's Wrongful, Bad Faith Conduct Since Execution of the Franchise Agreement.**

58.   Since opening, Urban Air has repeatedly engaged in a pattern and practice of aggressive communications, retaliatory conduct, bullying tactics, non-responsiveness to UA Benton's communications and requests and has otherwise dealt with UA Benton in bad faith and in a commercially unreasonable manner.

59.   Almost immediately after opening the Benton Location, Urban Air initiated a Membership Program in April 2019 without proper or sufficient due diligence, testing, evaluation or analysis prior to its implementation.

60.   In connection with the Membership Program, Urban Air collects all revenues for memberships sold by franchisees and distributes such revenues to individual franchisees.

Unofficial Copy

61.    Prior to the implementation of the Membership Program, UA Benton never received any preliminary correspondence or announcement concerning the program from Urban Air.  Instead, UA Benton was notified of the Membership Program by another franchisee.

62.    The Federal Trade Commission ("FTC") has promulgated certain laws requiring the delivery to prospective franchisees of a prescribed disclosure document, the Franchise Disclosure Document, concerning the franchisor, its management, and the material terms and conditions of the franchise agreement, among other things, prior to the execution of any agreement by a prospective franchisee.  This is now known as the "FTC Amended Franchise Rule."

63.    Pursuant to the Amended Franchise Rule, a franchisor is obligated to provide every prospective franchisee with a FDD, and related agreement, that details any and all of the initial and ongoing fees that a franchisor will charge to the franchisee.  16 C.F.R. § 436.5(f).

64.    16 C.F.R. § 436.5(f) expressly provides as follows:

Item 6: Other Fees. Disclose, in the following tabular form, all other fees that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part for a third party. State the title "OTHER FEES" in capital letters using bold type. Include any formula used to compute the fees.

If fees may increase, disclose the formula that determines the increase or the maximum amount of the increase. For example, a percentage of gross sales is acceptable if the franchisor defines the term "gross sales."

65.    The Amended Franchise Rule requires a franchisor to provide prospective franchisees with FDD disclosures that "present all material faces accurately, clearly, concisely and legibly in plain English."  16 C.F.R. § 436.1(d).

66.    The revenue and profitability information provided in the PowerPoint, outside of the FDD, violates the Amended Franchise Rule and the Arkansas Franchise Practices Act in

Unofficial Copy

several respects.  *See*  16 C.F.R. § 436.1(d), 16 C.F.R. § 436.1(e) and 16 C.F.R. § 436.5(s); Ark. Code. Ann. § 4-72-707.

67.     "It is an unfair and deceptive act or practice" for any franchisor to violate a provision of the Amended Franchise Rule, 16 C.F.R. § 436.2.

68.     In connection with the Membership Program, as noted above, Urban Air began charging UA Benton a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5%, which fees were *not* disclosed in the FDD or agreed to in the Franchise Agreement as required by law in violation of Amended Franchise Rule, 16 C.F.R. § 436.5(f) and the Arkansas Franchise Practices Act, Ark. Code. Ann. § 4-72-707.

69.     On May 16, 2019, despite Urban Air's agreement to waive UA Benton's royalty fees for the first six (6) months of operation, Urban Air improperly drafted funds for April royalty fees.

70.     It was not until that time when UA Benton first discovered that Urban Air's agreement to (i) waive UA Benton's royalties for a period of six (6) months and (ii) provide the $366,000 discount on attractions were not incorporated into the final, execution version of the Franchise Agreement due to the mistake or inadvertence of the parties, or fraud on the part of Urban Air.

71.     On June 7, 2019, Jerrod contacted Brandon Jones of Urban Air regarding the agreement Browning made concerning the waiver of UA Benton's royalties.

72.     On June 21, 2019, Browning emailed Jerrod claiming that he provided two options to Jerrod prior to the execution of the Franchise Agreement, which email misrepresented the nature of Browning's actual previous offer.

73.     On June 21, 2019, Browning wrote:

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**           **15**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

Jerrod if you recall we gave you 2 options.

Option 1 was you could pay retail for the attractions and not pay a royalty for 3 months.

Option 2 was we give you the attractions at cost with no royalty reduction.

You selected option 1.  You cannot have both.

Thank you.

Michael O. Browning, Jr.
CEO

74.     Thereafter, on June 27, 2019, Scott Perry ("Perry"), EVP and Chief Financial Officer of Urban Air, advised Jerrod that Urban Air was allegedly "unaware" of their agreement to waive royalties but that Urban Air would review it.

75.     In addition, since opening, Urban Air has failed and refused to send Membership Revenues to UA Benton in violation of the Franchise Agreement.

76.     In fact, from May 2019 to July 2019, UA Benton sent several communications to Urban Air regarding Urban Air's non-payment and withholding of membership revenues, but UA Benton's communications were ignored, and Urban Air failed to respond to UA Benton's numerous communications and requests.

77.     In particular, Jessica Cicero, on behalf of UA Benton, left voicemails for Perry, EVP and Chief Financial Officer of Urban Air, on June 18, 2019, June 20, 2019, June 21, 2019, July 1, 2019, July 22, 2019 and July 23, 2019, all of which Perry ignored and did not respond to.

78.     Finally, on July 24, 2019, Jerrod and several Urban Air executives, including Browning, had a conference call about various problems and issues, including Urban Air's prior agreement to waive UA Benton's royalty fees and the issues with construction and installation, among other things.

