# EXHIBIT A

017-316957-20

FILED
TARRANT COUNTY
7/16/2020 4:23 PM
THOMAS A. WILDER
DISTRICT CLERK

### CAUSE NO. 017-316957-20

| | | |
|---|---|---|
| **CONWAY URBAN AIR, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff*, | § | |
| | § | **TARRANT COUNTY, TEXAS** |
| **v.** | § | |
| | § | |
| **UATP MANAGEMENT, LLC,** | § | |
| **MICHAEL O. BROWNING, JR., and** | § | |
| **ALIX WREN,** | § | |
| *Defendants*. | § | **17TH JUDICIAL DISTRICT** |

### PLAINTIFF'S OPPOSITION TO DEFENDANTS'
### MOTION TO COMPEL ARBITRATION AND DISMISS
### OR STAY PROCEEDINGS

Plaintiff, Conway Urban Air, LLC ("Conway" or "Plaintiff"), for its response in opposition to Defendants' Motion to Compel Arbitration and Dismiss or Stay Proceedings, states as follows:

### **INTRODUCTION**

Defendants' motion seeks to compel arbitration based on an alleged "agreement to arbitrate" that is contained in an "***Amendment to Franchise Agreement (Membership Program)***" (the "Purported Amendment"), not the Franchise Agreement itself, and which Purported Amendment is not an enforceable agreement under Texas law and is unconscionable. The Purported Amendment lacks the essential elements of a binding agreement, fails for want of consideration, and was fraudulently procured under false pretenses and duress (where Plaintiff had no meaningful choice but to sign). The present motion seeks to end-run this Court's authority and piggy-back the determination of arbitrability on the unenforceable Purported Amendment in arbitration, even though the enforceability of the Amendment to Franchise Agreement is challenged and there was no actual "agreement to arbitrate" between Plaintiff and Defendants or meeting of the minds on this issue.

Here, recognizing various issues, errors, and omissions in connection with its uniform franchise agreement, in approximately April 2019, Defendant UATP Management ("UATP" or "Defendant") demanded its franchisees execute the "Purported Amendment" which materially altered and modified the terms of the Franchise Agreement and Plaintiff received absolutely nothing in return and derived no cognizable benefit.  Importantly, there is ***no*** agreement to arbitrate in the Franchise Agreement executed by the parties.   All of the purported authority cited by Defendants is wholly distinguishable in this regard.  Moreover, none of the cases stand for the proposition that arbitrability of a dispute should be determined by an arbitrator where the purported agreement to arbitrate is not contained in the original agreement but, rather is contained in a subsequent amendment to the parties' agreement, the enforceability and conscionability of which is specifically challenged.  Defendants' motion is yet another example of Defendants' underhanded conduct vis-à-vis their business relationship with Plaintiff.

Plaintiff filed this action to address numerous, significant violations of state and federal law relating to the formation of its business relationship with UATP, including UATP and its officers, agents, and employees' material misstatements of fact in violation of applicable federal regulations and Arkansas law, UATP's numerous breaches of the Franchise Agreement executed between Conway and UATP, UATP's violations of Arkansas' Franchise Practices Act, and relevant here, UATP's imposition of the Purported Amendment which materially altered the rights enjoyed by Conway under the Franchise Agreement without valid consideration and which was the product of fraud, misrepresentations, and represents an unconscionable contract of adhesion.

Moreover, the Purported Amendment contains a wholly overbroad and unconscionable arbitration provision (the "Purported Arbitration Agreement") which Defendants seek to enforce in the instant Motion.  For the reasons set forth herein, Conway respectfully requests this Court

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

DENY the Defendants' Motion to Compel Arbitration and Dismiss or to Stay (the "Motion") and permit this matter to continue in this forum.

## PROCEDURAL HISTORY

As a threshold matter, this matter was filed before this Court on May 18, 2020 and there is scant record before the Court, but for the Petition and the Defendants' Motion. Relatedly, the factual background of this matter has yet to be developed, beyond the allegations contained in the Petition itself and the allegations made in Defendants' Motion. *See* Def. Br. pp. 1-3.

## RELEVANT FACTUAL BACKGROUND

1.      After lengthy negotiations which began in February 2016, Conway entered into a Franchise Agreement with UATP on August 8, 2016. *See* Plaintiff's Original Petition. ¶¶ 15-38, 64. In April 2019, UATP mandated a new Membership Program. *Id*., ¶ 97.

2.      The Membership Program was followed by the presentation to Conway of the Purported Amendment. *Id*., ¶ 102. Conway was told that executing the Purported Amendment was "necessary" to implement the Membership Program and to receive membership revenue, and that its terms would only touch and concern the membership program. *Id*., ¶¶ 103-14.

3.      The Purported Amendment, and its arbitration agreement, were proffered in pre-printed, non-negotiable, electronic form through DocuSign. *Id*.

4.      Plaintiff was advised and made to believe that unless the Purported Amendment, he would not receive or be paid membership revenues from UATP which were paid by customers directly to UATP. (*See* Affidavit of Joseph Toddy attached hereto as Exhibit A).

5.      Plaintiff had no meaningful choice and executed the Purported Amendment under duress and threat of default. (*See* Exh. A). At the time of the execution of the Purported Amendment, based on various communications from representatives of UATP, Plaintiff

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

understood and believed that UATP would provide him with a Notice of Default unless he signed the Purported Amendment.  (*See* Exh. A).

6.      At the time of the execution of the Purported Amendment, based on various communications from representatives of UATP, Plaintiff also understood and believed and that if he failed to sign the Purported Amendment that he risked termination of his Franchise Agreement which would have resulted in a total loss of his investment.  (*See* Exh. A).