Unofficial Copy

79.     In that call, notwithstanding his June 21, 2019 email where he claimed to have provided Jerrod with two options, Browning claimed repeatedly that he did not recall making any such statements or reaching any agreement but Browning stated that Urban Air would do the "right thing".

80.     Moreover, since opening, Urban Air has failed to support UA Benton and other Urban Air franchisees and has implemented programs, mandated vendors and suppliers, and imposed fees, charges and costs upon UA Benton and other Urban Air franchisees with complete disregard for franchisee profitability and, in certain instances, in violation of the terms and provisions of the Franchise Agreement.

81.     For example, as noted above, Urban Air unilaterally forced franchisees who have invested millions of dollars to fund the development of and participate in a Membership Program in bad faith to drive Franchisor revenues and without performing sufficient due diligence or analysis on the impact it would have on unit economics, and which membership program is materially diminishing and impairing franchisee profitability to the substantial detriment of franchisees and the significant benefit of Urban Air who is collecting millions of dollars in membership fees.

82.     Another example involves Urban Air's mandatory vendor for socks.  Urban Air has mandated that franchisees purchase socks from an approved vendor at supra-competitive prices where alternative suppliers are available to provide socks of the same make and/or quality to Urban Air franchisees at approximately $0.50 less per pair.  In light of the fact that franchisees purchase upwards of 8,000 to 10,000 pairs of socks per month, a $0.50 per pair savings would be considerable.  Instead, Urban Air mandates the more expensive vendor in bad faith so that it may

Unofficial Copy

reap the benefit of substantial rebates from its sock vendor to its sole significant benefit and the substantial detriment of franchisees, including UA Benton.

83.     Likewise, despite Urban Air's claims concerning insurance, UA Benton's insurance premiums are significantly higher than Jerrod paid while operating Hangtime.

84.     Since June 2019, as association of Urban Air franchisees, including UA Benton, has repeatedly attempted to engage with Urban Air management and Urban Air's equity stakeholders in a dialogue to address the significant and substantial issues, concerns and challenges facing Urban Air franchisees, which requests for such dialogue have been repeatedly rejected by Urban Air.

85.     Moreover, despite repeated requests, Urban Air management and its equity stakeholders have failed and refused to address the significant challenges, issues and concerns of UA Benton and other Urban Air franchisees.

86.     The franchisee concerns include but are not limited to the following:

a.  Memberships – issues with pricing, data, program details, the funding of the development of the membership program (which, as noted, the fees and costs associated with the development of the membership program were unilaterally implemented and charged to franchisees in violation of the Franchise Agreement).

b.  Marketing – Urban Air's mandatory implementation of an alleged new marketing "vendor" and the imposition of additional fees associated with same, which fees were neither disclosed in the FDD or agreed upon in the franchise agreements.

c.  ROI/Profitability Issues and challenges facing Urban Air franchisees.

d.  Supra-competitive pricing on various goods, products, supplies and equipment.

Unofficial Copy

e.  Franchisor's receipt of substantial rebates to its own benefit and the substantial detriment of Urban Air franchisees.

f.  Unavailability of replacement parts - attractions are down in virtually every park leading to negative social media reviews and demands for refunds; some parks have had parts on order for two (2) years.

g.  Delays, construction costs, cost overruns - despite having built over 100 parks, such issues are still being experienced by franchisees on every project and Urban Air has failed to solve these challenges and problems.

h.  Terms of current franchise agreements.  Urban Air has materially modified and changed the terms of the Urban Air franchise agreement.  The agreement now contains broad, unfair and aggressive repurchase rights, broad reservations of rights to compete within protected territories, and higher and additional fees, among other problematic provisions.  Such terms and issues greatly impact resale value and marketability of existing locations.

i.  Lack of transparency in connection with Urban Air's fees, royalty statements and reports.

j.  Insurance – overpriced insurance premiums and various issues with Urban Air's mandatory insurance vendor's procurement of insurance coverages for franchisees and that vendor's wrongful financing of those premiums through their affiliate, which relationship between the vendor and the finance company was concealed and not disclosed to franchisees.

k.  Cannibalization – Urban Air continues to sell areas and approve sites in very close proximity to existing locations without performing sufficient due diligence,

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**                                                    **19**

analysis and examination of critical market demographics to determine if the locations are too close together which greatly impacts the success and profitability of both locations.

87.    In Item 8 of the FDD, Urban Air specifically represented that: "We [Urban Air] periodically negotiate purchase arrangements with suppliers for the benefit of our franchisees, and we may establish national buying accounts with vendors whose products meet our specifications."

88.    Section 22.A of the Franchise Agreement expressly provides: "Nothing in this agreement or any related agreement is intended to disclaim the representation made in the disclosure document provided to you by Franchisor."

89.    Notwithstanding said representation in the FDD and the express provision of the Franchise Agreement, Urban Air has not negotiated purchase arrangements with suppliers for the benefit of franchisees and, instead, charges supra-competitive prices for various mandatory goods, products, services, supplies and equipment, has mandated vendors for various mandatory goods, products, services, supplies and equipment who do the same and, further, Urban Air is collecting substantial rebates based on franchisee purchases from those mandatory vendors (and despite Urban Air's claims in various versions of the FDD that Urban Air does "not derive any revenue or material consideration from the sale of products to our franchisees" – which statement is materially false and fraudulent).