7.      Plaintiff was given little to no opportunity to review the Purported Agreement before the Membership Program went into effect and Defendant began levying the charges set out therein.  (*See* Exh. A).

8.      When Plaintiff signed the Purported Amendment, Plaintiff did not understand or agree to the substantial changes and modifications to the Franchise Agreement that UATP was imposing.  (*See* Exh. A).

9.      Instead, Plaintiff signed it because Plaintiff was led to believe by representatives of UATP that the Purported Amendment was limited to the membership program and was going to simply allow it to receive membership revenues in connection with that program.  (*See* Exh. A).

## <u>LEGAL ARGUMENT</u>

**A.     The Purported Amendment is Unenforceable and Not a Binding Contract under Texas Law and there is No Enforceable Agreement to Arbitrate.**

It is well settled law that an enforceable agreement under Texas law requires six elements: (1) a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of that breach. *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App. – Dallas 2008, no pet.) (*citing Case Corp. v. Hi-Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769 (Tex. App.—Dallas 2005, pet. denied). It is undisputed that the ***Franchise Agreement*** is a binding contract under Texas law.  However, the

***Purported Amendment*** is not enforceable or binding under Texas law and the essential elements to establish a binding contract under Texas law cannot be established.

For example, there was no "offer and acceptance" nor was there any "mutual assent" (e.g. meeting of the minds) in connection with the Purported Amendment. *See, e.g.*, *Equity Residential Props. Mgmt. Corp. v. Silvers*, No. 05-97-01073-CV, 1998 Tex. App. LEXIS 5538, *9-10 (Tex. App. – Dallas 1998, no pet.) (Plaintiffs' refusal to accept arbitration agreement amounted to a lack of mutual assent to be bound).  To the contrary, UATP presented the Purported Amendment to Plaintiff to sign and was threatened that it would not receive membership revenues and would face default and possible termination of the Franchise Agreement if it did not sign.  (*See* Exh. A). Likewise, Plaintiff never "agreed" to the terms of the Purported Amendment and there was no meeting of the minds.  Instead, Plaintiff only signed the Purported Amendment because he was led to believe by representatives of UATP that is was necessary in order to receive membership revenues under the Membership Program and to avoid default and termination.  (*See* Exh. A).

In particular, the Purported Amendment materially alters significant portions of the existing franchise agreements without consideration or any cognizable benefit to Plaintiff.  There was certainly no agreement or meeting of the minds with respect to the payment of additional fees and costs or the waiver of substantial rights to the courts and to pursue class action claims particularly where Plaintiff got nothing in return for such obligations.

Prior to foisting the Purported Amendment on Conway, UATP's federally-mandated disclosures – which were provided to Conway before he executed his Franchise Agreement – did not include any fees for the "Membership Program Fee" or an "NAF fee", listed as 2.5% and 5 % of Gross Sales, respectively.  *See* Plaintiff's Original Petition ¶¶ 99-100, 106.  In the absence of a contractual obligation to pay a royalty fee – and in the absence of the disclosure of the existing of

such ongoing payment in the franchise disclosure documents, Defendant may not charge such a fee.  Years later, when UATP decided to initiate the Membership Program and add new fees not disclosed in the franchise disclosure documents, it did so knowing full well it could not unilaterally impose these fees, and the Membership Program itself, on Conway.  Therefore, in an effort to mask and ultimately avoid liability for materially breaching the franchise agreements, Defendant promulgated the Purported Amendment.  *Id*. ¶ 102.

Here, the Purported Amendment fails for lack of consideration.  Likewise, the Purported Amendment was promulgated under false pretenses and through fraudulent means.

1.   *New, Undisclosed Fees & Charges*

It is unlawful for a franchisor to levy fees not disclosed in its franchise disclosure documents and not contained in the franchise agreements executed by the franchisees.  Yet, and as described above, UATP has introduced two, new fees to Conway: the Membership Program Fee and the NAF Fee.

16 C.F.R. § 436.5(f) expressly states that:

> Item 6: Other Fees. Disclose, in the following tabular form, all other fees that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part for a third party. State the title "OTHER FEES" in capital letters using bold type. Include any formula used to compute the fees.
> If fees may increase, disclose the formula that determines the increase or the maximum amount of the increase. For example, a percentage of gross sales is acceptable if the franchisor defines the term "gross sales."

See 16 C.F.R. § 436.5(f) (emphasis added).

In the 2016 FDD Conway was disclosed on, there is **no** Item 6 disclosure for an "NAF Fee" a "Membership Program fee," or "Direct Costs" associated with the Membership Program (because the program itself was not disclosed.) *See* Def. Ex. A, pp. 12-15.  Similarly, § 6 of Conway's Franchise Agreement sets forth the fees which Urban Air is authorized to charge

franchisees.  *See* Compl., ¶ 106, Ex. D.  Conway's Franchise Agreement states that UATP is authorized only to charge a Royalty Fee equal to "6% of weekly Gross Sales" and a Development Fund Fee of "1% of Weekly Gross Sales." *Id.*

In addition, the 2016 FDD and Conway's Franchise Agreement identifies an "Administrative Fee" which is defined as the "[p]ro-rata portion of call centers hourly rate plus a $5.00 commission." *See* Compl., Ex. D.  Clearly, neither document discloses a "Membership Program Fee" or "NAF Fee."  Yet, in the Purported Amendment, and without prior disclosure, UATP imposed the Membership Plan fee and NAF fee, as well as certain "Direct Costs" which "shall equal your pro rata share of *Franchisor's cost of operating the Membership Program*…which costs include, but are not limited to, the following: credit card processing fees, collections management, and hosting (AWS)."  *See* Def. Ex. B (emphasis added).  Strikingly, these fees and assessments represent a real, pecuniary benefit to UATP and Conway received nothing of value in return.