**Urban Air's Purported Notice of Default and Agreement to Resolve Fee Dispute.**

90.    On September 9, 2019, Urban Air provided UA Benton with a purported Notice of Default.

91.    However, the Notice of Default was baseless and unfounded as no monies were due and owing by UA Benton to Urban Air at that time.

Unofficial Copy

92.     Contrary to Urban Air's claims in its improper and unlawful Notice of Default, as of September 9, 2019, Urban Air was wrongfully withholding membership revenues due, owing and belonging to UA Benton, which amount of membership revenues withheld *exceeded* the claimed monies due from UA Benton (assuming Urban Air's claim concerning the agreement on the 6-month waiver of royalty fees was correct which was disputed).

93.     In fact, as of the aforesaid date of the purported Notice of Default, Urban Air owed UA Benton membership revenues in excess of $46,000 (that Urban Air was wrongfully withholding) and, *if there was no agreement to waive Royalty Fees for the first six months (which is vehemently disputed by UA Benton)*, UA Benton only owed approximately $44,000 in royalty fees to Urban Air.

94.     On September 26, 2019, UA Benton responded to Urban Air's improper and unlawful Notice of Default and provided Notice of Default to Urban Air based on Urban Air's withholding and non-payment of membership revenue due UA Benton.

95.     On October 23, 2019, UA Benton received an email from Stephen Polozola ("Polozola"), Urban Air's General Counsel, setting forth proposed terms of settlement of the issues between UA Benton and Urban Air relating to royalty fees and membership revenues.

96.     In that October 23, 2019 communication, Polozola requested a list of the outstanding items and issues relating to construction and installation and, for the first time, acknowledged that Urban Air was holding UA Benton's membership revenues.

97.     In resolution of the issues between the parties, *Polozola proposed* that: (1) the parties offset the membership revenues due UA Benton in the amount of $59,656.49 with the Royalty Fees in the amount of $60,893.37 allegedly due Urban Air and (2) that UA Benton pay the alleged difference to Urban Air.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**    **21**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

98. On October 31, 2019, in the interest of moving forward and to avoid continued disagreement regarding these issues, Brad Cicero ("Brad"), one of UA Benton's principals, emailed Polozola *agreeing* to the terms of settlement proposed by Urban Air.

99. Notwithstanding the agreement reached to resolve the issues between the parties concerning membership revenues and Royalty Fees, later that same day, Polozola emailed Brad and Jerrod adding various terms and conditions to the terms of the parties' agreement, including issues relating to UA Attractions and the outstanding issues and items with the construction and installation at the Benton Location.

100. However, Brad responded that the issues relating to construction and installation were separate and unrelated to the membership revenue and royalty fee issue.

101. On November 7, 2019, Brad provided Polozola with a detailed list of the open and outstanding issues and items relating to the construction and installation at the Benton Location, including the out of pocket costs incurred by UA Benton to perform work that UA Attractions failed to complete, and proposed a resolution relating to construction and installation issues.

102. Polozola failed to respond to Brad's email.

103. Consequently, on November 14, 2019, in good faith, Brad again emailed Polozola regarding the parties' agreement concerning royalty fees and membership revenues – which agreement had originally been proposed by Polozola.

104. Polozola again ignored Brad's communication.

105. On November 22, 2019, Brad sent a follow up email to Polozola in an effort to seek closure of these issues.

106. On December 11, 2019, almost three weeks later, Polozola finally responded to UA Benton's communications requesting "photos and the supporting invoices" relating to the

ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND **22**
AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION AND PERMANENT INJUNCTION

outstanding construction items and issues, which had been repeatedly communicated and well-known to Urban Air since *March 2019*.

107. On December 12, 2019, one day later, UA Benton provided photos to Polozola in response to his request.

108. On December 16, 2019, UA Benton informed Polozola that it was contacting its installation contractors to obtain the documentation Polozola had requested.

109. UA Benton immediately initiated diligent efforts to obtain the requested documentation but, due to the holidays and winter season, making contact with contractors was difficult and as of the filing of this action by Urban Air, the documentation had not yet been fully obtained and assembled.

### Urban Air's Bad Faith and Retaliatory Termination of the Franchise Agreement.

110. On January 9, 2020, Jerrod posted a message on the Urban Air franchisee Facebook group page concerning Urban Air's new contemplated marketing program and fees. Previously, Urban Air had announced a new vendor directive for local marketing which, in actuality, is another hidden, undisclosed fee that Urban Air intends to charge franchisees.

111. Urban Air immediately removed Jerrod's Facebook message which was critical about the marketing program and which contradicted specific representations that Browning had made previously that franchisees were not required to spend in excess of $7,000 per month on local marketing.

112. Urban Air also immediately proceeded to revoke and terminate Jerrod's access to the Urban Air franchisee Facebook group page in direct violation of laws prohibiting franchisees from associating with one another and the concept of good faith.

Unofficial Copy

113.     On January 13, 2020, *four days later*, in further retaliation for Jerrod's comments on the Urban Air franchisee Facebook group page and notwithstanding the parties' October 2019 agreement concerning fees and membership revenues, in a thinly cloaked punishment to UA Benton, Urban Air initiated this lawsuit claiming alleged "unpaid" royalties, which claims for non-payment of fees are manufactured, baseless, unfounded and in bad faith.

114.     Subsequent to the filing of the lawsuit seeking declaratory judgment that Urban Air was authorized to terminate the UA Benton Franchise Agreement based on the alleged non-payment of royalties, on February 6, 2020, Urban Air issued its improper and unlawful Notice of Termination of the UA Benton Franchise Agreement.