The Direct Costs are particularly inequitable because UATP is forcing Conway to directly pay for the unlawful program it created without its consent.  This is on top of the 2.5% Membership Program Fee UATP collects.  Conway derives no benefit from paying once, much less twice, for an unlawful program it did not ask for and was not given a choice about whether it wanted to participate in.  Indeed, there is no demonstrable benefit Conway in a program that reduces revenue at the unit level and increases costs at the same time.

With respect to the NAF Fee, there is no benefit to a program that does not exist, has no staff, and is not providing benefit Conway.  *See* Compl. ¶ 124.  The "NAF Fee" is a pure money grab that is not authorized by the existing franchise agreements and provides no benefit Conway, who is required to invest in local marketing under the Franchise Agreement.  Moreover, the

Purported Amendment deliberately blurs the lines between a national marketing fund designed to promote the Membership Program and a broader, general national marketing plan.  Critically, the Purported Amendment explicitly states that:

> "While we intend to invest the NAF for the benefit of all franchisees, we have no obligation to spend any amount on advertising in an area in which a franchisee is located or to ensure that any particular franchisee benefits directly or pro rata from the placement of advertising."

*See*, Def. Ex. B.

By contrast, Conway's FDD and Franchise Agreement already speak to marketing via the properly disclosed local marketing requirement.  Indeed, Conway is already required to devote 5% of its Gross Sales to local marketing, and, notwithstanding, UATP's CEO, Michael Browning's repeated representations to Urban Air franchisees that they will not be required to spend more than $7500 per month on advertising, irrespective of the Gross Sales.

   2.   *The Purported Arbitration Agreement*

Perhaps most egregious, the Purported Amendment includes an arbitration agreement not present in the original Franchise Agreement and, critically, not included in the FDDs that Plaintiff was disclosed with, and which also purports to preclude Plaintiff from bringing a class action – which is a considerable right that was possessed by Conway in the Franchise Agreement.  *See* Def. Ex. B.  The Purported Arbitration Agreement is not supported by independent consideration and is, therefore, void.

The Purported Arbitration Agreement is deliberately overbroad and substantially alters the terms of the existing franchise agreements.  Sec. 4.1 of the Purported Amendment reads:

**4.1 ARBITRATION. TO THE FULLEST EXTENT PERMITED BY LAW, ANY DISPUTE BETWEEN (A) YOU AND ANY OTHER OWNER AND (B) FRANCHISOR AND ITS AFFILIATES, AND THEIR RESPECTIVE SUBSIDIARIES, DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SHAREHOLDERS, DESIGNEES, AND REPRESENTATIVES (COLLECTIVELY, THE "FRANCHISOR INDEMNITEES") ARISING**

CONWAY'S OPPOSITION TO
                    DEFENDANTS' MOTION TO COMPEL
                    ARBITRATION AND DISMISS OR TO STAY

**UNDER, OUT OF, IN CONNECTION WITH, OR IN RELATION TO (I) ANY CLAIM, (II) THE NEGOTIATION OF THIS AGREEMENT (INCLUDING ANY OTHER AGREEMENT BETWEEN YOU AND FRANCHISOR), (III) THE OFFER AND SALE OF THE FRANCHISE OPPORTUNITY, (IV) REPRESENTATIONS MADE PRIOR TO THE EXECUTION OF THIS AGREEMENT, AND (V) THIS AGREEMENT OR ANY OTHER AGREEMENT BETWEEN YOU AND FRANCHISOR, ANY ATTACHMENTS THERETO, OR THE ENFORCEABILITY OF THIS AGREEMENT MUST BE SUBMITTED TO BINDING ARBITRATION BEFORE A SINGLE ARBITER WITH THE AMERICAN ARBITRATION ASSOCIATION PURSUANT TO ITS COMMERCIAL INDUSTRY RULES IN EFFECT AT THE TIME THE ARBITRATION DEMAND IS FILED. ANY ARBITRATION DEMAND WILL BE SUBJECT TO THE FEDERAL ARBITRATION ACT. FRANCHISEE, THE OWNERS, AND THE FRANCHISOR INDEMNITIES AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.**

*See* Def. Ex. B, , § 4.1.

Strikingly, and in addition to rendering disagreements under the Purported Amendment subject to arbitration, the Purported Arbitration Agreement compels arbitration of *all* disputes between Conway *and other franchisees*, Conway and UATP, *and* Conway and a host of third parties who are not signatories to the Purported Arbitration Agreement, and misleadingly identified as "Franchisor Indemnitees."[1]  These "Franchisor Indemnitees" are not signatories to the Purported Arbitration Agreement and Conway has not been made privy to any indemnification agreement between such entities and UATP.

Despite the fact that UATP represented to Conway that the Purported Amendment was "necessary" to implement the Membership Program, it is clear UATP purposefully misled Plaintiff and underrepresented the scope of the arbitration agreement in order to wrest critical rights from

---

[1]     This is a curious term, which UATP defines in the Purported Arbitration Agreement (and nowhere else) as "franchisor and its affiliates, and their respective subsidiaries, directors, officers, employees, agents, shareholders, designees, and representatives."

Conway without consideration or appropriate disclosure. Among the claims that are included in the Purported Arbitration Agreement are: "(I) any claim…(III) the offer and sale of the franchise opportunity. . ., and (V) this agreement or any other agreement between you and franchisor, any attachments thereto, or the enforceability of this agreement…" *See* Def. Ex. B, § 4.1.