115.     Subsequent to the filing of the lawsuit, upon information and belief, Urban Air deleted, destroyed, removed Jerrod's emails and has terminated Jerrod's access to his Urban Air email account.

### <u>COUNT I – VIOLATION OF ARKANSAS FRANCHISE PRACTICES ACT</u>

### <u>(ALL COUNTER-PLAINTIFFS/THIRD-PARTY PLAINTIFFS AGAINST URBAN AIR, BROWNING AND WREN)</u>

116.     Counter-Plaintiffs/Third Party Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 115 as if fully set forth herein.

117.     The Arkansas Franchise Practices Act (the "Act"), § 4-72-202 *et seq.* applies to franchised businesses established or maintained in the State of Arkansas.

118.     Counter-Plaintiff/Third Party Plaintiff's Urban Air franchise is located in Benton, Arkansas.

119.     Pursuant to the § 4-72-202 of the Act, "Person" means:

a natural person, corporation, partnership, trust, or other entity, and, in case

of an entity, "person" shall include any other entity which has a majority

Unofficial Copy

interest in such entity or effectively controls such other entity as well as the individual officers, directors, and other persons in active control of the activities of each entity.

120.    Pursuant to Section 4-72-202(8) of the Act, "good faith" means "honesty in fact in the conduct or transaction concerned."

121.    Section 4-72-204 of the Act entitled "Termination, cancellation, or failure to renew" provides, in pertinent part:

(a) It shall be a violation of this subchapter for a franchisor to:

(1) Terminate or cancel a franchise without good cause

122.    Section 4-72-206(1) of the Act prohibits any franchisor from requiring a franchisee in connection with a franchise agreement "to assent to a release, assignment, novation, waiver, or estoppel which would relieve any person from liability imposed by the [Act]."

123.    Section 4-72-206 of the Act entitled "Unlawful practices of franchisors" further provides:

It shall be a violation of this subchapter for any franchisor, through any officer, agent, or employee to engage directly or indirectly in any of the following practices:

. . .

(2) To prohibit directly or indirectly the right of free association among franchisees for any lawful purpose;

. . .

(6) To refuse to deal with a franchise in a commercially reasonable manner and in good faith.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**                                                    **25**

124.     Section 4-72-207 of the Act entitled "Misleading and fraudulent schemes – Penalty – Prosecutions" provides:

(a) It shall be unlawful for any person, directly or indirectly, in connection with the offer, sale, purchase, transfer, or assignment of any franchise in this state to knowingly:

(1) Employ any device, scheme, or artifice to defraud;

(2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or

(3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

(b) Any violation of this section shall be a Class B felony.

(c) Prosecutions for offenses committed in violation of this section must be commenced within five (5) years from the date of the crime or within five (5) years from the date of the commission of the last overt act in furtherance of the scheme to defraud.

125.     Section 4-72-208 of the Act entitled "Franchisee's remedies" provides, in pertinent part:

(a) Any franchisee who is harmed by a violation or violations of § 4-72-207 shall be entitled to recover treble damages in a civil action and, where appropriate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

(b) Any franchisee who is harmed by a violation of any other section of this subchapter shall be entitled to recover actual damages in a civil action and, where appropriate, obtain injunctive relief in addition to reasonable attorney's fees and costs of litigation.

126.    In violation of § 4-72-204 and § 4-72-206 of the Act, as detailed herein, Urban Air improperly terminated UA Benton's Franchise Agreement without good cause and in bad faith, and despite the parties' agreement in October 2019 to resolve the dispute between the parties concerning fees and membership revenues.

127.    In violation of § 4-72-206 of the Act, by virtue of the misconduct, actions and conduct detailed herein, Urban Air unlawfully prohibited UA Benton from the right of free association with other franchisees and failed and refused to deal with UA Benton in a commercially reasonable manner and in good faith.

128.    In violation of § 4-72-207 of the Act, by virtue of the misconduct, actions and conduct detailed herein, Urban Air, Browning and Wren employed a device, scheme and artifice to default, made untrue statements of material fact, including but not limited to false statements of material fact concerning revenues and profitability of Urban Air franchises, and engaged in acts, practices, and a course of business which operated as a fraud or deceit upon UA Benton.

129.    Urban Air terminated Counter-Plaintiff UA Benton's Franchise Agreement in an unjust and improper manner and in violation of the Act as set forth herein.

130.    Urban Air's misconduct and termination of UA Benton's Franchise Agreement is in bad faith, is retaliatory and improper, and violates the Act.

131.    By virtue of Counter-Defendants' Urban Air and Third Party Defendants' Browning and Wren's violations of the Act, Counter-Plaintiffs have been damaged.

Unofficial Copy

132.   As a result of Counter-Defendants' and Third Party Defendants' actions and misconduct, Counter-Plaintiffs have suffered and continue to suffer injury and have incurred and are continuing to incur monetary damages.

133.   Counter-Plaintiffs/Third Party Plaintiff seek damages, treble damages and attorneys' fees and costs of litigation in accordance with the Act in an amount that has yet to be determined in excess of $1,100,000.

## COUNT II – BREACH OF CONTRACT (FRANCHISE AGREEMENT)
## (UA BENTON AGAINST URBAN AIR)

134.   Counter-Plaintiff, UA Benton, realleges and incorporates the allegations of paragraphs 1 through 115 as if fully set forth herein.