In its existing Franchise Agreement, there is no arbitration agreement nor was one disclosed in the 2016 FDD provided to Conway's principal before the Franchise Agreement was executed. Even if there were some argument that the Purported Arbitration Agreement, as it pertains to the Purported Amendment and the Membership Program, was supported by valid consideration – which it is not – Defendant has reached far beyond the scope of the Purported Amendment and seeks now to rewrite essential terms of Conway's 2016 Franchise Agreement. This Court should make no mistake – giving up the right to utilize the courts is no small thing. Yet, Defendants insist Conway surrender its fundamental right to the courts without consent or providing valuable consideration. This failure of consideration renders the Purported Arbitration Agreement invalid.

Here, UATP misrepresented not only the purpose of the Purported Amendment, but also the need for the new ACH funds transfer form. While UATP claimed it was merely to permit the transfer of Membership Plan fees from, and percentage revenues to, franchisees, in reality the new ACH transfer fund was a backdoor effort to obtain permission for automatically transferring heretofore undisclosed fees to UATP and its affiliates. *See* Plaintiff's Original Petition ¶¶ 104, 106-112. Strikingly, UATP's General Counsel, Steven Polozola, falsely claimed that "Section 6.F. of your Franchise Agreement requires that 'you must participate in Franchisor's then-current electronic funds transfer program authorizing Franchisor to utilize a pre-authorized bank draft system.'" *Id.* ¶ 113. This is demonstrably false, because that section of the Franchise Agreement

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

does not require Conway permit electronic funds transfers to (or from) third parties for any reason. *Id*. ¶¶ 114-115.   Rather, it requires only that Conway permit withdrawals for those transfers specifically laid out in the Franchise Agreement.   *Id*. ¶ 116.

 Here, UATP commandeered the execution of the Purported Amendment under false pretenses and by fraudulently misrepresenting the nature, scope and extent of the Purported Amendment.   In executing the Purported Amendment, Plaintiff received no cognizable benefit and the Purported Amendment is unenforceable for want of consideration and because it lacks the essential elements to form a binding contract under Texas law.   Consequently, there is no agreement to arbitrate and the Defendants' motion should be denied.

**B.**    **The Court Should Determine Arbitrability and There is No "Clear and Unmistakable Evidence" that the Parties Agreed to Arbitrate the Question of Arbitrability.**

 Under Texas law, this Court functions as the gatekeeper and determine whether this dispute should be sent to arbitration. *RSL Funding, LLC v. Newsome*, 569 S.W.3d 116, 121 (Tex. 2018). As the Texas Supreme Court noted, "[t]he U.S. Supreme Court has explained that there are three types of disagreements in the arbitration context: (1) the merits of the dispute; (2) whether the merits are arbitrable; and (3) who decides the second question."   *RSL Funding LLC*, 569 S.W.3d at 120 (*citing First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 942, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)).

 While parties are free to contract away the third question (who decides what is arbitrable), in the absence of express language, the Court will make the arbitrability decision by default.   *Id.* "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options of Chi., Inc.*, 514 U.S. at 944 (*citing AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 89 L. Ed. 2d 648, 106 S. Ct. 1415 (1986)).   Texas has accepted this standard.   *See Robinson v. Home Owners Mgm't*

*Enters., Inc.*, 590 S.W.3d 518, 532 (Tex. 2019) (*citing First Options of Chi., Inc.*, 514 U.S. at 944).

This is so because "the law treats silence or ambiguity about the question 'who (primarily) should decide arbitrability' differently from the way it treats silence or ambiguity about the question 'whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement' -- for in respect to this latter question the law reverses the presumption." *Id*. As the United State Supreme Court held in *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70, 130 S. Ct. 2772, 177 L. Ed. 2d 403 (2010):

> "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other. The additional agreement is valid under [9 U.S.C.] § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract,' and federal courts can enforce the agreement by staying federal litigation under [9 U.S.C.] § 3 and compelling arbitration under [9 U.S.C.] § 4."

Once that decision is made, however, "before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, ____ U.S. _____, 139 S.Ct. 524, 530 (2019). Here, the Court must first determine arbitrability and then adjudicate whether the arbitration agreement is valid.

For the reasons stated above, there is no enforceable agreement to arbitrate. However, to the extent the Purported Arbitration Agreement itself is valid – which it is not – there is no express provision granting the right to determine arbitrability to the AAA and, therefore, this Court has exclusive jurisdiction over the question.

Here, the Purported Arbitration Agreement (Def. Ex. B, § 4.1) is bereft of any express provision which would confer the question of arbitrability to the AAA. In the absence of such express language, this Court must retain jurisdiction because, "a contract that is silent on a matter cannot speak to that matter with unmistakable clarity." *Robinson v. Home Owners Mgm't Enters., Inc.*, 590 S.W.3d at 532 (*quoting Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624,

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

632 (Tex. 2018)). *Home Owners* and *Jody James* represent binding authority on this Court.

Defendants argue that because § 4.1 of the Purported Amendment subjects "any dispute [relating to] enforceability of this agreement must be submitted to binding arbitration," coupled with a reference to the AAA's Commercial Rules, this amounts to a "clear and unequivocal" evidence of an intent to grant the AAA the authority to address the gateway question of arbitrability. Defendants ask this Court to depart significantly from the principles of *stare decisis* and follow several unpublished opinions, including an out-of-context footnote in a recent, unreported appellate decision of the Ft. Worth Court of Appeals, in order to shoe-horn the notion that a reference to the AAA Commercial Rules is sufficient for this Court to find "clear and unmistakable" evidence that both parties agreed to have issues of arbitrability decided by the AAA. Def. Br. p. 5. Strikingly, none of the cases cited by UATP speak to a situation akin to this one, where an existing contract was unilaterally modified under false pretenses by an amendment which contained an unconscionable arbitration provision that fundamentally altered the parties' ability to redress wrongs in a court of law.