135.   The Franchise Agreement is an enforceable agreement between UA Benton and Urban Air.

136.   In connection with the Franchise Agreement, the parties further agreed that UA was not obligated to pay royalty fees for a period of six (6) months from the date of UA Benton's Grand Opening which agreement was reached but which terms were not incorporated into the final agreement due to mistake or inadvertence by the parties, or fraud on the part of Urban Air.

137.   UA Benton fully performed its obligations under the Franchise Agreement.

138.   Urban Air materially breached the Franchise Agreement in several ways including but not limited to the following respects:

   a.   By wrongfully withholding and failing and refusing to pay membership revenues due and owing to UA Benton despite numerous requests.

   b.   By charging fees in excess of the 7% Royalty Fee and the Administrative Fee which were not authorized by the Franchise Agreement.

Unofficial Copy

c. By imposing and charging a "Membership Program Fee" of 2.5% and a "NAF Fee" of 5% which was never disclosed to UA Benton, which UA Benton never agreed to pay and which was not an agreed upon contractual obligation in the Franchise Agreement.

d. By terminating the Franchise Agreement in violation of the termination provisions set forth therein, in retaliation for UA Benton's communications with other franchisees and in bad faith.

e. By charging UA Benton supra-competitive prices for mandatory goods, products, services, supplies and equipment and mandated vendors who charged supra-competitive prices for mandatory goods, products, services, supplies and equipment.

f. By failing to negotiate for the benefit of franchisees and failing to use its market power due to volume purchases for the benefit of franchisees.

g. By failing to negotiate purchase arrangements with suppliers for the benefit of UA Benton and the other Urban Air franchisees.

h. By failing to provide promised support and assistance to UA Benton.

139.    As a proximate result of Urban Air's breaches of contract as alleged herein, Counter-Plaintiff has been damaged in amounts to be proven at trial.

140.    Pursuant to the Franchise Agreement and Chapter 38 of the Texas Civil Practice & Remedies Code, Counter-Plaintiff also seeks recovery of the attorney's fees incurred in bringing this action.

Unofficial Copy

## COUNT III – BREACH OF CONTRACT (INSTALLATION AGREEMENT)

## (UA BENTON AGAINST UA ATTRACTIONS, LLC)

141.    Third-Party Plaintiff UA Benton, realleges and incorporates the allegations of paragraphs 1 through 115 as if fully set forth herein.

142.    The Installation Agreement is an enforceable agreement between UA Benton and Third Party Defendant UA Attractions.

143.    UA Benton fully performed its obligations under the Installation Agreement.

144.    As detailed herein, in material breach of its obligations under the Installation Agreement, Third Party Defendant UA Attractions failed to commence work in accordance with the agreement, failed to properly install various attractions and equipment, and failed to complete the work or provide all necessary and required parts and equipment to UA Benton.

145.    As a proximate result of Third Party Defendant UA Attractions' breaches of contract as alleged herein, Third Party Plaintiff has been damaged in amounts to be proven at trial.

146.    Pursuant to the Installation Agreement and Chapter 38 of the Texas Civil Practice & Remedies Code, Counter-Plaintiff also seeks recovery of the attorney's fees incurred in bringing this action

## COUNT IV – FRAUD

## (ALL COUNTER-PLAINTIFFS/THIRD-PARTY PLAINTIFFS AGAINST URBAN AIR, BROWNING AND WREN)

147.    Counter-Plaintiffs/Third Party Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 115 as if fully set forth herein.

148.    As alleged with specificity and particularity herein, Counter-Defendants Urban Air and Third Party Defendants Browning and Wren knowingly made false and misleading statements of fact to Counter-Plaintiffs/Third Party Plaintiffs.

ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND
AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION AND PERMANENT INJUNCTION

30

Unofficial Copy

149.    In particular, among other misleading and inaccurate representations, Counter-Defendants Urban Air and Third Party Defendants Browning and Wren falsely misrepresented:

a.    that "Urban Air Adventure Parks Average **44% profit margins** on **$3.5 million in revenue**".   (See Exh. B, p. 3 (emphasis in original)).

b.    the gross revenue, gross profit and operating expenses of Urban Air locations over a four month period. (See Exh. B, p. 10).

c.    that Urban Air franchisees have "Access to our EXCLUSIVE Insurance Program. BEST rates in the industry, typical savings of $5,000 per month."  (See Exh. B, p. 41 (emphasis in original)).

d.    that "Average Urban Air Adventure Park operates at 44% profits.  (See Exh. B, p. 40).

150.    Counter-Defendant Urban Air and Third Party Defendants Browning and Wren knew or should have known that these representations were false, misleading and inaccurate at the time they were made.

151.    Counter-Defendant Urban Air and Third Party Defendants Browning and Wren made the false statements with the intent to defraud the Counter-Plaintiffs/Third Party Plaintiffs and in order to induce the Counter-Plaintiffs/Third Party Plaintiffs to rely on the statements.

152.    Counter-Plaintiffs/Third Party Plaintiffs believed the false statements made to them and acted in reliance upon those beliefs to their detriment.

153.    As a result of their detrimental reliance on Counter-Defendant Urban Air and Third Party Defendants' Browning and Wren's fraudulent statements, Counter-Plaintiffs/Third Party Plaintiffs have been damaged in an amount to be proven at trial.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND**                                          **31**
**AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY**
**INJUNCTION AND PERMANENT INJUNCTION**

Unofficial Copy

## COUNT V – REFORMATION OF CONTRACT

### (UA BENTON AGAINST URBAN AIR)

154.    Counter-Plaintiff/Third-Party Plaintiff, UA Benton, realleges and incorporates the allegations of paragraphs 1 through 115 as if fully set forth herein.