In *Diligent Tex. Dedicated LLC v. York*, NO. 02-17-00416-CV, 2018 Tex. App. LEXIS 7146 (Tex. App. –Ft. Worth 2018, pet. denied), the Court of Appeals was discussing the issue of *waiver of the right to arbitrate*, which occasioned the reference to the footnote in question. *See Diligent Tex. Dedicated LLC*, 108 Tex. App. LEXIS at * 9. The question of arbitrability is conspicuously absent from the *Diligent* opinion in general. However, the relevant text of this all-important footnote established that *Diligent* is <u>not</u> a departure from the precedent established in *Robinson* and *Jody James*:

> We have previously held that the incorporation of AAA rules in an arbitration agreement generally, though not always, indicates that the parties have agreed that the arbitrator rather than the trial court will decide arbitrability questions. *Haddock v. Quinn*, 287 S.W.3d 158, 172 (Tex. App.—Fort Worth 2009, pet. denied) (noting

that courts require unmistakable evidence that parties intend for an arbitrator to decide gateway matters so as not to "force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide" (*quoting First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-95, 115 S. Ct. 1920, 1924-25, 131 L. Ed. 2d 985 (1995)))

In *Haddock*, which *Diligent* references, the court reviewed decisions from various jurisdictions, but could not find on the facts before it a categorical imperative that references to the AAA Rules, of themselves, compelled the Texas courts to defer the question of arbitrability to the arbiter. *Haddock v. Quinn*, 287 S.W.3d at 175. Moreover, *Haddock* made clear that, for a court to imply the issue of arbitrability was conferred by contract to the arbitrator, the arbitration provision had to be "unequivocal." *Id*. at 174. Here, the Purported Arbitration Agreement is not unequivocal: it contains numerous carveouts reserved solely for UATP.[2] Particularly egregious is § 4.2.6, which reads:

> 4.2.6 Claims, including claims by an affiliate of Franchisor, seeking recovery or any other remedy based on Franchisee's failure to pay any moneys due under this Agreement, any agreement with an affiliate of Franchisor, or any unpaid invoices owed to an affiliate of Franchisor when due.

This is in stark contrast to § 4.1(b), which requires Conway to arbitrate *all* claims it may have against UATP's affiliates (which it defines therein as "Franchisor Indemnitees").

Defendants' reliance on the unreported opinion, *Dow Roofing Sys., LLC v. Great Comm'n Baptist Church & Chamberlin Dall., LLC*, NO. 02-16-00395-CV, 2017 LEXIS 7370 (Tex. App.—Fort Worth Aug. 3, 2017, pet. denied) is likewise misplaced. In *Dow*, the Court of Appeals found reference to the AAA Construction Rules dispositive on the issue of arbitrability in a very different fact pattern than the one here, and where the sole argument against applying the AAA Construction Rules was the defendant's unsuccessful claim that provisions of the arbitration agreement were

---

[2]    UTAP reserves six, broad categories of disputes which it need not refer to arbitration.

inconsistent with the AAA rules, rendering the arbitration unconscionable, was dismissed by the Court. *Dow Roofing Sys., LLC,* 2017 LEXIS 7370 at *8 (*citing Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 68-69, 130 S. Ct. 2772, 2777, 177 L. Ed. 2d 403 (2010). Likewise, the agreement to arbitrate in that case was found in the original agreement between the parties, not an after-the-fact amendment, which was procured without consideration, through fraudulent means, and under false pretenses. The fact that there is no agreement to arbitrate in the original Franchise Agreement further underscores the fact that there is no "clear and unmistakable" evidence that both parties agreed to have issues of arbitrability decided by the AAA.

In light of the fact that there is no "clear and unequivocal" evidence the parties intended to grant the AAA the authority to determine gateway questions of arbitrability, this Court should find it retains jurisdiction over that issue.

## C.     The Arbitration Provision Is Unenforceable and Unconscionable.

As a threshold matter, the Purported Arbitration Agreement found in the Purported Amendment, to the extent it is an enforceable agreement (which it is not), is subject to the Federal Arbitration Agreement ("FAA"), 9 U.S.C. §§ 1-307. The FAA permits a party to challenge the enforceability of the arbitration agreement on  any "grounds as exist at law or in equity for revocation of any contract." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 131 S. Ct. 1740, 1746, 179 L. Ed. 2d 742 (2011) ("This saving clause [in 9 U.S.C. § 2] permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."); *Fogal v. Stature Constr., Inc.,* 294 S.W.3d 708, 715 (Tex. App. 2009) (*quoting* 9 U.S.C.S. § 2); *see also In re Poly-America, L.P.,* 262 S.W.3d

337, 347 (Tex. 2008) (*citing First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.

Ct. 1920, 1924, 131 L. Ed. 2d 985 (1995))

Such defenses to contract include fraud in the inducement and unconscionability. *See In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). "In determining the validity of an agreement to arbitrate under the FAA, courts must first apply state law governing contract formation.")). "[O]rdinary principles of state contract law determine whether there is a valid agreement to arbitrate." *Id.* (*citing In re Kellogg Brown & Root*, 166 S.W.3d 732, 738 (Tex. 2005); *see also In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2003).