155.    In August 2016, Jerrod and Diana opened their Hangtime Trampoline Park in Benton, Arkansas.

156.    In August 2017, Urban Air approached Jerrod and Diana to convert their location to an Urban Air location.

157.    Urban Air pitched Jerrod and Diana on the benefits of converting to the Urban Air system.

158.    In an effort to incentivize Jerrod and Diana to convert to an Urban Air, Browning made a series of promises, representations and statements to induce Jerrod and Diana to pursue a conversion opportunity.

159.    In August 2017, Browning specifically represented to Jerrod and Diana that if Hangtime was converted to an Urban Air location, Urban Air would not charge a royalty fee during the first six (6) months of operation, that Urban Air would "discount" the price of attractions by $366,000, and that Urban Air would not charge an initial franchise fee of $30,000.

160.    Prior to the execution of the Franchise Agreement between UA Benton and Urban Air, Browning represented to Jerrod that Urban Air would not charge a royalty fee during the first six (6) months of operation from the date of the Grand Opening.

161.    Prior to the execution of the Franchise Agreement between UA Benton and Urban Air, Browning represented to Jerrod that Urban Air would "discount" the price of attractions by $366,000.

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**                                                32

162.    Prior to the execution of the Franchise Agreement between UA Benton and Urban Air, Browning represented to Jerrod that Urban Air would not charge an initial franchise fee of $30,000.

163.    Prior to reducing the Franchise Agreement to writing, Urban Air and UA Benton agreed that Urban Air would not charge a royalty fee during the first six (6) months of operation.

164.    Prior to reducing the Franchise Agreement to writing, Urban Air and UA Benton agreed that Urban Air would "discount" the price of attractions by $366,000.

165.    Prior to reducing the Franchise Agreement to writing, Urban Air and UA Benton agreed that Urban Air would not charge an initial franchise fee of $30,000.

166.    Pursuant to the discussions and negotiations between Browning and Jerrod, UA Benton agreed to execute the Franchise Agreement.

167.    Pursuant to the negotiations and discussions between Browning and Jerrod, UA Benton and Urban Air agreed to reduce their understanding and agreement to writing and enter into the Franchise Agreement.

168.    Urban Air drafted the Franchise Agreement between UA Benton and Urban Air.

169.    UA Benton would not have agreed to execute the Franchise Agreement and convert the Hangtime Trampoline Park to an Urban Air location if Urban Air had not agreed to waive royalty fees during the first six (6) months of operation.

170.    UA Benton would not have agreed to execute the Franchise Agreement and convert the Hangtime Trampoline Park to an Urban Air location if Urban Air had not agreed to "discount" the price of attractions by $366,000.

Unofficial Copy

171.    UA Benton would not have agreed to execute the Franchise Agreement and convert the Hangtime Trampoline Park to an Urban Air location if Urban Air had not agreed to waive the initial franchise fee of $30,000.

172.    UA Benton's execution of and entry into the Franchise Agreement was conditioned upon receipt of the concessions offered by Browning which included waiver of royalty fees for a period of six months from opening, waiver of the initial franchise fee of $30,000 and a $366,000 "discount" of the price of attractions.

173.    On or about September 30, 2017 the Franchise Agreement was signed by UA Benton and Urban Air.

174.    The Franchise Agreement contains a reference to the waiver of the initial franchise fee of $30,000.  (Exh. C, "Summary Page", p. 75).

175.    The Franchise Agreement makes no reference whatsoever to the waiver of royalty fees for a period of six months from the date of the Grand Opening or the $366,000 "discount" on the price of attractions.

176.    Although the Franchise Agreement does not contain any provision or reference whatsoever to the $366,000 "discount" on the price of attractions, such a discount was provided.

177.    However, Urban Air has refused to honor the parties' agreement concerning waiver of royalty fees for a period of six months from the date of the Grand Opening.

178.    Instead, Urban Air has wrongfully taken the position that the agreement to waive royalties for six months was not reached because such provision was not contained in the written Franchise Agreement, which Urban Air drafted, and even though the agreement to "discount" the price of attractions by $366,000 was similarly not included in the Franchise Agreement.

Unofficial Copy

179.    To the extent that the Franchise Agreement does not provide that UA Benton's royalty fees were waived for a period of six months from the date of the Grand Opening of the Benton Location and that UA Benton was being provided with a $366,000 "discount" on the price of attractions, the Franchise Agreement between Urban Air and UA Benton does not express the true intent and understanding between Urban Air and UA Benton.

180.    To the extent that the Franchise Agreement does not provide that UA Benton's royalty fees were waived for a period of six months from the date of the Grand Opening of the Benton Location and that UA Benton was being provided with a $366,000 "discount" on the price of attractions, a variance exists between the original understanding and agreement between UA Benton and Urban Air, which the parties' agreed to reduce to writing, and the Franchise Agreement which was executed by Urban Air and UA Benton.

181.    The failure of the Franchise Agreement to provide that UA Benton's royalty fees were waived for a period of six months from the date of the Grand Opening of the Benton Location and that UA Benton was being provided with a $366,000 "discount" on the price of attractions was based on a mutual mistake by Urban Air and UA Benton, or fraud on the part of Urban Air in connection with its drafting of the Agreement.