Under Texas law and the FAA, the determination that a contract containing an arbitration clause is fraudulent does not automatically render the arbitration agreement void. *Fogal* at 719 (*citing Will-Drill Resources, Inc. v. Samson Resources Co.*, 352 F.3d 211, 219 (5th Cir. 2003) (applying severability doctrine). The question of whether the arbitration agreement was *also* obtained through fraud is a question for the trial court "when it is determining whether to compel arbitration." *Id.* (*citing First Options of Chicago, Inc.*, 514 U.S. at 943, 115 S. Ct. at 1924). If, after addressing the question of whether the arbitration agreement was procured through fraud in the negative, the trial court compels arbitration, questions of fraud with respect to the entire agreement can be addressed in that forum because " the remaining part of the contract [ ] is severed from the arbitration agreement." *Fogal* at 719-720 (*citing In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 647-49 (Tex. 2009)).

Here, Plaintiff Conway argues the Purported Arbitration Agreement was procured through fraud and, as a result, the Court should retain jurisdiction over the parties' dispute.

1.    *The Arbitration Agreement is the Product of Fraud and/or Duress.*

Under the laws of the State of Texas, the elements of fraud are "a material

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, *which was intended to be acted upon*, which was relied upon, and which caused injury." *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994) (*quoting DeSantis v. Wackenhut Corp*., 793 S.W.2d 670, 688 (Tex. 1990), (*citing Stone v. Lawyers Title Ins. Corp*., 554 S.W.2d 183, 185 (Tex. 1977) (emphasis added))).  The elements for fraudulent inducement are the same as common law fraud in Texas.  *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 758 (Tex. 2009).

As set forth in the Petition, UATP made numerous, false representations of fact concerning, among other things, the nature of the Membership Program, the necessity of executing the Purported Amendment in order to participate in the Membership Program, and the contents and import of the Purported Amendment.  *See* Plaintiff's Original Petition. ¶¶ 103-105.   These promises and statements also applied to the arbitration agreement contained within the Purported Amendment with equal force.  For example, UATP intended that Conway believe the Purported Amendment's arbitration provision was limited only to the disputes due to the Membership Plan.  However, UATP knew these statements were false when they were made.  The Purported Arbitration Agreement, in reality, fundamentally alters Conway's rights as enjoyed under the Franchise Agreement.  None of this information was disclosed to Conway when he was forced to sign the Purported Amendment and the Purported Arbitration Agreement.

Plaintiff executed the Purported Amendment because it was already a franchisee in the system who relied upon their franchisor's claim that the Purported Amendment would not materially alter the terms of the franchise agreements they signed, but rather cover only a new program – the Membership Plan.  *See* Exh. A.  This was demonstrably false, and Plaintiff has suffered the loss of key, contractual rights as a result, including the right to freely associate and to

bring claims in a court of law.

Likewise, under Texas law, duress requires unlawful conduct or the threat of unlawful conduct of such a character as to destroy the other party's exercise of free will and judgment. *Dallas County Cmty. Coll. Dist. v. Bolton,* 185 S.W.3d 868, 878-79. Here, UATP's threats of non-payment of membership revenues and notice of default and/or termination if the Purported Amendment was not signed destroyed Plaintiff's exercise of free will and judgment, and left Plaintiff with no meaningful choice but to sign.

For these reasons, the Court should find the arbitration agreement unenforceable because it was procured through fraud and/or duress.

2.      *The Arbitration Agreement is Void Because it is Unconscionable*

Even if the Court does not invalidate the arbitration agreement because it was procured through fraud and/or duress – which it ought to do for the reasons stated above – the Court should find it void because it is both procedurally and substantively unconscionable. From a procedural perspective, the arbitration agreement was and is a contract of adhesion and procured via fraud, duress and under false pretenses. Substantively, Conway received no consideration for surrendering its right to sue in court, waive its rights to assert a class action, pay additional fees or incur additional costs. Therefore, this Court should find the Purported Arbitration Agreement is void and unenforceable because it is unconscionable.

Under Texas law, unconscionable contracts cannot be enforced. *In re Poly-America, L.P.*, 262 S.W.3d 337, 348 (Tex. 2008). Texas State courts permit a showing of *either* procedural *or* substantive unconscionability, *or* both. *See In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677-679 (Tex. 2006). While Texas courts will not generally rescue a party from a bad deal, "[u]nconscionable bargains are [ ] an exception to the freedom that generally pervades contract

law." *Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014). "Unconscionability" is a term that "defies a precise legal definition because "it is not a concept, but a determination to be made in light of a variety of factors not unifiable into a formula." *Id.* (*quoting* 27 Stephen Cochran*, Texas Practice Series: Consumer Rights and Remedies* § 4.2 at 394 (3d ed. 2002); *see also* 1 James J. White &Robert S. Summers*, Uniform Commercial Code* § 4-3 at 294 (5th ed. 2006)).

"Substantive unconscionability" refers to the "fairness of the arbitration provision itself," while "procedural unconscionability" speaks to the "circumstances surrounding adoption of the arbitration provision." *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex. 2010) (*quoting In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 677 (Tex. 2006)). In general, a contract will be found unconscionable where the court finds that "given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *Id.* (*quoting In re First Merit Bank, N.A.*, 52 S.W.3d 749, 757 (Tex. 2001) (*citing* TEX. BUS. & COM. CODE § 2.302 cmt. 1)); *see, also Restatement (Second) of Contracts* § 208, cmt. b (1981). Finally, where the allegation is that the arbitration provision is, of itself, unconscionable, Texas courts will look to whether "the arbitral forum in a particular case is an adequate and accessible substitute to litigation, a forum where the litigant can effectively vindicate his or her rights." *Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 231 (Tex. 2014) (*quoting In re Olshan*, 328 S.W.3d at 894).

Here, Conway was already heavily invested in its Urban Air franchise (far in excess of $1,000,000 with a long term lease at the premises where the adventure park is located) when UATP foisted the Purported Amendment and its Purported Arbitration Agreement on it in late April 2019.