182.    To the extent that the Franchise Agreement does not provide that UA Benton's royalty fees were waived for a period of six months from the date of the Grand Opening of the Benton Location and that UA Benton was being provided with a $366,000 "discount" on the price of attractions, the written Agreement between Urban Air and UA Benton does not express the true intent and understanding between Urban Air and UA Benton.

183.    The Franchise Agreement between the UA Benton and Urban Air should be reformed to reflect the true intent and understanding between the parties.

ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND
AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION AND PERMANENT INJUNCTION                                           35

Unofficial Copy

## COUNT VI – DECLARATORY JUDGMENT

**(ALL COUNTER-PLAINTIFFS/THIRD-PARTY PLAINTIFFS AGAINST URBAN AIR)**

184.     Counter-Plaintiffs/Third-Party Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 115 as if fully set forth herein.

185.     The Franchise Agreement contains express provisions and pre-conditions to termination of a Franchise Agreement.

186.     At the time of Urban Air's wrongful, manufactured and unlawful termination of the Franchise Agreement on February 6, 2020, UA Benton did not owe monies to Urban Air and the termination was retaliatory, improper and in bad faith.

187.     There is a justiciable controversy between Urban Air and UA Benton as to the validity and lawfulness of terminating the Franchise Agreement.

188.     Pursuant to the Texas Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon 1997), UA Benton seeks a judicial determination that Urban Air's termination of the Franchise Agreement was invalid and unlawful, that Urban Air terminated the Franchise Agreement in violation of the terms and provisions of the Franchise Agreement and that Urban Air shall be enjoined from enforcement of the post-termination obligations set forth in the Franchise Agreement.

## COUNT VII – APPLICATION FOR TEMPORARY RESTRAINING ORDER,

## TEMPORARY INJUNCTION AND PERMANENT INJUNCTION

**(ALL COUNTER-PLAINTIFFS/THIRD-PARTY PLAINTIFFS AGAINST URBAN AIR)**

189.     Counter-Plaintiffs/Third Party Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 115 as if fully set forth herein.

Unofficial Copy

190.     Pleading further and in the alternative to the extent necessary, Counter-Plaintiff UA Benton has a probable right of recovery for their claims for violation of the Arkansas Franchise Practices Act, breach of Franchise Agreement, Fraud, Reformation of Contract and Declaratory Judgment against Counter-Defendant Urban Air.

191.     Urban Air undeniably possesses and possessed superior bargaining and economic power in a one-sided franchise relationship, and now seeks – without good cause or justification – to wrongfully terminate UA Benton's Franchise Agreement.

192.     The instant action filed by Urban Air was precipitated by a Facebook post made by Jerrod, which Urban Air took issue with.

193.     Four days after the Facebook post, Urban Air initiated this action in retaliation for the Facebook post to terminate UA Benton's Franchise Agreement based on manufactured, pretextual and improper grounds.

194.     Urban Air wrongfully and improperly seeks to terminate UA Benton's Franchise Agreement in bad faith and without cause.

195.     As detailed herein, UA Benton seeks an Order:

a.   Preliminarily enjoining Urban Air from terminating UA Benton's Franchise Agreement pending a determination on the merits of the propriety of the purported default and termination of UA Benton by Urban Air; and

b.   Preliminarily enjoining Urban Air during the pendency of this matter, from interfering with the operation of UA Benton's business and customer relationships; and

c.   Preliminarily enjoining Urban Air from altering the *status quo* of its franchise relationship with UA Benton until such date as this matter is resolved on the merits.

Unofficial Copy

196.    Counter-Plaintiff UA Benton is likely to succeed on the merits of the counterclaims because Urban Air's termination of the Franchise Agreement was unlawful and improper.

197.    In addition, imminent and irreparable injury or harm will occur before the trial of this cause if a temporary restraining order and a temporary injunction are not entered by the Court to maintain the status quo pending a determination of the propriety of the termination of the Franchise Agreement.

198.    UA Benton will suffer immediate, irreparable injury if the injunctive relief sought herein is not granted.

199.    UA Benton will lose its entire business if termination is not preliminarily enjoined and the harm that UA Benton will suffer is not readily compensable by monetary damages.

200.    If the injunctive relief sought is not granted, and the termination is deemed wrongful, UA Benton cannot be adequately compensated by monetary damages.

201.    More strikingly, if Urban Air is permitted to unilaterally terminate UA Benton's location without good cause, not only will UA Benton lose its entire investment, UA Benton will also be forced to terminate all of the employees at the Benton Location and will face substantial liability to the landlord under the lease.

202.    Loss of a franchised business constitutes irreparable harm.  *See e.g. Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970).

203.    *Semmes* is highly instructive in this matter as that case dealt with facts and circumstances similar to those surrounding the instant dispute – involving the alleged wrongful termination of a franchisee, and the resulting consequences of such an event to decimate the business, livelihood, reputation and spirit of the terminated franchisee.

Unofficial Copy

204.     In *Semmes,* which involved the termination of an automobile dealership, the Court held quite emphatically that: "the right to continue a business in which [the dealer] had engaged … is not measurable entirely in monetary terms; *the [dealers] want to sell automobiles, not to live on the income from a damages award*." *Id.* at 1205. (emphasis supplied).