Conway was (falsely) told the Purported Agreement was necessary to implement the Membership Program in order to receive membership revenues and was demanded to sign it immediately. Regardless, Defendant implemented the Membership Program within days, whether franchisees like Conway signed it or not.  Simply, there was no meaningful opportunity to review the Purported Agreement and Purported Arbitration Agreement with, or without, counsel because UATP unilaterally instituted the Membership Program and the associated financing, billing and crediting Conway irrespective of its signature.  Nor was Conway granted an opportunity to negotiate any of the terms of the Purported Amendment or the Purported Arbitration Agreement.

In light of the foregoing, then, Conway was placed in an untenable position without meaningful choice – if it did not execute the Purported Amendment, which contained the Purported Arbitration Agreement, it was told it would not receive its membership revenues and threatened that it would be held in default under the Franchise Agreement and ultimately terminated thereby losing a multi-million dollar investment.  UATP used its superior position as franchisor to dictate a manifestly unfair amendment to Conway's Franchise Agreement upon it, which significantly altered material terms and conditions in UATP's favor and provided no benefit whatsoever to Conway in return. Indeed, there was no meaningful opportunity for Conway to "walk away" from the Purported Amendment without significant detrimental impact – and as such, the Purported Amendment is procedurally unconscionable.

Defendants have argued that this Court may find valid consideration for an arbitration provision in the "bilateral promise to arbitrate," but there is no such promise here.  Rather, and for the reasons set forth above, the Purported Arbitration Agreement is clearly a contract of adhesion. Texas defines a contract of adhesion as one where "one party has absolutely no bargaining power or ability to change the contract terms."  *Serv. Corp. Int'l v. Lopez*, 162 S.W.3d 801, 809 (Tex.

App.-Corpus Christi [13th Dist.] 2005) (*citing In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 370-71 (Tex. App.-Houston [14th Dist.] 2000, orig. proceeding)).  Admittedly, adhesion contracts are not *per se* unconscionable or unenforceable, and arbitration provisions are not *per se* unconscionable, either.  *In re U.S. Home Corp.*, 236 S.W.3d 761, 764 (Tex. 2007) (citations omitted).  Therefore, the Court must have more than the presence of an adhesion contract to render it unenforceable, which it undoubtedly does here.

Conway was and is at a complete disadvantage with respect to bargaining with UATP and had no opportunity to negotiate the terms of the Purported Amendment or the Purported Arbitration Agreement because it was already operating the franchise in accordance with the Franchise Agreement.  (*See* Exh. A).  Rather, UATP foisted those additional terms and condition upon Plaintiff and demanded they be signed and used false and misleading statements about the scope of these agreements to obtain Conway's compliance and the threat of adverse consequences if the Purported Amendment was not signed.  By nature, UATP's franchise agreements are, themselves, strongly adhesive and require strict compliance with UTAP's operations manual and system requirements. The Membership Plan was introduced as a *new* system requirement, and deviation from the system for which Conway initially bargained for yet Conway was obligated to follow.  As set forth above, the degree of adhesion here is exceedingly high.

In addition, substantive unconscionability is shown where an arbitration provision unreasonably favors the party with stronger bargaining position.  The arbitration provision here is decidedly one-sided.  While franchisees are effectively limited to bringing any and all claims they may have against UATP, or its "Franchisor Indemnitees" in single arbitration, UATP has reserved several categories of claims as exempt from arbitration.  One, in particular, stands out:

> 4.2.6 Claims, including claims by an affiliate of Franchisor, seeking recovery or any other remedy based on Franchisee's failure to pay any moneys due under this Agreement, any

agreement with an affiliate of Franchisor, or any unpaid invoices owed to an affiliate of Franchisor when due.

*See* Def. Ex. B

§ 4.2.6 exempts Defendant from arbitrating claims for damages due to non-payment of money due and owing under the Purported Amendment, which is intended to modify the *entire* franchise agreement, as well as any other agreements made by franchisees with approved vendors. Yet, Conway is bound to arbitrate its claims with not only UATP, but also vendors it mandates, as well as other, unnamed affiliates of UATP.  Clearly, UTAP has reserved for itself a lower-cost alternative to arbitration which it denies franchisees.  This strongly indicates the arbitration agreement is unreasonably harsh with respect to the franchisees to the point of unconscionability.

The Court should find, based on the foregoing, that the arbitration agreement is procedurally and substantively unconscionable and deem it unenforceable as a matter of law.

Because the Court has ample evidence before it to establish that the Purported Arbitration Agreement is the product of fraud or in the alternative, an unconscionable agreement, it should find that the Purported Arbitration Agreement is void and unenforceable and DENY Defendants' Motion entirely.

**D.     The Request for Attorney's Fees Should be Denied.**

Conway does not contest the fact that the Franchise Agreement between it and UATP contains several provisions (§§ 13(G), 14(G), 23(G)) which shift counsel fees and costs from UATP to the franchisee.  However, in this instance UATP is likely referring to the language of § 23(G), which is not as expansive as UATP claims in the Motion.  Rather, the express language in the Franchise Agreement is more limited, obligating Conway to pay reasonable counsel fees and costs only where UATP is the "prevailing party" in a legal action rising out of or in connection with the Franchise Agreement.  *See* Def. Ex. A, p. 39, § 23(B).  Notably, the Franchise Agreement

defines "prevailing party" as a "party that is awarded actual relief in the form of damages, declaratory relief, or injunctive relief, as well as a party that successfully defends a legal action commenced against it." *Id*.

Per the express terms of the Franchise Agreement, UATP is not entitled to its fees and costs here, should it prevail on the Motion, because it will not obtain declaratory or injunctive relief, should the court compel arbitration. Nor would it obtain a damages award if it is successful. Further, UATP's success on this early, procedural motion – if it is successful – is not equivalent to a successful defense of a legal action.  Therefore, attorney's fees are wholly inappropriate in this context.