205.     *Semmes* and its progeny stands for the proposition that the "improper deprivation of an inveterate enterprise that, but for the defendant's challenged action, could be expected to continue" constitutes irreparable harm.  *See, e.g., ABA Distribs., Inc. v. Adolph Coors Co.*, 661 F.2d 712, 714 (8th Cir. 1981).

206.     In other words, depriving a franchisee in Counter-Plaintiff's position inflicts a form of harm so severe that money cannot adequately compensate the aggrieved business owner.

207.     As detailed herein, if Urban Air is permitted to wrongfully terminate (and potentially take back) UA Benton's location for no value based on manufactured, pretextual and bad faith grounds in violation of the Arkansas Franchise Practices Act and the express terms of the Franchise Agreement, Counter-Plaintiffs will be financially devastated – having lost the opportunity to operate the location, repay substantial debt which has been incurred to develop the Benton Location and avoid substantial liability to lenders.

208.     Not only does the law require an injunction, logic does as well.

209.     If Urban Air is successful in its termination efforts and is not enjoined pending a determination on the merits, UA Benton's entire business operation will be terminated, and UA Benton will suffer, in addition to the obvious financial consequences associated with losing its business but will face third-party exposure to the Landlord and lenders who provided financing for the development, construction and opening of the Benton Location.

Unofficial Copy

210.    If a temporary restraining order and preliminary injunction is not granted, UA Benton stands to lose everything related to this business.

211.    Comparatively, Urban Air stands to lose nothing.

212.    Here, between UA Benton and Urban Air, a far greater hardship will be imposed upon UA Benton if the requested injunctive relief is not granted.

213.    The imposition of the requested restraints and preliminary injunctive relief is in the public interest.

214.    Absent injunctive relief, UA Benton will be left without an adequate remedy at law for their Arkansas Franchise Practices Act, breach of contract, fraud, reformation of contract and declaratory judgment claims and monetary damages will not adequately compensate Counter-Plaintiff.

215.    A balancing of equities shows that the injunctive relief sought would further the interests of justice.

216.    Accordingly, Counter-Plaintiff UA Benton respectfully request that the Court enter an order as follows:

    a.  Preliminarily enjoining Urban Air from terminating UA Benton's Franchise Agreement pending a determination on the merits of the propriety of the purported default and termination of UA Benton by Urban Air; and

    b.  Preliminarily enjoining Urban Air during the pendency of this matter, from interfering with the operation of UA Benton's business and customer relationships; and

    c.  Preliminarily enjoining Urban Air from altering the *status quo* of its franchise relationship with UA Benton until such date as this matter is resolved on the merits.

Unofficial Copy

217.     To the extent necessary and as the Court deems appropriate, Plaintiffs are willing to post a bond in connection with this request for injunctive relief.

218.     This application is verified by Counter-Plaintiff in accordance with the requirements of Rules 680 and 682 of the Texas Rules of Civil Procedure and the Affidavit of Jerrod Phillips is also filed in support of the application.

### COUNT VIII – ATTORNEYS' FEES

### (ALL COUNTER-PLAINTIFFS/THIRD-PARTY PLAINTIFFS AGAINST ALL COUNTER-DEFENDANTS/THIRD-PARTY DEFENDANTS)

219.     Counter-Plaintiffs/Third-Party Plaintiffs reallege and incorporate the allegations of paragraphs 1 through 115 as if fully set forth herein.

220.     Counter-Plaintiffs/Third-Party Plaintiffs are entitled to attorneys' fees pursuant to the Franchise Agreement, Installation Agreement, the Arkansas Franchise Practices Act, Texas Civil Practice & Remedies Code § 38.001, *et seq.* (Vernon's 1985), and Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a) (Vernon 1997).

### PRAYER

WHEREFORE, Counter-Plaintiffs/Third-Party Plaintiffs, Urban Air of Benton, LLC, Jerrod Phillips and RDAD Holdings, LLC, prays this Court enter judgment against UATP Management, LLC, UA Attractions, LLC, Michael O. Browning, Jr. and Alix Wren, jointly and severally, in an amount in excess of $1,100,000 and for Counter-Plaintiffs' reasonable and necessary attorneys' fees for maintaining this action, and any other relief which this Court may deem to be just, equitable and proper.

ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND
AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY
INJUNCTION AND PERMANENT INJUNCTION

41

Unofficial Copy

Respectfully submitted,

_____

Robert L. Chaiken
State Bar No. 04057830
rchaiken@chaikenlaw.com
Carrie P. Kitner
State Bar No. 24074921
ckitner@chaikenlaw.com
**CHAIKEN & CHAIKEN, P.C.**
Legacy Town Center III
5801 Tennyson Pkwy., Suite 440
Plano, Texas 75024
Telephone: (214) 265-0250
Facsimile:   (214) 265-1537

Andrew P. Bleiman
(*pro hac vice* application to be submitted)
andrew@marksklein.com
Mark I. Fishbein
(*pro hac vice* application to be submitted)
mark@marksklein.com
Marks & Klein, LLP
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
Facsimile: (732) 219-0625

**ATTORNEYS FOR
DEFENDANTS/COUNTER-
PLAINTIFFS/THIRD-PARTY PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon all counsel of record by electronic service on this 24th day of February, 2020.

*/s/ Robert L. Chaiken*_____
Robert L. Chaiken

**ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIM, THIRD-PARTY PETITION AND AMENDED VERIFIED APPLICATION FOR TEMPORARY RESTRAINING ORDER, TEMPORARY INJUNCTION AND PERMANENT INJUNCTION**            **42**