Moreover, and for the reasons set forth herein, Conway does not grant the validity of the Purported Amendment or the Purported Arbitration Agreement.  As these matters are directly in contest, it is wholly premature for any application for counsel fees and costs.  Only after this dispute is adjudicated can the Court be in a position to state whether, and to what extent the agreements here are covered by the of the Franchise Agreement.

## **CONCLUSION**

For the reasons set forth herein, Plaintiff Conway Urban Air, LLC respectfully requests this Court DENY Defendants' Motion.  This Court has the right and authority to exercise its jurisdiction over the parties' dispute because the Purported Amendment and the Purported Arbitration Provision contained within it is void and unenforceable.  Moreover, the Court has the authority to determine gateway issues of arbitrability which it should exercise here.

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

Respectfully submitted,

/s/ *Robert L. Chaiken*
Robert L. Chaiken
State Bar No. 04057830
rchaiken@chaikenlaw.com
Carrie P. Kitner
State Bar No. 24074921
ckitner@chaikenlaw.com

**CHAIKEN & CHAIKEN, P.C.**
5717 Legacy Dr., Suite 250
Plano, Texas 75024
Telephone: (214) 265-0250
Facsimile: (214) 265-1537

Andrew P. Bleiman
*(pro hac vice* application to be submitted)
andrew@marksklein.com
Mark I. Fishbein
*(pro hac vice* application to be submitted)
mark@marksklein.com

**MARKS & KLEIN, LLP**
1363 Shermer Road, Suite 318
Northbrook, Illinois 60062
Telephone: (312) 206-5162
Facsimile: (732) 219-0625

**ATTORNEYS FOR PLAINTIFF**

CONWAY'S OPPOSITION TO
DEFENDANTS' MOTION TO COMPEL
ARBITRATION AND DISMISS OR TO STAY

CAUSE NO. 017-316957-20

| | | |
|---|---|---|
| **CONWAY URBAN AIR, LLC,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| *Plaintiff,* | § | |
| | § | **TARRANT COUNTY, TEXAS** |
| **v.** | § | |
| | § | |
| **UATP MANAGEMENT, LLC,** | § | |
| **MICHAEL O. BROWNING, JR., and** | § | |
| **ALIX WREN,** | § | |
| *Defendants.* | § | **17ᵀᴴ JUDICIAL DISTRICT** |

---

## AFFIDAVIT OF JOSEPH TODDY

---

| | |
|---|---|
| **STATE OF ARKANSAS** | § |
| | § |
| **COUNTY OF WHITE** | § |

BEFORE ME, the undersigned authority, on this date personally appeared JOSEPH TODDY, the undersigned Affiant, who swore on oath that the following facts are true and correct.

1.      "My name is Joseph Toddy. I am over eighteen (18) years of age, of sound mind, and fully competent to make this Affidavit. I have personal knowledge of the facts stated herein and they are all true and correct. I have never been convicted of a felony or of a crime involving moral turpitude.

2.      I am a member and authorized representative of Conway Urban Air LLC ("Conway").

3.      Conway is an Arkansas limited liability company with its principal place of business in Faulkner, Arkansas.

EXHIBIT

A

4.      I was specifically told that executing the Amendment to Franchise Agreement (Membership Program) was "necessary" to implement the Membership Program, to receive membership revenues, and that its terms would only touch and concern the membership program.

5.      The Amendment to Franchise Agreement (Membership Program) was provided to me via DocuSign in a pre-printed, non-negotiable, electronic format.

6.      I was given no opportunity to negotiate or change any of the terms of the Amendment to Franchise Agreement (Membership Program).

7.      Rather, I was advised and made to believe by representatives of UATP Management, LLC via electronic communications and in online meetings that unless the Amendment to Franchise Agreement (Membership Program) that our business would not receive or be paid membership revenues from UATP Management, LLC which membership revenues were paid by customers directly to UATP Management, LLC.

8.      At the time of the execution of the Amendment to Franchise Agreement (Membership Program), based on various communications and statements from representatives of UATP Management, LLC, I understood and believed that UATP Management, LLC would provide me with a Notice of Default unless I signed the document presented to me.

9.      At the time of the execution of the Amendment to Franchise Agreement (Membership Program), based on various communications and statements from representatives of UATP Management, LLC, I also understood and believed and that if I failed to sign the Amendment to Franchise Agreement (Membership Program) that I risked termination of my Franchise Agreement which would have resulted in a total loss of my investment of well over $1,200,000.

10.     I had no meaningful choice but to execute Amendment to Franchise Agreement (Membership Program) and I signed it under duress and only so that I would not be defaulted under the Franchise Agreement or terminated.

11.     I was given little to no opportunity was given to review the Amendment to Franchise Agreement (Membership Program) before the Membership Program went into effect and UATP Management, LLC began levying the charges set forth therein.

12.     When I signed the Amendment to Franchise Agreement (Membership Program), I did not understand or agree to the substantial changes and modifications to my Franchise Agreement that UATP Management, LLC was imposing.

13.     Instead, I signed it because I was led to believe by representatives of UATP Management LLC that the Amendment to Franchise Agreement (Membership Program) was limited to the membership program and was going to simply allow me to receive membership revenues in connection with that program.

FURTHER AFFIANT SAYETH NOT."

_____
JOSEPH TODDY

SWORN TO AND SUBSCRIBED before me on this 16 day of July, 2020.



_____
NOTARY PUBLIC in and for the State of Arkansas

**AFFIDAVIT OF JOSEPH TODDY**                                                                                    3